UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

CITY OF BIRMINGHAM FIREMEN'S AND :    Civil Action No.
POLICEMEN'S SUPPLEMENTAL PENSION :
SYSTEM, Individually and on Behalf of All :    <u>CLASS ACTION</u>
Others Similarly Situated,                          :
                                       :    COMPLAINT FOR VIOLATIONS OF THE
                   Plaintiff,    :    FEDERAL SECURITIES LAWS
                                         :
     vs.                                      :
                                         :
RYANAIR HOLDINGS PLC and MICHAEL : 
O'LEARY,                                  :
                                         :
                 Defendants.    :

—————————————————— x    <u>DEMAND FOR JURY TRIAL</u>

Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System ("plaintiff") alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation of plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Ryanair Holdings plc ("Ryanair" or the "Company"), Company press releases and earning calls, and analyst and media reports about the Company.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Ryanair American Depositary Shares ("ADSs") between May 30, 2017 and September 28, 2018, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.      Ryanair is a Dublin-based airline operator.  It has used a low-fare business model to grow into the largest airline in Europe.  But, as was recently revealed, one of the secrets to the Company's success was its use of aggressive anti-employee practices.  Ryanair imposed suspect contracts to avoid labor laws, vehemently opposed any attempts at unionization, forced employees to pay for workplace basics such as training, uniforms and water, and banned employees from using Company electricity to charge their cell phones.  In 2017, after suffering through years of mistreatment and the ever-growing demands placed on them by management, pilots and other employees began to leave the Company en masse, which resulted in a shortage of the skilled workers necessary to continue Ryanair's operational growth.  Despite these defections, Ryanair publicly claimed that its employees were overwhelmingly satisfied with their "***industry leading***" pay and benefits and the alternatives to unionization that had been established by the Company.

- 1 -

3.    On September 14, 2017, it was reported that Ryanair had lost a key ruling in the European Court of Justice ("ECJ") that cast doubt on the legality of the Company's use of Irish employment contracts to evade local labor laws throughout Europe.  The next day, Ryanair announced that it would need to cancel up to 50 flights a day for the next six weeks due to pilot "schedul[ing]" issues, impacting some 315,000 customers.  Soon thereafter, reports began to circulate that the disruption was not due to scheduling issues as the Company had claimed, but rather to widespread defections by disgruntled employees.

4.    Then, in a stunning reversal, the Company conceded its need to recognize unions in December 2017.  However, Ryanair continued to downplay the extent of the labor unrest and conceal the expected impact to the Company's operations and financial results.  For example, on May 21, 2018, Ryanair stated that it remained the "*employer of choice*" for aviation workers in Europe and that its fiscal 2019 profits would fall within a range of "€1.25bn to €1.35bn."

5.    However, in the summer of 2018, discontent among Ryanair's workers continued to spill out into the open, belying defendants' public claims regarding improved labor relations. Workers in Germany, Belgium, Sweden, Portugal, Italy, the United Kingdom, the Netherlands and Ireland were forced into threatening collective action.  The resulting flight cancellations damaged the Company's brand and forced it to pay millions in compensation costs or to re-route fliers.

6.    Then, on July 23, 2018, Ryanair disclosed a 20% decrease in quarterly profits, due in part to a 34% increase in staff costs.  Shortly thereafter, on October 1, 2018, the Company revealed that it could not meet its annual profit guidance due to the lost fares and ballooning costs related to the strikes and flight cancellations.  By market close on October 1, 2018, the price of Ryanair ADSs had fallen to $80.93 per ADS, *36% below* the Class Period high of more than $126 per ADS.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

8.     Venue is proper in this District pursuant to §27 of the 1934 Act because certain of the acts and practices complained of herein occurred in this District and the ADSs that are the subject of this action are deposited with the Bank of New York Mellon in this District and traded on the NASDAQ Stock Market LLC (the "Nasdaq") in this District.

9.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

10.     Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System purchased Ryanair ADSs, as set forth in the accompanying certification incorporated herein by reference, and has been damaged thereby.

11.     Defendant Ryanair is an airline operator based in Dublin, Ireland.  Its ordinary shares trade on the Dublin Stock Exchange under the ticker symbol "RYA."  Its ADSs trade on the Nasdaq under the ticker symbol "RYAAY."  Each ADS represents five ordinary shares.

12.     Defendant Michael O'Leary ("O'Leary") has served as a director of Ryanair since 1988 and as the Company's Chief Executive Officer ("CEO") since 1994.

13.     Defendant O'Leary made, or caused to be made, false and misleading statements that artificially inflated the price of Ryanair ADSs.  Defendant O'Leary, because of his positions with the Company, possessed the power and authority to control the contents of Ryanair's quarterly reports,

press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. He was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions with the Company, personal participation in the fraud as detailed herein, and his access to material non-public information available to him but not to the public, defendant O'Leary knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. Defendant O'Leary is liable for the false and misleading statements pleaded herein.

## BACKGROUND

14.     Ryanair is an airline operator headquartered in Dublin, Ireland. The Company was the first European airline to emulate the low-fare, low-cost operating model pioneered in the United States by companies such as Southwest Airlines Co. Since its founding, the Company has rapidly expanded, as its annual booked passenger volume has grown from less than one million passengers in calendar year 1992 to more than 130 million passengers in fiscal year 2018.[1] The Company is now the largest airline in Europe.

15.     Defendant O'Leary has served as Ryanair's CEO since 1994. He built Ryanair's initial success by luring passengers with rock-bottom fares, while charging them for everything from checking their luggage to inflight food and drink.

16.     After a period of exceptional growth, Ryanair's reputation for poor customer service began to take a toll on its results. In response, in 2014 Ryanair announced it would be pursuing a new corporate strategy to improve customer service with its "Always Getting Better," or "AGB,"

---

[1]     The Company's fiscal year ends on March 31 of the calendar year. For example, its fiscal 2018 ended March 31, 2018.

program.  Defendant O'Leary publicly described the program as a "revolutionary" cultural shift where there would be "no more conflict." One of the key strategic initiatives of the AGB program was a "promise that every Ryanair flight will be crewed by a team of well trained and passionate professionals." In the years that followed, Ryanair experienced a period of rapid growth and financial success as it changed its public image.  For fiscal 2017, Ryanair achieved a net profit of more than €1.3 billion, a 150% increase over fiscal 2014 net profit of €523 million.

17.     However, Ryanair's new image of a conflict-free corporate culture concealed growing turbulence behind the scenes.  In the lead-up to the Class Period, the Company had placed ever greater demands on its pilots and other employees in the pursuit of higher productivity, even as it denied them fair contracts and decent working conditions.  The Company forced many of its employees to work as temporary contractors, rather than full-time employees, in order to minimize their workplace benefits and skirt local labor laws by imposing less worker-friendly Irish contracts on all of its employees.  The Company forced pilots to pay for basic training, cabin crews to cover the costs of their own uniforms, and even refused to cover the cost of water.  At one point, the Company banned employees from plugging into electrical sockets, going so far as to characterize the act as theft of Company electricity.  Moreover, in order to assert control over pilots, the Company limited seniority privileges and maintained the right to unilaterally move pilots to different bases across Europe.  A former pilot would later describe the conditions as "'social barbarism.'" Key to the imbalance of power between management and labor was Ryanair's vehement opposition to any type of freedom of association, actively disrupting any unionization effort.

18.     In sum, Ryanair's profit growth was built, in large part, on squeezing ever greater "productivity" out of its workers for as little cost as possible to the Company.  But, by mid-2017, the Company was facing a staffing crisis behind the scenes as skilled pilots and employees left the

Company in droves for competitors, and those who remained voiced ever greater dissatisfaction with their working conditions. As would later be claimed by the Irish pilots' union, 700 pilots left Ryanair in 2017 – or over ***17% of the Company's entire stable of pilots as of fiscal 2017 year end***. The Company masked these defections by hiring new, mostly younger and less qualified pilots. As a result, unbeknownst to investors, the Company's historical profit growth was built on an undisclosed and unsustainable foundation of worker exploitation and employee turnover. While Ryanair publicly maintained that its workers were satisfied and receiving "industry leading" pay and benefits, in truth the Company was poised for massive operational disruptions, as it could not continue to hire enough skilled workers to replace the workers that had left or persist in its obstinate opposition to the equitable treatment of its employees without wide-spread worker disturbances.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

19.   The Class period begins on May 30, 2017. On that day, Ryanair filed a release with the SEC on Form 6-K announcing its financial results for its fiscal year ended March 31, 2017. The release stated that Ryanair had experienced "a 6% increase in full year net profit to €1.316bn." It continued: "The combination of a 13% cut in average fares, coupled with Year 3 of the 'Always Getting Better' (AGB) programme delivered 13% traffic growth to 120m customers, and an industry leading 94% load factor. Unit costs fell by 11% (ex-fuel down 5%)." The release highlighted the Company's treatment of its workers and employees as a reason for the Company's success. In particular, the release stated that Ryanair had completed "***industry leading***" contracts with its pilot and cabin crew bases in Europe and that the ECJ had recently issued a ruling that validated Ryanair's treatment of its workers. The release stated in pertinent part:

> <u>**Our People**</u>
>
> Ryanair continues to recruit and invest in the best available talent. In FY17 we created over 1,000 new positions for pilots, cabin crew, engineers, and IT

developers, and we will create at least another 1,000 new jobs again in FY18.  Last year we promoted more than 900 people internally.  We invest continuously in staff training and have installed 3 fixed based simulators, 2 engineering training aircraft, and purchased a B737-700 specifically for pilot training so that our people can learn and develop on the very best equipment at no cost to themselves.

> *In April we negotiated new pay and condition agreements with 10 of our pilot and cabin crew bases which means that all of our 86 bases now enjoy 5 year agreements, which guarantee them industry leading rosters, and pay increases each year.  At a time when many of Europe's airlines are cutting pay, pensions, and jobs, this combination of job security and annual pay increases is a key attraction for Ryanair's people*.

> In April the European Court of Justice (ECJ) issued a positive ruling in the A-Rosa social tax case which – although it does not involve Ryanair directly – clarifies the social tax status of international transport workers.  This now allows Ryanair to return to the French Courts to recover the unlawful double-charges (approx. €15m) imposed on Ryanair and our people.  The A-Rosa decision should also halt actions by the Italian Authorities who have sought to double-charge social taxes which have already been validly paid in Ireland under EU law.

20.     Also on May 30, 2017, Ryanair hosted a conference call with analysts and investors to discuss the Company's fiscal 2017 financial results.  In his prepared remarks, defendant O'Leary stated that the "***outstanding***" contracts the Company had negotiated with its pilot and cabin bases offered "***a key attraction for Ryanair's people***" and a competitive advantage for the Company.  He again highlighted the ECJ ruling as validating the Company's employee model, stating in pertinent part:

> *In April we negotiated new pay and condition agreements through collective bargaining process with 10 of our pilot and cabin crew bases, which were outstanding.  It means now that all of our 86 bases are covered by five year pay and conditions agreements, which guarantees both our pilots and cabin crew industry leading rosters, pay increases every year*.

> *At a time when many of Europe's airlines are cutting pay, pensions, and jobs; this combination of job security and annual pay increases is a key attraction for Ryanair's people*.  We also had a major win in the European Court of Justice ruling in the A-Rosa case.  It means that the French and to a lesser extent the Italians will now have to stop trying to ignore Irish Social Tax Certificates what are called A101s.  It means we're now returning to the French courts to recover about EUR15 million of unlawful double-charge double taxation, which was imposed on us in

France and provisions made for similar charges in Italy where we expect will now fall away.

21.     Later in the call, in response to an analyst question about the planned wage increases, defendant O'Leary stated that a 2% annual wage increase was a reasonable assumption that had been "***locked away***" by the negotiated contracts "***for the next three or four years***."  He also claimed that Ryanair's collective bargaining apparatus was beloved by its employees and that the "***vast majority***" of employees opposed unionization, which allowed Ryanair to avoid the strikes and other work disturbances plaguing other airlines.   Defendant O'Leary went on to reject what he called "[in]accurate" and "idiotic criticisms" of the Company's labor policies and represented that unionization would not be "***an issue for the foreseeable future***" because of broad support among employees with the current arrangement.   He stated in pertinent part:

> On the wage deals, yes Mark, ***2% is a reasonable assumption***.  That's certainly our budgeted year assumption and ***that's locked away not just for this year, but for the next three or four years.  I think that's important at a time when you see airlines across Europe either being threatened with strikes by their pilots and their cabin crew***.  We've seen it in [Harp] or we see it in some of the French airlines, easyJet seem [sic] to have regular types of strikes during the summer period.  ***We don't have that kind of wage inflation in Ryanair.  It's also important that I emphasize to investors too that we have a very sophisticated collective bargaining infrastructure within Ryanair at all of our 86 bases***.  This was tested by the Irish unions and it went all the way to the Irish Supreme Court who confirmed that actually we do have a collective bargaining and all of our people are covered by collective bargaining.

> Everybody who works in Ryanair is also protected by the Irish Constitution where they're entirely free to join a union and they're entirely free if they so wish to have a union representative.  ***Now the vast majority of our people don't want to be represented by unions, they prefer to deal directly with us and we'll continue to encourage that***.  We still scratch our heads at some of the recent coverage that came out of Scandinavia where a couple of investment funds said they weren't going to invest in Ryanair because of ***concerns about our labor policies.  It is being driven by some not very accurate coverage from some of these proxy firms***.  We closed the base in Copenhagen and moved the aircraft outside of Copenhagen because the SAS unions were allowed to engage in secondary picketing and blockade our aircraft.  In fact since that, we've grown to be the third largest airline in Copenhagen and we account for about 90% of Copenhagen's growth over the last two years.

But we are not going to be blackmailed or held to ransom by anybody else's union whether it's the SAS union up in Scandinavia or the Aer Lingus union in Dublin or pilot unions anywhere. And I think there is a case coming up, the model case which will come out sometime later this year is likely to result in more local contracts, which may require a change in Irish legislation where currently pilots and cabin crew have to pay their taxes in Ireland, which by the way Ireland is a high tax country for personal taxes. It would be good for us if we have a system in Europe of local contracts and the model case may bring that about sometime later this year. It will not lead to a unionization. If we're threatened by unionization in any one base, I think we will be considering either freezing or closing those bases. But it would be much more helpful to us to move to a structure of local contracts as we increasingly establish what are much more now permanent bases across 34 countries in Europe.

**So, wage inflation is low. We have a very sophisticated collective bargaining system. We reject some of the idiotic criticism that came out of some Scandinavian pension forums recently that somehow we don't deal with our employees, our employees are not covered by collective bargaining when they are. And we do not see unionization being an issue for the foreseeable future**.

22.    On July 24, 2017, Ryanair filed a release with the SEC on Form 6-K announcing its financial results for its fiscal quarter ended June 30, 2017. The release stated that Ryanair had experienced "a 55% rise in Q1 profit to €397m" and that "[t]raffic grew 12% to 35m as Ryanair's lower fares and 'Always Getting Better' (AGB) programme delivered a record 96% load factor."

23.    On July 25, 2017, Ryanair filed its 2017 annual financial report on Form 20-F with the SEC, which was signed and contained a signed certification by defendant O'Leary attesting to the report's accuracy and compliance with the federal securities laws (the "2017 20-F"). The 2017 20-F highlighted the Company's recently negotiated long-term contracts with all of its employees and their access to collective bargaining units, stating in pertinent part:

Ryanair currently conducts collective bargaining negotiations with groups of employees, including its pilots and cabin crew, regarding pay, work practices, and conditions of employment, through collective-bargaining units called Employee Representative Committees ("ERC"). **Following negotiations through this ERC system, pilots at all of Ryanair's 86 bases are covered by four, five or six year collective agreements on pay, allowances and rosters which fall due for negotiation at various dates between 2018 and 2023. Cabin crew at all of Ryanair's bases are also party to long term collective agreements on pay, allowances and rosters, which expire in March 2021.** Limitations on Ryanair's flexibility in dealing with its employees or the altering of the public's perception of Ryanair generally could have

a material adverse effect on Ryanair's business, operating results, and financial condition.

\*        \*        \*

Ryanair's crews earn productivity-based incentive payments, including a sales bonus for onboard sales for flight attendants and payments based on the number of hours or sectors flown by pilots and flight attendants (within limits set by industry standards or regulations governing maximum working hours). During the 2017 fiscal year, *such productivity-based incentive payments accounted for approximately 40% of an average flight attendant's total earnings and approximately 31% of the typical pilot's compensation. Pilots at all of Ryanair's 86 bases are covered by 4, 5 or 6 year collective agreements on pay, allowances and rosters which fall due for negotiation at various dates between 2018 and 2023. Cabin crew at all Ryanair bases are also party to long term collective agreements on pay, allowances and rosters which expire in March 2021. In April 2017, Ryanair agreed to increase the pay of pilots and cabin crew in accordance with the terms of individual base collective agreements*. Ryanair's pilots are currently subject to IAA-approved limits of 100 flight-hours per 28-day cycle and 900 flight-hours per fiscal year. For the 2017 fiscal year, the average flight-hours for Ryanair's pilots amounted to approximately 70 hours per month and approximately 842 hours for the complete year, a 2% increase on the previous fiscal year.

24.    The 2017 20-F also stated that Ryanair's relationship with its employees was "good," based on "regular" discussions with employee collective bargaining units by "Ryanair's senior management," and that the Company would "*not face significant difficultly in hiring and continuing to employ the required personnel*" sufficient to meet its growth plans, stating in pertinent part:

> *Based on its experience in managing the airline's growth to date, management believes that there is a sufficient pool of qualified and licensed pilots, engineers and mechanics within the EU to satisfy Ryanair's anticipated future needs in the areas of flight operations, maintenance and quality control and that Ryanair will not face significant difficulty in hiring and continuing to employ the required personnel*. Ryanair has also been able to satisfy its needs for additional pilots and flight attendants through the use of contract agencies.

\*        \*        \*

> *Ryanair considers its relations with its employees to be good*. Ryanair currently negotiates with groups of employees, including its pilots, through "Employee Representation Committees" ("ERCs") regarding pay, allowances, rosters, work practices and conditions of employment, including conducting formal

- 10 -

negotiations with these internal collective bargaining units. Ryanair's senior management meets regularly with the different ERCs to consult and discuss all aspects of the business and those issues that specifically relate to each relevant employee group and where necessary to negotiate with these collective bargaining units. Following negotiations through this ERC system, pilots and cabin crew at all Ryanair bases are covered by long term collective agreements which provide certainty on cost, pay and conditions.

25. The statements referenced in ¶¶19-24 above were materially false and/or misleading when made because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them:

(a) that the Company had experienced a breakdown in relations with its employees amidst their growing dissatisfaction with working conditions, lack of benefits, exploitative contracts and management hostility;

(b) that the Company's pilots and/or cabin crews had sought union recognition or collectivization in several key markets – including Ireland, the United Kingdom, Germany and other bases – and employees had internally expressed widespread discontent with the Company's collective bargaining units;

(c) that the Company was experiencing elevated and increasing employee turnover, which had resulted in the loss of hundreds of qualified and skilled employees, including pilots, to competitor airlines;

(d) that the Company's newly negotiated contracts had not ameliorated employee discontent or "locked away" employee wage growth for three or four years, but rather, defendants were aware that pilot and cabin crew contracts had to be reformulated to significantly increase pay and benefits, comply with local labor laws and provide other worker concessions to enable Ryanair to hire and retain sufficient qualified employees to meet operational targets;

(e)     that, because of (a)-(d) above, the Company was unable to hire sufficient pilots to meet expected demand and was thereby exposed to increased risk of flight cancellations, loss of reputational assets and increased costs from flight disruptions;

(f)     that, because of (a)-(e) above, the Company's historical operating model and profit growth were not sustainable; and

(g)     that the Company could not meet internal earnings expectations.

26.     On September 14, 2017, the ECJ ruled against Ryanair's practice of imposing Irish jurisdiction for labor contracts on all staff.  As a result, the Company's workers were provided recourse to local jurisdictions for contract disputes and potential entitlements under local labor laws. The next day, Ryanair announced that it would be canceling up to 50 flights a day for six weeks to increase "punctuality."  Soon thereafter, media reports began to claim that Ryanair was attempting to cover up a massive outflux of pilots and other key personnel due to dissatisfaction with working conditions at the Company.  For example, on September 18, 2017, *The Irish Times* reported that the Irish pilots' union, IALPA, had determined that "***more than 700 pilots left Ryanair in its latest financial year, creating a significant new pilot and training challenge for the airline***."  Similarly, that same day, *The Journal* reported that 140 Ryanair pilots had gone to a single competitor, Norwegian Air, in the past year alone.

27.     In response to this news, the price of Ryanair ADSs declined from $114.09 per ADS to $107 per ADS between September 13, 2017 and September 18, 2017, a decline of more than $7, or 6%, on abnormally high trading volume.  However, the price of Ryanair ADSs remained artificially inflated as defendants continued to make material misstatements and conceal the true reason behind the flight cancellations, pilot defections, increased labor costs and the likelihood of collective actions.

28.     On September 18, 2017, Ryanair filed a release with the SEC on Form 6-K providing an update on flight cancelations.  The release quoted defendant O'Leary, who forcefully rebutted reports that the cancellations were due to a loss of pilots, stating in pertinent part:

> "*Ryanair is not short of pilots – we were able to fully crew our peak summer schedule in June, July and August* – but we have messed up the allocation of annual leave to pilots in Sept and Oct because we are trying to allocate a full year's leave into a 9 month period from April to December.  *This issue will not recur in 2018* as Ryanair goes back onto a 12 month calendar leave year from 1st Jan to 31st December 2018."

29.     Also on September 18, 2017, Ryanair held a conference call with analysts and investors to discuss the flight cancellations and ECJ ruling.  Defendant O'Leary claimed that the flight cancellations were the result of "*a management (expletive) up, it's not a pilot shortage*."  He stated that any media reports to the contrary were false and that the Company had experienced only a minimal rate of employee turnover because of its "good pay" and "excellent rosters," stating in pertinent part:

> I have seen some comments out of Norwegian [Air] in recent days that they have hired 140 of our pilots in the last 12 months.  We don't believe that figure is accurate.  We have lost some pilots to Norwegian, mainly pilots of Scandinavian nationality.  *The figure, according to our records, [is] well under 100, or it's under 100 in the last 12 months*.

> And to put that in some context, as of today we employ over 4,200 pilots.  We would not have noticed 100 – or less than 100 pilots going to Norwegian.  *It is part of our normal pilot turnover, which on an annualized base is less than 5%*.

> *And we believe that we have a low rate of pilot turnover, it is under 5%, because of good pay, our excellent rosters* where we have fixed four – or five on, four days off and the banks of four weeks of annual leave, which give the pilot in effect not just 20 days of leave but also another 16 days [off], because we bank the leave in five day blocks with four days off.  So each pilot with a bank of 20 – four weeks leave gets in actual fact 36 days of total leave away from the organization while they are having that four weeks of leave.

> *                *                *

The unions are much beloved of this the world is running out of pilots.  Pilots by law can't fly more than 900 hours a year, which is about 18 hours a week.  Our captains

are paid between EUR150,000 and EUR180,000 a year.  It does take about three years to train somebody from being a first officer, junior first officer to being a captain.

> *But people getting paid that kind of money to do that – those kind of duty are flight hours less than 18 – are about 18 a week, you would never run out of the supply of*.

30.     Later in the call, defendant O'Leary stated that the Company would fix the "rostering" issue by slightly increasing flight crew levels, which would cost only "maybe EUR20 million or EUR30 million over a full 12-month period."  He stated the changes were "not something you're going to notice [truthfully] in our numbers."

31.     Defendant O'Leary also rejected claims that the ECJ ruling would lead to increased costs for the Company or the likelihood of unionization, because Ryanair's employees purportedly preferred the Company-sponsored collective bargaining units to unionization and were content with their working conditions and the competitive benefits Ryanair offered.  For example, defendant O'Leary represented that the ECJ ruling "*will not lead to an increase in pay; it will not lead to an increase in unionization*" because there "*is simply no great demand for unionization here at Ryanair,*" stating in pertinent part:

> *However this misinformation that's out there that somehow Ireland doesn't comply with European employment law or union rights or anything else is complete rubbish*.  Ireland guarantees everybody's, for example, freedom of association.  The right to join the union is protected by the Irish Constitution. *Everybody in Ryanair is free to join the union.  Nobody in 30 years has ever managed to make a claim that they were somehow denied*.

> And I've even seen some particularly inaccurate research which claims that somehow Ryanair's contract prohibits people joining unions.  *Nothing could be further from the truth*.  We would be in breach of Irish law, Irish Constitution if we ever in our 30 years produced a contract that prohibited people joining a union. People are free to join a union, *but the reality is that over our 30 years they prefer to deal directly with us and not through third-party unions and we expect that situation to continue*.

*     *     *

The Mons case will lead to more local course jurisdiction over our contract, but since the Irish contracts comply with almost all European rules and regulations *we think there will be very few amendments to our contract arising out of local course jurisdiction.*

\*     \*     \*

*But it will not lead to an increase in pay; it will not lead to an increase in unionization*.

On two separate occasions the UK pilots have sought – or a minority of UK pilots have sought to impose binding union recognition on Ryanair, which is a third-party process overseen by the UK government under which the pilots or a group of workers, in this case pilots, can vote in secret ballot undertaken by ACAS. And if a majority vote in favor they get unionization.

In two secret ballots, the pilots have never got more than 20% in favor of unionization. And that's a secret ballot mandated by a third-party. *There is simply no great demand for unionization here at Ryanair because in the main we have over a 30-year period managed to pay our people better, give them better rosters, give them more rapid promotion opportunities and give them more – better leave allocation if they continue to deal directly with us and we think that will continue to be the case*.

So any of this concern that the Mons case will somehow – is some breaking down of Irish contracts or weakening of our advantageous [Ts and Cs] is simply untrue. *We do not believe it will add to our pay, our latest pay. And certainly these claims that there will be 10% increases in pay is completely bogus and untrue*.

32.     In the weeks that followed the conference call, Ryanair continued to claim that media reports of widespread pilot dissatisfaction and high employee turnover were false, including during the Company's Annual General Meeting of shareholders held on September 21, 2017. During the conference, defendant O'Leary claimed that there was no discord between the Company and its pilots, because they were "*very well paid for doing what is a very easy job*," and that Ryanair was "*the airline of choice for young pilots*" because of its "very good pay" and "fixed rosters." He blamed rumors of discontent on a small minority of self-important rebels who did not reflect the views of the majority of the Company's employees. He also claimed that any employees who misbehave would be quickly and easily dealt with without adverse impacts to the Company's overall

operations.  Defendant O'Leary continued to contend that the Company would only accept unions "***when hell freezes over***."

33.     On September 27, 2017, Ryanair filed a release with the SEC on Form 6-K providing an update on flight cancelations (the "September 27 Release").  The September 27 Release stated that Ryanair would slow its planned growth during the winter season by flying 25 less aircraft beginning November 2017 and 10 fewer aircraft beginning April 2018 in order to "***eliminate all risk of further flight cancellations***."  The September 27 Release also contained a section entitled "For Ryanair's Pilots," which claimed that the Company had received "***widespread support***" from its pilots and that claims to the contrary were "***false***" and being spread by "***competitor airline[s]***."  It stated in pertinent part:

>    (A)     ***We appreciate the widespread support we have received from our 4,200 pilots over the past weeks***.  Hundreds of pilots, and many of their ERC's have been in regular contact with the airline offering to work days off, to work one week of their allocated month of leave, ***and offering to go public to correct the false claims made about them, and Ryanair, by competitor airline pilots in certain media outlets***.  We appreciate their professionalism which has meant that since last Monday (18th Sept.) Ryanair has operated over 16,000 daily flights with only 3 cancellations, and over 96% of all first wave flights departing on time.

>    (B)     This slower growth will provide stability to pilot rosters from November to March We will not need pilots to give up one week of their well-earned annual leave from Nov. onwards.  Slower growth creates a large surplus of standby pilots so we can allocate all annual leave due in the 3 months to December, and more again in Q1 of 2018.

>    (C)     We have communicated these changes by email to Ryanair pilots today.  We have assured them that all their annual leave is protected.  ***This now eliminates the roster problems this winter, because slower growth means we no longer require our pilots to reorganise their annual leave***.

>    We are implementing a €10,000Capts/€5,000F.O. base supplements at Dublin, Stansted, Berlin and Frankfurt from 1st October as we agreed these pay increases with the 4 base ERC's at recent meetings.  We received requests from a number of other ERC's who wish to discuss these issues, and we have agreed to schedule meetings with these ERC's over the coming months.

- 16 -

(D)     *We will not respond or accede to anonymous demands made via unsigned emails for group or regional meetings, or for union interference at these internal ERC meetings.  Many of our pilots and ERC's have confirmed that these unsigned letters were drafted by pilots/unions of competitor airlines who wish to pursue an industrial relations agenda at the expense of Ryanair and its pilots*.

(E)     *We have also written to our pilots to correct last week's false claims made about our pilot recruitment*.  In the current year under 100 Captains have left (mainly to retirement or long haul airlines) and less than 160 F.O's (mostly to long haul airlines).  Over the next 8 months Ryanair has recruited and will train over 650 pilots not only to replace these leavers/retirees but also to crew up for the 50 new Boeing aircraft we will buy to May 2018 to bring our fleet to 445 for S18.  *Contrary to false claims of pilot shortages, Ryanair has in recent weeks seen a big surge in pilot applications from Gulf carriers and in Germany and Italy where both Air Berlin and Alitalia are in bankruptcy and hundreds of their pilots are facing job losses or steep cuts in their pay and conditions*.

34.     On October 31, 2017, Ryanair filed its financial report with the SEC for the six months ended September 30, 2017 on Form 6-K (the "October 31 Release").  The October 31 Release stated that Ryanair had experienced an "11% increase in H1 profit to €1.29bn" and that "[t]raffic grew 11% to 72m."  The October 31 Release provided an update on the "one-off" "rostering" issues experienced during the quarter, claiming that the problem had been resolved and the risks of further cancellations "*eliminate[d]*," stating in pertinent part:

**Pilot Rostering Failure & Recovery**

In early September we suffered a material failure in the management of our pilot rostering function.  *We are not short of crews*, with over 4,200 pilots (5.2 crews per aircraft) and have hired over 900 new pilots this year to date.  We operated the peak summer schedule in July & August (12.5m customers monthly) without incident.  However as we entered September, a series of poor planning decisions created a perfect storm of one-off pilot shortages due to:

–>     Over-allocated calendar months of annual leave to over half our pilots in September, October, November and December;

–>     a bottleneck of over 200 new recruits were delayed being released to line flying by mis-managed blockages in the completion of their base training; and

–>     an insufficient focus on short term pilot recruitment in summer 2017 to allow for a one-off spike in annual leave from September to December 2017 caused by our agreement with the IAA to transition over a 9 month period (April to December

2017), to a new-agreed-calendar year FTL cycle from 1 January to 31 December 2018.

This rostering failure caused punctuality in the first half of September to plummet to the low 70%. We responded on Fri 15 September by taking a painful decision (solely to protect the other 98% of our customers) to cancel 50 (2%) of our 2,200 daily flights for the last 6 weeks of September & October. Then on Wed 27 September we announced the grounding of 25 (6%) of our 400 aircraft fleet for the 5 month winter season from November to March 2018. These very difficult and disruptive decisions quickly restored our schedules to 90% punctuality for the 99% of customers who were unaffected by these disruptions, and eliminated any further rostering cancellations.

\* \* \*

*This rostering failure has challenged us to address the competitiveness of our pilot pay, as well as pilot concerns about communications, career progression and basing. While our pay was already slightly higher than B737 competitor airlines, we could have responded sooner to a tightening market for experienced F.O's with pay increases for our experienced pilots, reinforcing our long standing and successful ERC collective bargaining process, and improving the range and choice of bases and contracts we offer our pilots. We will now move from being "competitive" to offering materially higher (over 20%) pay with better career prospects, superior rosters, and much better job security than Norwegian, among others, can offer. We expect these measures, if/when accepted by all our pilot bases, will add some €45m to our FY18 crew costs (and up to €100m in a full year) but will not significantly alter the substantial unit cost advantage we have over all other EU airline competitors.*

\* \* \*

We are investing in new operations management which will shortly be headed by Peter Bellew returning from his successful stint as CEO of Malaysia Airlines. We have added resources to our pilot recruitment, base manager and rostering teams so that we can respond quickly to the needs of our pilots and cabin crew, promptly address their requests, and work more closely with them to facilitate opportunities at those bases where they wish to live and develop their careers. The test of any management team, is the speed and effectiveness with which they respond to a crisis, and the pilot rostering failure in early September was just such a crisis. *We have responded quickly to repair this failure, eliminate further cancellations and we are determined to invest the time, money and manpower to ensure that it never recurs.*

35.    In addition, the October 31 Release claimed that rumors of widespread pilot discontent or employees' desire for unionization were the product of a "**campaign of**

- 18 -

*misinformation*" being spread by "*competitor airline pilot unions*."  The October 31 Release stated in pertinent part:

### Collective Bargaining – some facts

> *One of the predictable by-products of this September rostering failure is a renewed campaign of misinformation by competitor airline pilot unions*.  Since Ryanair has, for over 30 years, operated a sophisticated collective bargaining process, *supported fully by our pilots and cabin crew* – confirmed and validated by the Irish Supreme Court – the only way our existing 5 year base agreements can be changed (some of which run to 2020) is by negotiation between the airline and our base ERC's.  This has already taken place successfully at over 10 bases.  The Stansted pilots have voted, in secret ballot, to reject this large pay increase and we will respect their wishes, and they will continue with the existing pay agreement at Stansted until 2020.  We will engage with the Stansted ERC to understand any concerns they may have, even while we add over 30 new pilots at Stansted in November on these new higher pay rates.  If Stansted pilots wish to reconsider or revote, they may do so at any time through their ERC.  However, we will not, and cannot, be forced to meet with any outside group such as the so called EERC which like REPA (2004) and RPG (2012) is a front for competitor airline pilot unions (BALPA, IALPA, ECA and even more bizarrely some U.S. pilot unions).

> \*          \*          \*

> *I'm sorry that our people have had to listen to misinformation about Ryanair promoted by competitor pilot unions, however we have been here before, and we will be again.  We understand that the reason they wish to denigrate Ryanair is because their airlines cannot compete with us*.  As usual when these union airlines fail, such as Monarch, Air Berlin and Alitalia in recent months, their pilots all come to Ryanair seeking jobs that pay up to €175,000 p.a., deliver a double bank holiday weekend every week, with the best promotions record and, the best job security in Europe.  We will continue to work hard to deliver for our people, our customers and our shareholders while these competitor unions will continue to rail and fail.

36.     Also on October 31, 2017, Ryanair held a conference call with analysts and investors to discuss the half-year results.  During the call, defendant O'Leary claimed that the rostering issue had been "*fixed*" and doubled down on his claim that overall the Company's workforce was content and supported the Company's policies.  He rejected what he called "*nonsense*" from "*some of the more idiot sections of the media that there's a shortage of pilots*."  He claimed that Ryanair had a "*flood of people who want to join us*" and that the "*relationship with the pilots is very good*" and "*it*

*will continue to be good because we are paying them extraordinarily well*." He stated in pertinent

part:

> These results cover the 6-month period where we suffered a material rostering failure in September. *We are not short of crews, nor are we short of pilots. We have more than sufficient pilots*.

> \*      \*      \*

> *So we are seeing a significant uptick in applications* from Air Berlin pilots, Monarch pilots, Alitalia pilots. And again, *it allays this nonsense that we have to keep hearing and particularly, in some of the more idiot sections of the media that there's a shortage of pilots*. I keep going back to the point. We have 2,500 qualified pilots on a waiting list. We're hiring about 40 a week at the moment. And this year to date we have hired over 900 pilots. There's another 2,500 waiting in the wings who want to join. But every year, I think I've been in this business, some of the unions somewhere is [sic] produced a study that says there's a worldwide shortage of pilot. If there is, it might affect maybe some regional or turboprop operators. *It's never going to affect a jet operator like Ryanair* that pays captains EUR 150,000 a year and promotes people from joining – 2 captains, say, typically within a 3- to 4-year period.

> \*      \*      \*

> Now I hasten that, if there is industrial action, we will not close bases. That will be too easy because that's what the competitor airline unions would want us to do. But we will move some aircraft out of certain bases if there was industrial action, that there will be consequences. And those consequences will not be to the advantage of those pilots. But we're not at that stage. *The relationship with the pilots is very good, despite what you might read in the papers. And it will continue to be good because we are paying them extraordinarily well. We're providing excellent job security. We're providing them with a roster that gives them a double bank holiday weekend at the end of every week of flying. And we continue to welcome literally hundreds of pilots to Ryanair on an annualized basis*. We're flying brand new aircraft and building up their hours and getting rapid promotion to captaincy. So I think the underlying, when you get – cut through the fog and the noise of the PR – and look. There would be another 6 months of negative PR generated by pilot unions in whatever country it happens to be, and their friends in the local media, who generally tend to be somewhat left-wing and pro-union, that's just where we are. But nobody buys those newspapers anymore anyway.

37.      During the conference call, defendant O'Leary also emphasized that the Company

had no need to further increase its pay for its pilots because current packages were sufficient and

- 20 -

that, if anything, labor costs would decrease from previously provided estimates, stating in pertinent

part:

> We have a huge cost leadership over everybody else.  Yes, we are – have suffered a rostering failure.  In part, we're dealing with that by significantly stepping up pilot pay.  I believe the pilots will accept those increased pay terms over the coming weeks and months.  But those that don't, then that's fine.  They'll continue under existing pay.

*      *      *

> **So the EUR 45 million might actually be reduced between now and the end of the year** by some or other of those bases who don't yet agree or aren't willing to agree to those pay deals.  And it's important – there has been quite a sea change in Stansted, for example, who this time last week were all full of fire and under or over – mainly because they were misadvised by the unions that if you reject this 22% pay increase and Ryanair come back with more.  That's not the case.  You reject this pay increase, then you're not getting – there won't be more.  You simply stay on the deal you're on.  And that's helpful.

*      *      *

> So we need to get [a] lot more professional and better at the way we service our pilots and our cabin crew, and fix the very silly and unnecessary grief we have caused them, certainly over the last 6 months.  **And why is it necessary to pay them 20% more?  It isn't.  But we want to pay our pilots more**.  We think they do a great job in Ryanair.  I love Ryanair's pilots.  I despise competitor airline new pilot unions, but I love our pilots and I've long done so.

38.     Defendant O'Leary also reiterated that Ryanair would remain a "nonunion company"

for the foreseeable future as it would not even "sit down" with any unions, stating in pertinent part:

> **Are we going to sit down with some pilot unions or competitor pilot unions or this EERC, which is the latest construct of these competitor pilot unions?  No, we won't.  There won't be any discussions with them now or at any time in the future**.  We have a – what is it, an exhaustive collective bargaining process.  I think it's important to understand, the pilots have participated in this process, this bargaining process for over 30 years.  It's no secret that the pilots at Stansted are on a 5-year pay deal that runs to 2020, that they voted on a secret ballot and approved by an overwhelming majority.  Now we're offering to improve those pay terms again.  They are perfectly free using the ERC to reject that offer.  But that doesn't mean there will be an alternative offer.  But we will continue to engage with them.  And with any other bases that have turned down the deal and want to discuss it further.  But there won't be any more money on the table.  I think what they are misunderstanding, and certainly what some of the media have misunderstood, is we're now offering pay

- 21 -

terms that are EUR 20,000 to EUR 25,000 more than any other – the other 737 low-cost carriers. ***We have a flood of people who want to join us***, from bankrupt companies and from those other inferior pay airlines. We're hiring 40 new pilots a week. And we're adding those pilots at those bases in Stansted and at other bases who have turned down the deal at the higher pay rates. So that is [the way] it will lie. We have seen all of the speculation about industrial action that – none of it which is backed up any facts whatsoever. But if they wish to take industrial action, they are free to take industrial action. But the last people to take industrial action were the SAS unions in Copenhagen, to which we responded by closing the base in Copenhagen and moving the aircraft out of there. While still growing over a[n] 80-month period to become the third-largest airline in Copenhagen.

*   *   *

It is important that we reestablish that clear blue water between Ryanair pay and competitor alternatives. Because we expect our guys and girls to deliver us more productivity. I think it's also, though, there is niche symmetry between – we're ensuring that we restore a significant pay premium to Ryanair pilots over our competitors. It also makes it much more difficult for the unions of competitor airlines to whisper in our pilots' ears, "Don't accept this big pay increase because we will do something. We'll get you, I don't know, redundancies like we got in Monarch or in Air Berlin." ***And we are determined, as has always been, we have been nonunion company for 30 years. We will remain a nonunion company by paying our people more and by fixing the broken elements of communication with pilots that undoubtedly broke this summer***. Where we (expletive)ed up their rosters, we messed up their days off. We didn't handle and we haven't handled well very reasonable requests for them for days off or leave or whatever it was. That should be basic tenets in the operation of any company. It has always been within Ryanair. You may not like the answer we give you to a request, but at least you get the answer pretty quickly. And even that fell down this summer. And I think that is a management failure. We have recognized there was a management failure. And we are investing very heavily, not just in pay, we're not – this thing is not going to be addressed by just paying them more. Although certainly, paying them more is a good way to start off addressing it. But paying them more and fixing the rosters, which has now being done and improving the way we communicate directly with pilots. I mean to such an extent that in all this, a pilot could send in a request to us in rostering and wouldn't get an answer at all. By the time we get to the end of November, they will sent in – there will have – there'll be an individual each pilot can communicate with and their requests will guaranteeing [sic] that all those and the request will be answered within 48 hours.

39.     Then, in a startling reversal – and in direct contradiction to statements made by defendants only weeks previously – on December 15, 2017, Ryanair conceded that it needed to recognize employee unions in the face of mounting employee unrest. In a Form 6-K filing, the

- 22 -

Company stated that it had invited discussions with unions in Ireland, the United Kingdom, Germany, Italy, Spain and Portugal in order to stave off expected employee strikes that threatened to disrupt flights during the critical holiday travel season.

40.     In response to this news, the price of Ryanair ADSs declined from $112.44 per ADS to $103.31 per ADS between December 14, 2017 and December 18, 2017, a decline of approximately $9, or 8%, over two trading days on abnormally high volume.  However, the price of Ryanair ADSs remained artificially inflated as defendants continued to make material misstatements and conceal the extent of employee dissatisfaction and labor unrest and the expected impact of these issues on the Company's operations and financial results in the months that followed.

41.     On February 5, 2018, Ryanair filed a release with the SEC on Form 6-K announcing its financial results for its fiscal quarter ended December 31, 2017 (the "3Q18 Release").  The 3Q18 Release stated that Ryanair had experienced a "12% rise in Q3 profit to €106m" and that its "[t]raffic grew 6% to 30.4m with load factors up 1% to 96%."  The 3Q18 Release quoted defendant O'Leary, who stated that the Company had been successfully negotiating with pilot unions throughout Europe and that union recognition "will not alter [the Company's] cost leadership in European aviation" amidst its growth plans, stating in pertinent part:

> "After 30 years of successfully dealing directly with our people it became clear in Dec. that a majority of pilots wanted to be represented by unions.  In keeping with our policy to recognise unions when the majority of our people wanted it, we have met pilot unions in Ireland, UK, Spain, Germany, Italy, Portugal, Belgium and France to discuss how we can work with them on behalf of our people.  **We have successfully concluded our first recognition agreement with BALPA in the UK, a market which accounts for over 25% of our pilots.  When this process has completed, we expect to have similar engagement with cabin crew unions.  While union recognition may add some complexity to our business and may cause short-term disruptions and negative PR it will not alter our cost leadership in European aviation, or change our plan to grow to 200m traffic p.a. by Mar. 2024**.  Our aircraft allocations may alter by base as we capitalise on new growth opportunities in France and Scandinavia."

42.    The 3Q18 Release also stated that traffic for fiscal 2019 was expected to increase 6% to 138 million travelers and that staff costs were only expected to increase by €100 million, as previously disclosed pay increases became annualized.

43.    Also on February 5, 2018, Ryanair held a conference call with analysts and investors to discuss the quarterly financial results.  In his prepared remarks, defendant O'Leary highlighted the purported progress the Company had made in negotiating collective agreements with pilot unions and that its "cost discipline" would continue to keep staffing costs down at Ryanair as compared to its competitors, stating in pertinent part:

> We've – pleased that we have successfully concluded our first recognition agreement with BALPA in the U.K.  That is a milestone because it is by far and away our largest market and accounts for over 25% of our traffic, and over 25% of our pilots are based there in the U.K.  It is by far and away the largest market we have.  ***And I think it's a reflection of our ability to change the model, enter into union recognition and do so without disrupting the growth or the operations or our growth*** are based there in the U.K.  It is by far and away the largest market we have.

> As we've said here over the last number of months, union recognition may add some complexity to the business and it may cause short-term disruptions and some negative union PR, but it does not alter our cost leadership in European aviation or alter our plan to grow to 200 million passengers per annum by March 2024.

> Again, the key theme of this morning's conference call will be our unit cost discipline.  In Q3, unit cost fell 1%.  Ex-fuel unit cost increased by 3%, but primarily due to the higher staff and the one-off EU261 costs arising from the September rostering failure and our decision to cancel flights in September and October.

> Our cost advantages on other nonfuel cost lines is significantly better than our competitors across Europe and will continue to improve over the coming years, particularly as we take delivery of 210 MAX 200 aircraft from April 2019 onwards.  These game changers have 4% more seat capacity and are at least 16% more fuel-efficient and will materially alter and improve the cost base for the better.

44.    In response to analyst questions, defendant O'Leary denied that there would be any additional pay or staffing cost increases, stating: "The pay increase is 20%.  It's not going to be 21%, it's not going to be 25%, it's going to be 20%, and ***that's it.  And so some of you in the modeling***

*who have forecasted labor will rise by an additional EUR 170 million, EUR 240 million, I think EUR 100 million is a reasonable figure*."

45.     On May 21, 2018, Ryanair filed a release with the SEC on Form 6-K announcing its financial results for its fiscal year ended March 31, 2018.  The release stated that Ryanair had experienced "a 10% increase in full year profit after tax to €1.45bn, as lower fares . . . stimulated 9% traffic growth to over 130m guests."  The release also stated that "*FY19 profits will fall to a range of €1.25bn to €1.35bn*."  The release described this estimate as "*on the pessimistic side of cautious*," indicating that the Company was not only on track to achieve the estimate, but potentially to exceed it.  The release also reported a 10% increase in profits and claimed that labor unrest "had minimal impact on [the Company's] operations," and that Ryanair remained the "employer of choice in the EU airline sector," as it continued to "deal openly and fairly with [its] people and their unions."  The release continued, in pertinent part:

**Labour Cost:**

> *While we have made a promising start in negotiations with pilot unions, including signed recognition agreements with BALPA (UK) and ANPAC (Italy), we are also making considerable progress with our cabin crew negotiations, most notably in the UK and Spain*.  We suffered a 1 day pilot strike in Germany (Dec. 2017), and 3 days of cabin crew strikes in Portugal (in March/April), but *in all cases, the majority of our people continued to work normally so these strikes had minimal impact on our operations.  Our combination of higher pay, improved rosters, and unmatched job security will, we believe, continue to make Ryanair an employer of choice in the EU airline sector*.  We're welcoming hundreds of new pilots and cabin crew to Ryanair this year, including many joiners from bankrupt airlines such as Monarch and Air Berlin among others.  *We will continue to deal openly and fairly with our people and their unions*, but we will not make concessions on pay or productivity which threatens either our low cost model or our cost leadership in Europe.

46.     Also on May 21, 2018, Ryanair hosted a conference call with analysts and investors to discuss the Company's fiscal 2018 financial results.  Defendant O'Leary stated that Ryanair had "made significant progress with our union recognition negotiations" and that any remaining disputes

were over minor issues likely to be resolved in the short-term and without significant disruptions to

Ryanair's business.  He also stated that the Company had "***taken great comfort from the degree to***

***which the pilots have reflected that they're happy with the terms and conditions, the rostering and***

***the pay in Ryanair***" following an "extensive" internal survey.  He stated in pertinent part:

> On labor, ***we've made significant progress with our union recognition***
> ***negotiations***.  We've already signed the first 2 recognition agreements with BALPA
> and ANPAC.  We expect that – we're close to doing deals, I think, in Germany and
> Spain.  The good news is that we have now negotiated 5-year pay deals with all of
> the pilots and the cabin crews, so we're not now a – we're not – in the discussions
> with the unions, it's we're not focusing on pay issues.  ***They all accepted our pay as***
> ***very competitive, better than in many cases 737 competitors Jet2 and/or***
> ***Norwegian, but we are dealing in some cases with silly issues, union sort of***
> ***inefficiencies***.  For example, the Spanish unions want the pilots committee to have
> an extra 36 days off a year to think and reflect about union issues.  We've made the
> point those rules apply in Spain for people working in canning factories doing it
> Monday to Friday with 2 days off at weekend.  Our guys get 5 days off, followed – 5
> days on, followed by 4 days off.  And if they want 36 days off for the 6 committee
> members in Spain, then those committee members can go to a 5/3 roster or and they
> can think about union issues on – while they're on their 3 days off, followed by 1 day
> a month – or 1 day a week of union contemplation.  So we're down to those kind of
> issues.  I think we will continue to make progress both on the pilot and with the cabin
> crew unions, but we are not going to accept any ridiculous inefficiencies.  And if that
> means we have occasional strikes such as the ones we had with the German pilots in
> December or with the Portuguese cabin crew in Easter, ***we think they will be***
> ***reasonably small in number and will be on a country-by-country basis but only***
> ***where we're dealing with unreasonable demands or expectations.  We have done***
> ***an extensive survey of our pilots, more than 50% participation; and have taken***
> ***great comfort from the degree to which the pilots have reflected that they're happy***
> ***with the terms and conditions, the rostering and the pay in Ryanair.  They want to***
> ***see us make improvements on the way we allocate annual leave and base transfers***
> ***that we have made under Peter.  And the new team and operations have made***
> ***significant progress in those areas***.

47.     Later, in response to analyst questions, defendant O'Leary stated that "labor is not

much that [sic] a surprise to us," and the anticipated costs of unionization would be capped at €100

million as previously reported.

48.     On June 11, July 19 and July 20, 2018, Ryanair filed releases with the SEC on Form

6-K announcing that it had secured agreements to recognize unions for its U.K., Germany and Italy

based cabin crews, respectively.  In the releases, Ryanair stated, "'[a]s this growing number of pilot and cabin crew recognition agreements confirms, we are making progress and confounding those sceptics who claimed that our December 2017 decision was not real or genuine.'"

49.     The statements referenced in ¶¶28-38 and 41-48 above were materially false and/or misleading when made because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them:

(a)     that the state of the Company's labor relations was far worse than had been publicly represented by defendants, including the amount and nature of pilot defections surrounding the flight cancellations announced in September 2017 and the subsequent discussions between the Company and its employees, and that, as a result, Ryanair was now threatened with massive strikes and other disruptions across its operations;

(b)     that the Company was not negotiating with its employees fairly or in good faith, but instead had presented take-it-or-leave-it proposals and doubled down on hardball negotiating tactics in order to pressure employees to capitulate, which had little to no prospect for success;

(c)     that the Company had been unable to hire and retain sufficient pilots to meet expected demand in the face of expected strikes and was thereby exposed to increased risk of flight cancellations, loss of reputational assets and increased costs from flight disruptions;

(d)     that the Company needed to significantly increase pay and benefits in the short term beyond the €100 million estimated increase to staff costs to be able to hire and retain sufficient qualified employees to meet operational targets and prevent widespread strikes;

(e)     that, as a result of (a)-(d) above, the Company's historical operating model and profit growth were not sustainable; and

(f)      that, as a result of (a)-(e) above, the Company was not on track to meet its 2019 profit estimate of €1.25 billion to €1.35 billion, such profit estimate lacked a reasonable basis, and defendants Ryanair and O'Leary did not reasonably believe that the estimate would be achieved.

50.      On July 23, 2018, Ryanair reported its financial results for the quarter ended June 30, 2018 in a release filed with the SEC on Form 6-K (the "1Q19 Release").  In the 1Q19 Release, the Company disclosed a 20% decrease in quarterly profits to €319 million, due in large part to a 34% increase in staff costs.  The Company also disclosed that strikes had damaged its operations and financial results, stating in pertinent part:

**Strikes**

In recent months we implemented a series of initiatives to make Ryanair more attractive to pilots and cabin crew, including (a) a 20% pay increase under 5-year pay agreements which makes our pilots significantly better paid than competitor (Norwegian & Jet2) B737 pilots; (b) we cut training/bonding costs for new pilot and cabin crew recruits; (c) we facilitated over 700 pilot transfers to their preferred base; (d) we invested heavily in new simulators and in house training capacity; and, (e) we announced we would recognise trade unions.

Despite signing pilot and cabin crew union recognition agreements in our major markets (the UK and Italy, and a recent agreement in Germany for cabin crew), progress has been slower in smaller markets where competitor pilots are impeding both progress and process.  ***We suffered 2 unnecessary strikes by a small minority (25%) of Irish based pilots in July (with a 3rd strike threatened for 24 July).  Cabin crew have also threatened strikes in Spain, Portugal, and Belgium on 25 & 26 July.  We have minimised the impact of these strikes on customers by cancelling a small proportion of our flight schedule, well in advance of the day of travel, to allow our customers to switch flights or apply for full refunds.  While we continue to actively engage with pilot and cabin crew unions across Europe, we expect further strikes over the peak summer period as we are not prepared to concede to unreasonable demands that will compromise either our low fares or our highly efficient model***.

***If these unnecessary strikes continue to damage customer confidence and forward prices/yields in certain country markets then we will have to review our winter schedule, which may lead to fleet reductions at disrupted bases and job losses in markets where competitor employees are interfering in our negotiations with our people and their unions***.  We cannot allow our customers flights to be unnecessarily disrupted by a tiny minority of pilots.

51.     In response to this news, the price of Ryanair ADSs declined from $116.70 per ADS to less than $103.52 per ADS between July 20, 2018 and July 24, 2018, a decline of more than $13, or 11%, over two trading days on abnormally high volume.  However, the price of Ryanair ADSs remained artificially inflated as defendants continued to make material misstatements and conceal the extent and severity of the labor disruptions and the resulting impact to Ryanair's financial results. For example, the 1Q19 Release stated that Ryanair continued to expect fiscal 2019 profits of between €1.25 billion and €1.35 billion.

52.     Throughout the summer of 2018, Ryanair's labor relations problems spread and escalated.  Workers in Germany, Belgium, Sweden, Portugal, Italy, the United Kingdom, the Netherlands and Ireland were forced into threatening to take collective action.  Thousands of flights were cancelled impacting hundreds of thousands of customers.  The resulting flight cancellations damaged the Company's brand and forced it to pay millions in compensation costs or to re-route fliers.

53.     Then, on October 1, 2018, the Company revealed that it could not meet its annual profit guidance due to decreased fares and ballooning costs related to the strikes and flight disruptions.  The Company further stated that it could be subject to even "***further disruptions*** in Q3, which may require full year guidance to be lowered further and may necessitate further trimming of loss making winter capacity."

54.     In response to this news, the price of Ryanair ADSs declined from $96.04 per ADS to $80.93 per ADS between September 28, 2018 and October 1, 2018, a decline of more than $15, or 16%, over a single trading day on abnormally high volume.

**LOSS CAUSATION AND ECONOMIC LOSS**

55.     As detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Ryanair ADSs and operated as a fraud or

- 29 -

deceit on purchasers of Ryanair ADSs.  As detailed above, when the truth about Ryanair's misconduct was revealed over time, the value of the Company's ADSs declined precipitously as the prior artificial inflation no longer propped up the price of the Company's ADSs.  The decline in the price of Ryanair ADSs was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price decline negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macro-economic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Ryanair ADSs and the subsequent significant decline in the value of the Company's ADSs when defendants' prior misrepresentations and other fraudulent conduct were revealed.

56.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Ryanair's business, operations and financial condition, as alleged herein.  Before the time that plaintiff purchased Ryanair ADSs, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Ryanair ADSs to be artificially inflated.  Plaintiff and other Class members purchased Ryanair ADSs at those artificially inflated prices, causing them to suffer damages as complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

57.     At all relevant times, the market for Ryanair ADSs was an efficient market for the following reasons, among others:

(a)     Ryanair ADSs met the requirements for listing and were listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)     according to the Company's July 30, 2018 annual financial report filed on Form 20-F, ADSs accounted for approximately 43.7% of Ryanair's issued ordinary shares as of June 30, 2018 (assuming conversion of all ADSs into ordinary shares); with over 1.71 billion ordinary shares outstanding as of March 31, 2018, this demonstrates a very active and broad market for Ryanair ADSs;

(c)     as a regulated issuer, Ryanair filed periodic public reports with the SEC;

(d)     Ryanair regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)     unexpected material news about Ryanair was rapidly reflected in and incorporated into the Company's ADS price.

58.     As a result of the foregoing, the market for Ryanair ADSs promptly digested current information regarding Ryanair from publicly available sources and reflected such information in Ryanair's share price.  Under these circumstances, a presumption of reliance applies to plaintiff's purchases of Ryanair ADSs.

59.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding Ryanair's business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them

important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

60.     Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by defendants, but rather statements of historical and present fact, and thus did not fall within any "Safe Harbor."

61.     Defendants' verbal "Safe Harbor" warnings accompanying any of their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the Company, and thus were ineffective to shield those statements from liability.

62.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Ryanair who knew that the FLS was false. Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Ryanair ADSs during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and defendants' legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

64.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ryanair ADSs were actively traded on the Nasdaq. There are likely thousands of members in the proposed Class, if not more.  Record owners and other members of the Class may be identified from records maintained by Ryanair or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

66.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Ryanair;

(c)     whether the price of Ryanair ADSs was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

68.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

69.     Plaintiff incorporates the foregoing paragraphs by reference.

70.     Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and other members of the Class in connection with their purchases of Ryanair ADSs.

72.     Plaintiff has suffered damages in that, in reliance on the integrity of the market, plaintiff paid artificially inflated prices for Ryanair ADSs.  Plaintiff would not have purchased

Ryanair ADSs at the prices paid, or at all, if plaintiff had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

73.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of Ryanair ADSs.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

74.     Plaintiff incorporates the foregoing paragraphs by reference.

75.     Ryanair and O'Leary acted as controlling persons within the meaning of §20(a) of the 1934 Act.

76.     By virtue of his high-level positions, stock ownership, control over SEC filings, participation in and awareness of the Company's operations and intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, defendant O'Leary had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements plaintiff contends are false and misleading.  Defendant O'Leary was provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Ryanair, meanwhile, controlled defendant O'Leary and all of its employees.

77.     By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Declaring that defendants violated the 1934 Act and awarding plaintiff and the Class compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

C.      Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

D.      Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 6, 2018                ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        MARIO ALBA JR.


                                        _s/ Samuel H. Rudman_
                                        SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com
                                        malba@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
BRIAN E. COCHRAN

                   s/ Darren J. Robbins
                  DARREN J. ROBBINS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

City of Birmingham Firemen's and Policemen's Supplemental Pension System ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re BHP Billiton Limited Sec. Litig.*, No. 1:16-cv-01445 (S.D.N.Y.)
*City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Credit Suisse Group AG, et al.*, No. 1:17-cv-10014 (S.D.N.Y.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this *5th* day of November, 2018.

City of Birmingham Firemen's and
Policemen's Supplemental Pension System

By: _James D. Love_ _____
James D. Love, Assistant City
Attorney

RYANAIR

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**ADR**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 11/28/2017 | 10 | $121.90 |
| 11/28/2017 | 60 | $121.77 |
| 11/29/2017 | 90 | $124.39 |
| 11/30/2017 | 25 | $124.30 |
| 12/15/2017 | 55 | $106.16 |
| 12/15/2017 | 100 | $106.59 |
| 08/28/2018 | 140 | $102.23 |