UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF BIRMINGHAM FIREMEN'S AND POLICEMEN'S SUPPLEMENTAL PENSION SYSTEM and CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RYANAIR HOLDINGS PLC and MICHAEL O'LEARY,<br><br>Defendants. | Civil Action No. 1:18-cv-10330-JPO<br><br><u>CLASS ACTION</u><br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS


**Page**

I. SUMMARY OF THE CASE ....................1

II. JURISDICTION AND VENUE ....................8

III. THE PARTIES ....................9

IV. SUBSTANTIVE ALLEGATIONS ....................11

A. An Overview of Ryanair ....................11

B. O'Leary's Aggressive Management Style and Controversial Public Persona ....................14

C. "Always Getting Better"? ....................16

D. Ryanair Conceals that Its Low-Cost Base Is Dependent on Exploitative and Unsustainable Labor Practices ....................17

1. Methods of Employment ....................17

2. Ryanair's Purported "Industry-Leading" Pay, Terms, and Conditions ....................20

3. Ryanair's Historical Opposition to Unions Allowed It to Keep Labor Costs Low Compared to Peers ....................22

E. Leading Up to the Class Period, Ryanair Promises Continued Growth and Cost Discipline and Dismisses Reports of Labor Unrest ....................26

F. Ryanair Continues to Hide the True Extent of Employee Unrest and the Tenuousness of Its Low-Cost Model During the Class Period ....................29

G. The September 2017 "Rostering Failure" Raises Red Flags ....................33

H. Ryanair's Pilot Shortage Emboldens Employees to Demand Improved Pay and Working Conditions ....................36

I. Investors Begin to Learn the Truth but Defendants Continue to Mislead the Market ....................42

1. Ryanair Concedes that It Needs to Recognize Employee Unions in the Face of Mounting Employee Unrest ....................42




1548445_1

**Page**


2. Contrary to Management Assurances, Union Negotiations and Labor Relations Do Not Progress Smoothly in the First Half of 2018....47

3. On July 23, 2018, Ryanair Discloses a 20% Decrease in Quarterly Profits Due in Large Part to a 34% Increase in Staff Costs....53

4. On October 1, 2018, Ryanair Discloses a 12% Decrease in Full-Year Profits Due in Large Part to Decreased Fares and Ballooning Costs Related to Strikes and Labor Issues....60

J. Summary of Class Period Events....63

K. Post-Class Period Revelations....64

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD....66

VI. ADDITIONAL EVIDENCE OF SCIENTER....115

A. In December 2017, Senior Management Admitted to Pilots that O'Leary Was Focused on Employee Relations....116

B. O'Leary's Decades-Long History with Ryanair and Accounting Background Supports an Inference of Scienter....117

C. O'Leary's Extensive Knowledge and Close Monitoring of the Company's Operational Model and Costs Supports an Inference of Scienter....118

D. The Alleged Misrepresentations and Omissions Concerned Ryanair's Core Operations....119

E. The Suspicious Replacement of COO Mick Hickey with Peter Bellew, and the Removal of O'Leary from Day-to-Day Management Supports an Inference of Scienter....120

F. Ryanair's Return to Its Anti-Union Stance with Ryanair Sun Demonstrates Defendants' Knowledge....122

G. Defendant O'Leary Sold over $120 Million of His Ryanair Stock While in Possession of Material Non-Public Information....123

VII. LOSS CAUSATION/ECONOMIC LOSS....126

**Page**

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET DOCTRINE ....127

IX. NO SAFE HARBOR ....129

X. CLASS ACTION ALLEGATIONS ....131

XI. CLAIMS FOR RELIEF ....132

COUNT I: ....132

For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants....132

COUNT II: ....133

For Violation of §20(a) of the Exchange Act Against All Defendants....133

XII. PRAYER FOR RELIEF ....134

XIII. JURY DEMAND ....135

By and through the undersigned counsel, Lead Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System and City of Birmingham Retirement and Relief System (together, "Plaintiff") alleges the following against Ryanair Holdings plc ("Ryanair" or the "Company") and Michael O'Leary ("O'Leary") (together, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) a review and analysis of public filings made by Ryanair with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants; and (e) information readily obtainable on the Internet. Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE CASE

1. This is a securities class action on behalf of all purchasers of Ryanair American Depository Shares ("ADSs") between May 30, 2017 and September 28, 2018, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), against Ryanair and its Chief Executive Officer ("CEO"), O'Leary, for violations of the federal securities laws.

2. During the Class Period, defendant Ryanair owned and operated an "ultra-low fare" airline serving short-haul, point-to-point routes from 86 bases to more than 200 airports across Europe. During that time it carried more passengers than any other short-haul airline in Europe, scheduling over 2,000 flights per day. Ryanair's business model and its ability to compete in a

highly saturated industry depended on its ability to undercut competitors' prices, offering fares at extremely low prices. In order to do so and remain profitable, Ryanair kept its costs to an absolute minimum. Indeed, the Company was known for taking the "no-frills" experience to extreme levels, charging passengers to select a seat, more than $50 to print a boarding pass at the airport and even for water onboard its flights, and refusing to give customer refunds in even extraordinary circumstances. Defendant O'Leary had a reputation as an aggressive and penny-pinching, albeit brilliant, businessman who, in his own words, "didn't give a shit" what customers or the general public thought of him. He frequently insulted Ryanair's customers, calling them "whingers" and "idiots" when they complained about the airline's draconian practices. Nevertheless, the Company's lack of customer service, while frequently a topic of public outrage, did not prevent it from growing exponentially beginning in the mid-1990s. So long as Ryanair's flights were the cheapest in the market and had high rates of punctuality and reliability, customers were willing to overlook insult and continue to flock to Ryanair.

3. Key to Ryanair's ability to offer the lowest ticket prices in the market (and so to the success of its business model generally) was its ability to minimize four primary operational costs: (i) aircraft equipment and finance costs; (ii) customer service costs; (iii) airport access and handling costs; and (iv) personnel costs.

4. While Ryanair was known for containing costs across all four operational areas, the cost advantages that really distinguished Ryanair among its low-fare competitors – and in turn the key to its share price – were its ability to keep personnel costs and airport access fees low. But, as was revealed during the Class Period, Ryanair did so by underpaying and even exploiting its workforce. For one thing, substantial percentages of both cabin crew and pilot pay was "performance incentive" based. For pilots, this meant having to fly a certain number of hours and

avoiding unscheduled absences; for cabin crew, it meant meeting often unattainable sales targets for inflight passenger purchases of food, drink, lottery tickets, and other sundry items sold on Ryanair's planes. Crew were also only paid for their in-flight time, meaning that nearly half the hours they worked during a given day – when cleaning the plane, boarding and disembarking passengers, or waiting at the airport for delayed or cancelled flights – were entirely unpaid. Employees were expected to cover the cost of their training, uniforms, and any meals or accommodation when stranded away from their home bases due to flight cancellations. Both crew and pilots have reported that the working environment at Ryanair was toxic, and that its aggressive culture started at the top with O'Leary. And, at least internally, management admitted the same.

5. Airport access and personnel costs, while seeming unconnected, are actually interrelated. In addition to lower base pay and terrible working conditions, Ryanair used a number of structural tricks designed to keep its employment costs lower than competitors'. Central among these was the practice of keeping its employees on Irish contracts, regardless of what country the employee actually resided in; adamant refusal to recognize unions, and penalizing employees who sought to promote union activity at Ryanair; and employing the majority of its first officers, second officers, cabin crew, and a minority of its captains through third-party agencies. This allowed Ryanair to impose zero-hour contracts (contracts where no guaranteed minimum number of work hours were provided), avoid paying employees for sick leave or social benefits, avoid paying social taxes, and have the "flexibility" to move pilots and crew members from base to base at the drop of a hat where economically advantageous to do so.

6. In light of these employment practices, it is unsurprising that in early 2017, unbeknownst to Plaintiff and the Company's shareholders, Ryanair was undergoing an exodus of hundreds of pilots – particularly its experienced, and thus less replaceable, pilots – to competitor

airlines. With the market for pilots tightening generally beginning in spring of 2017, and Ryanair's working conditions causing general unrest among its employees, the Company was poised for a crisis. Nevertheless, in public statements between May 30, 3017 and July 25, 2017, Defendants assured investors that the Company's labor relations were "excellent" and its pay and conditions "great" and actually "industry leading." And Defendants claimed that far from a pilot shortage existing at Ryanair, the Company had recruited 1,000 pilots during the previous year. They also emphasized that there was ***no risk of unionization***, and that the Company had a sophisticated collective bargaining system in place for employees already that employees were satisfied with.

7. But Defendants knew, or were reckless in not knowing, that these statements were materially false and misleading and omitted material facts. Despite their glowing representations of Ryanair's labor relations, the truth was that employees were not happy, crucial pilots were leaving for competitor airlines, and Ryanair could not recruit experienced pilots fast enough to replace them. The Company also knew that the "collective bargaining" system it had created was a sham – employees did not have any negotiating power with Ryanair, and that was a key element in Ryanair's strategy to keep its staff costs so low. And Defendants also knew, as O'Leary later admitted, that Ryanair was "always going to be unionised" and that union recognition was "inevitable at some point in time."

8. Cracks in the Company's "story" began to emerge on September 15, 2017, when the Company announced it had been forced to cancel hundreds of flights over the next several weeks due to a "rostering cock-up," by its staffing team that resulted in steeply decreased rates of punctual departures. According to the Company, a mandated scheduling change that required Ryanair to allocate pilot leave on a calendar-year basis rather than a fiscal-year basis had left the Company with a one-time problem of allocating pilots their vacation weeks in just nine months instead of twelve.

Defendants apologized for the scheduling team's failure to properly plan for more pilots needing to take their leave after the peak summer travel schedule was completed. They also claimed that while there was no general pilot shortage, the need to give pilots their vacation time had left the Company temporarily short-handed and unable to handle its flight operations as efficiently as desired. The decision to cancel the flights – as well as a second round of cancellations for the same purported reason two weeks later – ultimately impacted 700,000 customers. In truth, the Company's pilot shortage – and continued mass exodus of experienced pilots to competitor airlines – had left Ryanair short-staffed.

9. In addition to souring public opinion of Ryanair (thereby necessitating fares to be lowered to fill its planes), the cancellations had another effect. Pilots and employees, generally fed up with their conditions and angry that management was scapegoating them by blaming its scheduling failure on their "need to take vacation," began to discuss collective action. After O'Leary further insulted pilots at the Company's September 21, 2017 annual general meeting – calling pilots' job "easy," the pilots "self-important" and "precious about themselves," and saying "hell [would] freeze over" before Ryanair recognized employee trade unions – pilots across 46 bases joined forces and rejected the Company's proposed offer of bonuses to work through the pilot shortage. Instead, the pilots insisted that they wanted changes in their terms and conditions, including the introduction of permanent contracts under local law. Cabin crew soon followed with similar demands. Ryanair refused, insisting that business – and its low fare model – would continue on as usual.

10. Over the next several months, threats of industrial action and public whistleblowing on Ryanair's terrible labor conditions cast a pall over Ryanair's operations. Nevertheless, management insisted on October 31, 2017 that its labor relations were fine, that it was "an excellent employer of pilots," and that it would "remain a nonunion company." Just six weeks later, in a

dramatic reversal (one that O'Leary later admitted was part of the Company's planned-for "evolution"), Defendants announced that the Company would recognize unions for the first time in its history. Investors and financial analysts were stunned – as one put it, "[h]ell has frozen over" – and the ADS price dropped sharply. But Defendants reassured nervous investors that recognizing unions would not have a significant impact on Ryanair's cost base and would not alter its fundamental business model or its promise to grow to 200 million customers by March 2024. As discussed herein, Defendants knew, or were reckless in not knowing, that their reassurances were materially false and misleading and omitted material facts.

11. Negotiations between the Company and employee unions did not progress smoothly in the first half of 2018, but the Company continued to falsely and misleadingly assure investors in its February 5, 2018 and May 21, 2018 SEC filings and earnings presentations that its cost advantage would not be harmed by either strikes or unionization. During one of the airline's busiest months, July, strikes forced the Company to cancel hundreds of flights, impacting tens of thousands of customers' travel plans and driving the Company's costs skyward as it was forced to refund flights.

12. Then, on July 23, 2018, Ryanair reported its financial results for the first quarter of 2018, revealing for the first time that Defendants' assurances over the past months that unionization would not impact its business model might not hold water. The Company not only disclosed a 20% decrease in quarterly profits, due to a 34% increase in staff costs, it also disclosed a 3% drop in its fare targets for the next quarter. The share price of the Company's ADSs dropped sharply on the news. Still, the market accepted management's false and misleading representations that this was merely a transition period, and that the Company was maintaining and would maintain its high-efficiency, low-cost business model in the face of unionization.

13. Strikes continued. On August 10, 2018, employees from Germany, Ireland, Belgium, Sweden, and the Netherlands staged a simultaneous strike that led Ryanair to cancel approximately 400 flights – one-sixth of its total daily schedule – and impacted 67,000 passengers. A simultaneous cabin crew strike in September 2018 across Belgium, the Netherlands, Italy, Spain, and Portugal resulted in nearly 200 flights being cancelled, and 30,000 passengers impacted. Management downplayed the strikes' impact, stating that the costs would be minimal and that the Company's business model was intact.

14. Then, on October 1, 2018, the Company revealed it could not meet its annual profit guidance due to decreased fares and ballooning costs related to strikes, flight disruptions, and labor issues. Ryanair cut its earnings guidance by 12%, and indicated that the Company could be subject to even further guidance reductions and decreases in winter capacity (*i.e.*, flight cancellations) in the near future. On this news, Ryanair's ADS price fell over 15% in a single day on unusually high trading volume. Financial analysts linked the disclosure to the effects of unionization. As one put it, due to the unionization process, "Ryanair's key labour advantage relative to peers is now gone."

15. During the Class Period, while the share price was artificially inflated, O'Leary personally cashed in on such artificial inflation by selling a substantial amount of his Company stock for total proceeds of over $120 million. As detailed below, these sales were suspicious in timing and amount and dramatically out of line with O'Leary's selling practices before the Class Period. Indeed, his Class Period sales were the first sale of stock that O'Leary had made in five and a half years and were executed at prices that were near Ryanair's all-time high.




16. As summarized above and detailed further herein, the disclosure of the truth about Ryanair's need to recognize unions and resulting increased costs and decreased profits had a devastating impact on the Company's shareholders, wiping out millions in shareholder value and causing substantial damage to Plaintiff and the Class. This action seeks to recover the damages suffered by those investors as a result of Defendants' fraudulent scheme.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

18. Venue is proper in this District pursuant to §27 of the Exchange Act because certain of the acts and practices complained of herein occurred in this District and the ADSs that are the subject of this action are deposited with the Bank of New York Mellon in this District and traded on the NASDAQ Stock Market LLC (the "NASDAQ") in this District.

19. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## III. THE PARTIES

20. Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System, as set forth in the certification previously submitted and incorporated herein by reference, purchased Ryanair ADSs at an artificially inflated price during the Class Period and was damaged as a result of Defendants' alleged misconduct. *See* ECF No. 12-2.

21. Plaintiff City of Birmingham Retirement and Relief System, as set forth in the certification previously submitted and incorporated herein by reference, purchased Ryanair ADSs at an artificially inflated price during the Class Period and was damaged as a result of Defendants' alleged misconduct. *See* ECF No. 12-2.

22. Defendant Ryanair Holdings plc is a short-haul, low-fare airline operator with operations in 37 European countries. Its principal executive offices are located at Airside Business Park, Swords, Co., Dublin, K67 NY94, Ireland. Its ordinary shares trade on the Dublin Stock Exchange under the ticker symbol "RYA." Its ADSs trade on the NASDAQ under the ticker symbol "RYAAY." Each ADS represents five ordinary shares. As of March 31, 2018, there were over 1.17 billion ordinary shares of Ryanair stock outstanding.

23. Defendant Michael O'Leary has served as a director of Ryanair since 1988 and as the CEO since 1994. O'Leary's involvement with Ryanair began in 1987, when he served as the personal financial advisor to Ryanair founder Tony Ryan. In 1988, he became Deputy Chief Executive, and in 1991, Chief Operating Officer ("COO") of the Company. Since taking the helm as CEO, O'Leary instituted the airline's current no-frills, low-cost model, and has grown the airline in terms of passenger traffic, bases, routes, and revenue, exponentially. Prior to working with Tony Ryan, O'Leary worked at KPMG as a tax consultant. He has a business degree from Trinity College in Dublin.

24. Defendant O'Leary made, or caused to be made, false and misleading statements that maintained artificial inflation in the price of Ryanair ADSs. Defendant O'Leary, because of his positions with the Company, possessed the power and authority to control the contents of Ryanair's quarterly and annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. He was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions with the Company, personal participation in the fraud as detailed herein, communications with other corporate officers and employees, attendance at weekly management and regular Board of Directors meetings, and his access to material non-public information available to him but not to the public, defendant O'Leary knew or disregarded with severe recklessness that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

25. Defendant O'Leary is liable as a direct participant in the wrongs complained of herein. In addition, O'Leary, by reason of his status as CEO and Executive Director of the

Company, was a "controlling person" within the meaning of §20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of his position of control, O'Leary was able to, and did, directly or indirectly control the conduct of Ryanair's business.

26. As CEO of Ryanair, and as a controlling person of a publicly traded company whose ADSs were and are registered with the SEC pursuant to the Exchange Act and were and are traded on the NASDAQ and governed by the federal securities laws, defendant O'Leary had a duty to promptly disseminate accurate and truthful information regarding Ryanair's operations, business, financial metrics, and financial statements, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Ryanair ADSs would be based upon truthful and accurate information. Defendants' materially false and misleading misstatements and omissions during the Class Period violated these requirements and obligations.

## IV. SUBSTANTIVE ALLEGATIONS

### A. An Overview of Ryanair

27. Ryanair owns and operates an "ultra-low fare" airline serving short-haul, point-to-point routes from 86 bases to more than 200 airports across Europe. Advertising itself as "Europe's No. 1 airline," as of June 30, 2018, the Company flew 2,000 daily flights. In order to support its operations, Ryanair employed an average weekly number of 11,150 and 12,334 "flight staff" (captains, first officers, second officers, and cabin crew) during fiscal year 2017 ("FY17") and fiscal year 2018 ("FY18"), respectively. During the Class Period, Ryanair represented that its strategy was to "offer low fares that generate increased passenger traffic while maintaining a continuous focus on cost-containment and operating efficiencies."

28. The Company was first established in 1985 with the purpose of competing with Aer Lingus and British Airways on routes between Ireland and the U.K., but it operated at a significant loss. Only when the current CEO, defendant O'Leary, relaunched the Company in 1997 based on the successful low-cost model of Southwest Airlines in the United States did the airline become profitable. Since then, Ryanair has grown consistently and exponentially, with passenger traffic reaching 130.3 million in FY18. In bringing the low-cost, "no-frills" airline model to Europe, Ryanair is widely acknowledged to have revolutionized air travel within the continent, its low fares making air travel accessible to far more passengers than could previously afford it.

29. The lynchpin of Ryanair's business model is to keep operating costs as low as possible in order to be able to offer fares at extremely low prices. The mega-low fares allow Ryanair to increase the number of passengers it carries, generating not only additional fare revenue and keeping its airplane "load factors"[1] high, but increasing the "ancillary revenue" brought in – revenue derived from sales of pre-flight items like priority seating and checked bags, as well as in-flight sales of food, drink, lottery scratchcards, and other assorted items, and other travel services, such as car rentals and bus tickets. During the Class Period, ancillary revenue accounted for approximately one-third of Ryanair's overall revenue. Moreover, as defendant O'Leary explained during the Company's July 24, 2017 earnings call, Ryanair's low "unit costs"[2] were crucial to its ability to compete with the other low-fare airlines in Europe seeking to emulate its success: "it [is that]

---

1 Passenger "load factor" refers to the percentage of the aircraft that is filled in a given flight. Low-cost carriers such as Ryanair typically have the highest load factors in the industry, and high load factors translate to higher profits. In 2017, Ryanair's load factor was 94.7%.

2 "Unit cost" is one of the most salient and focused-on metrics in the airline industry. It is measured by cost per available seat kilometer ("CASK"). The various expenses that are considered in the CASK metric include fuel and oil costs, staff costs, maintenance and repairs, airport and handling charges, and route charges. To remain competitive in the low-cost carrier space, and offer low fares while remaining profitable, Ryanair had to keep its unit cost as low as possible.

widening unit cost gap between us and the competition that will continue to enable Ryanair to succeed, but particularly as we expand the amount of head-to-head competition we have with these so-called peers."

30. Ryanair focuses its cost-containment strategy on the four primary areas of operating expense that every airline must contend with: (i) aircraft equipment and finance costs; (ii) customer service costs; (iii) airport access and handling costs; and (iv) personnel costs.

31. During the Class Period, the Company's strategy for keeping aircraft equipment and finance costs low centered on its use of only a single type of aircraft: Boeing 737-800s. This limited the costs of training pilots, crews, and engineers on flying and maintaining the aircraft, as well as the costs of purchasing spare parts and equipment. Other low-fare airlines, such as Norwegian Airlines ("Norwegian") and easyJet, used comparable strategies.

32. To keep customer service costs low during the Class Period, Ryanair contracted third-party ticketing, passenger, and aircraft handling services at many airports. It was able to negotiate competitive rates for these services through multi-year deals, and the practice avoided the need to have additional staff of its own at the gates.

33. Similarly, the Company kept its airport access and handling costs low by prioritizing airports in secondary locations, which offered competitive prices for their access slots. Even when Ryanair did seek slots in primary airports, it was able to negotiate favorable contracts because of the number of passengers it would bring to those airports' shops, restaurants, and other businesses. As discussed further below, Ryanair's employment model also gave it a distinct advantage against its competitors in this area of operating expense. Because employee contracts were designed to maximize the airline's "flexibility," Ryanair could simply pick up and move its aircraft and crew to

another airport on short notice. This gave it significant leverage when any particular airport threatened to, or did, implement higher fees.

34. Where Ryanair was truly able to distinguish itself from its low-cost competitors, however, was in minimizing its personnel costs while maximizing personnel productivity. But, as discussed below, Ryanair's strategy for minimizing personnel costs involved poor labor practices and stretching the tolerance of its employees to the breaking point. *See* ¶¶42-54, *infra*. As Defendants knew prior to the Class Period, this strategy was unsustainable. Indeed, O'Leary admitted that union recognition was part of Ryanair's planned-for "evolution" stating "we were always going to be unionized at some point in time," and "it was inevitable."

**B. O'Leary's Aggressive Management Style and Controversial Public Persona**

35. The driving force behind Ryanair and the chief architect of its success since the mid-1990s has been notorious CEO and Executive Director of the Board O'Leary. Since taking the helm of Ryanair in 1994, O'Leary has developed an admitted reputation for casual contempt toward Ryanair's passengers, pilots, and cabin crew. O'Leary has become one of Europe's most controversial public figures for his outrageous media statements and PR stunts, following a strategy of "no PR is bad PR." He is, simply put, one of the most admired and hated businessmen in Europe, known for his stance that he does not "give a shit if no one likes [him]" so long as he makes a profit.

36. A self-described penny-pincher, O'Leary has taken cost-cutting at Ryanair to extraordinary lengths. Measures taken by the airline under O'Leary include: urging flight attendants to lose weight to help utilize less fuel; charging passengers for printing their boarding passes at the airport; and reducing the paper size of Ryanair's inflight magazine. O'Leary has also suggested measures such as installing a "coin slot on the toilet door," claiming that "[i]f someone wanted to pay €5 to go to the toilet [he] would carry them [him]self"; eliminating seats and having a "standing

room" section on the plane; and eliminating the co-pilot position and instead training cabin crew to take over in the event of an emergency.

37. For years, O'Leary espoused an attitude that the customer was nearly always wrong, and Ryanair staff were instructed to follow policies reflecting as much. O'Leary has drawn public ire for statements suggesting that Ryanair pilots would "engineer a bit of turbulence" in order to boost drink sales and calling passengers who forget to bring their boarding card with them to the airport "stupid." Media outlets have reported numerous instances where disabled passengers were not only not accommodated, but publicly shamed for any delays resulting from needing extra time to board. Passengers attempting to receive refunds – even in extreme cases such as where they experienced death in the family or life-threatening illness – were often met with stalwart opposition. O'Leary described the airline's position as follows: "You're not getting a refund so fuck off. We don't want to hear your sob stories."

38. In addition to hurling insults at passengers, O'Leary has consistently expressed little concern, and even disdain for, Ryanair's own pilots and cabin crew. For instance, when asked how it is possible for Ryanair to offer such low fares, O'Leary freely explained that Ryanair's "pilots work for nothing." O'Leary is also on record as stating that the idea that his staff is his "most important asset" is nothing but corporate "bullshit." Instead, O'Leary views his "[s]taff [as] usually [the] biggest cost" and has claimed that many are "lazy bastards who need[] a kick up the backside."

39. Love him or hate him, O'Leary is unquestionably one of Ireland's most successful entrepreneurs, with a reputation for diving into the details of how Ryanair operates. In addition to weekly meetings with his senior management, in which details of ongoing operations in each of the organization's various corporate departments are discussed, former colleagues of O'Leary have praised his extensive knowledge of Ryanair's operations and focus on keeping costs low. Insiders

have said that O'Leary is always "incredibly well-prepared" for the senior management gatherings, knowing what is happening "in each element of the business."

**C. "Always Getting Better"?**

40. By the mid-2010's, the airline's name had become synonymous with a complete lack of customer service. As O'Leary described it in September 2013, the airline tended to "unnecessarily piss people off." In 2014, after shareholders complained that the airline's abrasive image was harming its business, the Company finally decided a new approach was necessary. Defendant O'Leary has described the new strategy as a reaction to the realization that: "'We began to upset a significant proportion of our customer base by being, "We're cheap and everybody hates us, so we don't care." We needed to soften that whole presentation.'" Consequently, O'Leary stated, there was a "'realisation in 2013 that people are willing to pay a higher fare to easyJet or Aer Lingus or BA just to avoid us.'"

41. The Company sought to reform its bad reputation by launching the "Always Getting Better," or "AGB" campaign in 2014. The campaign implemented a number of more "customer-friendly" policies, including increased cabin bag allowances, a 24-hour grace period for minor booking errors, and a promise that "every Ryanair flight will be crewed by a team of well trained and passionate professionals." O'Leary publicly described the program as a "revolutionary" cultural shift where there would be "no more conflict." In the years that followed, Ryanair experienced a period of rapid growth and financial success as its public image improved. In FY17, Ryanair achieved a net profit of more than €1.3 billion, a 150% increase over fiscal year 2014 net profit of €523 million. However, as detailed below, Ryanair's new image of a conflict-free and friendly corporate culture did not extend to its employees, who remained subject to substandard contracts and policies amounting to what a former pilot would later describe as "'social barbarism.'"

**D. Ryanair Conceals that Its Low-Cost Base Is Dependent on Exploitative and Unsustainable Labor Practices**

42. Throughout the Class Period, Ryanair touted its ability to recruit and retain pilots and staff due to its "industry leading" pay, "great" terms and conditions, promotion opportunities for pilots, and desirable rosters (five days on, four days off for pilots, and five days on, three days off for cabin crew). Unfortunately for its employees, Ryanair's frequent assurances to the public and investors that its working conditions were among the best in the industry were false and misleading.

**1. Methods of Employment**

43. Ryanair employed its pilots and cabin crew through several different types of contracts, though nearly all employees' contracts were subject to Irish law.[3] First, Ryanair employed a certain number of its senior staff – captains, some first officers, and a few cabin crew managers – directly through contracts with Ryanair. These "direct" employees were entitled to the normal social benefits given to non-flight crew employees of Ryanair, including paid sick leave. Ryanair employees during the Class Period estimated that approximately 30% of Ryanair's pilots and less than 20% of its cabin crew were directly employed by Ryanair during the Class Period.

44. Second, a great many of Ryanair's pilots (more than half, and the vast majority of first and second officers) and some cabin crew were considered "self-employed" under Irish law. When Ryanair wanted to offer these individuals employment (typically after the employee's bonded probationary period ended), it required them to create and register Irish shell companies, either alone or with other Ryanair "self-employed" pilots or cabin crew, "recommending" that the employees use specified accountants to set up the organization under Irish tax law. The Company would then "contract" the employee's company through a third-party agency, such as Brookline Aviation and

[3] U.K. crews' contracts were subject to U.K. law, which had been a precondition to Ryanair opening bases within the U.K.

McGinley Aviation for pilots. This structure benefitted Ryanair's low-cost base, as the Company was not required to provide "self-employed" workers with the social benefits or pay the social taxes required by most European jurisdictions. The "self-employment" model also allowed the Company to easily move pilots from base to base as required for economic efficiency on short notice.

45. Third, Ryanair engaged a substantial portion of its cabin crew through third-party outsourcing agencies, such as Crewlink. These individuals were not paid directly by Ryanair, despite having been hired specifically to work for Ryanair, and were not provided many social benefits, such as paid sick leave. These individuals' employment contracts were often structured as "zero-hour contracts," meaning that they were not guaranteed to work a particular number of hours under the contracts, and indeed, Ryanair was not required to give them ***any*** hours if it chose not to. This was obviously beneficial for Ryanair, as it was not required to pay the outsourced crew members in the event it chose to cut flights or close bases. However, use of these contracts created significant economic instability for workers, was suspected to violate minimum wage laws in certain European countries, and was considered an extremely poor labor practice in Europe overall. Throughout the Class Period, Ryanair adamantly (and falsely) denied that any of its employees were on zero-hour contracts.

46. Contracting its employees under Irish law, whether directly or through an agency, saved Ryanair a significant amount of money, and indeed, was crucial to minimizing its staffing costs as its operations expanded. As mentioned previously, contracting all employees, regardless of where they resided, under Irish law meant that the Company was not required to pay the social benefits costs mandated under the employment law of many staff members' home countries. Additionally, Ryanair was able to insist that disputes regarding its employment contracts were required to be heard in Ireland, which, as the country where Ryanair was headquartered and where

the airplanes on which its employees worked were registered, had jurisdiction over the contracts. Not only did this save Ryanair money by ensuring it did not have to litigate employment suits in foreign countries, it dissuaded the majority of Ryanair employees from bringing disputes to court in the first place. Without any affordable and reasonable access to challenge their contracts in the court system of their country of residence, many staff members were effectively forced to accept Ryanair's terms and conditions as they found them. Ryanair's use of Irish contracts regardless of the employee's home base differentiated it from low-fare competitors like easyJet, which utilized local labor contracts for its employees.

47. Ryanair's use of Irish employment contracts also created meaningful complications for many employees residing outside of Ireland and even exposed them to criminal liability. A number of self-employed pilots both before and during the Class Period, for example, were prosecuted by their home countries' revenue services for failure to pay appropriate taxes, even though those same pilots had paid taxes in Ireland as they had been instructed to do by Ryanair-recommended accountants. Other staff members were unable to open bank accounts or obtain financial loans in their home countries, as they could not legally show that they were employed within the country and having to use a foreign bank account hurt their credit scores at home.

48. Irish law also benefitted Ryanair's cost base in another key respect: Irish law did not require Ryanair to recognize or negotiate with trade unions. Unlike many countries in Europe, including the U.K., which provide a legal mechanism for employees to sue for union recognition, in Ireland no such mechanism exists. While the Irish Industrial Relations Act of 1990 and the 2001 Amendment to that Act affirm that all employees must have the freedom to organize and join in collective action, a 2007 decision from the Supreme Court of Ireland held that companies could satisfy that requirement by providing an internal collective bargaining structure. Thus, under Irish

law, so long as it provided its employees an opportunity for collective bargaining, Ryanair was free not to acknowledge union demands or accept union involvement in its labor relations.

**2. Ryanair's Purported "Industry-Leading" Pay, Terms, and Conditions**

49. Pilots and cabin crew formed the majority of Ryanair employees during the Class Period, with cabin crew representing approximately 60% of total staff and pilots approximately 30%. However, pilots constituted about 60% of Ryanair's total staff costs due to the disparity between pilot and cabin crew salaries, while cabin crew represented approximately 28%:

**Estimated total cost and share by employee type, FY17E**




*Source: Redburn*

50. Ryanair stated throughout the Class Period that its pilots and cabin crew were paid in a manner designed by Ryanair to "emphasize[] productivity-based pay incentives," and told shareholders that Ryanair's employee compensation was "excellent," and even "industry leading." Behind closed doors, and as was revealed during the Class Period, Ryanair pilots and crew members were in fact receiving far less than what their counterparts were paid by other low-fare airlines, and in some instances, crew were making less than their home countries' minimum wage.

51. For cabin crew, "performance incentivizing" pay meant that a significant portion of their pay – approximately 42% of an average crew member's total earnings in FY18 – was based on the number of hours worked and whether the employee was able to meet pre-set sales targets for a

particular flight. Crew were only paid for "in-flight" hours worked, meaning that their paid time started at takeoff and concluded at landing. While supposedly designed to encourage quick turn-arounds between flights, this policy also had the effect of ensuring that crew were only paid for approximately ***half*** the time that they were actually working. For example, Ryanair did not pay crew for the time spent at the airport before a flight (even if a scheduled flight was delayed or eventually cancelled), for cleaning the plane between flights and boarding passengers, and for time the plane spent sitting at the gate. Additionally, crew received only half the minimum wage in the U.K. for "standby" days, during which they were required to be on call to fill in on flights at any time.

52. Crew were also penalized for absences – regardless of cause – and for missing sales targets, such as by threats of being reassigned to a less desirable base, given a less desirable roster, missing bonuses, and even with loss of employment. Cabin crew have reported that in-flight sales targets were often set at unattainable levels, and that they were encouraged to sell by whatever means necessary, including at the expense of customer service and by competing with their colleagues. Indeed, many cabin crew were quoted during the Class Period as saying that the emphasis on sales distracted their colleagues from focusing on passenger safety.

53. Pilots were also required to satisfy certain productivity targets in order to reach their full salary potential (productivity incentive payments comprised approximately 31% of pilot pay in FY18), typically by meeting a certain number of hours flown. Ryanair penalized pilots for absences, including by decreasing their bonuses and promotion opportunities and threatening to reassign them to less desirable bases, routes, or rosters. Pilots reported during the Class Period that Ryanair's policy encouraged pilots to report for flight duty when sick, fatigued, or otherwise not in suitable flying condition.

54. Ryanair effectively reduced staff pay in other ways as well. For one thing, during much of the Class Period, Ryanair required staff to purchase their own uniforms, and to pay for their own training (for pilots, this entailed a bonding cost of up to €30,000, and for crew, a payment of €2,150). If, in the course of their employment, a flight back to a crew's home base was cancelled, crew were expected to pay for their own accommodations and meals while stranded. Nor did Ryanair cover meals or beverages for staff during their working hours, or even provide them a reduced rate; crew were even expected to pay for water and for charging their cellular phones. These practices were not standard in the airline industry. They did, however, contribute to making Ryanair's productivity to cost per employee ratio far higher than rivals easyJet and Norwegian:

**As of September 2017: Staff productivity vs staff unit cost for European airlines**




*Source: Redburn, company, SRS Analyser, Bloomberg*

### 3. Ryanair's Historical Opposition to Unions Allowed It to Keep Labor Costs Low Compared to Peers

55. Defendants knew that if employees were permitted to unionize, and if the Company was required to deal with those unions, the Company's ability to keep its personnel costs so dramatically low would be substantially damaged or lost entirely. For this reason, the Company adamantly refused throughout its history to recognize unions, even as the vast majority of the airline industry – including comparable airlines like competitor easyJet and the very airline Ryanair was

modeled after, Southwest – accepted and worked with them. During the Class Period, O'Leary, who was largely responsible for the Company's notorious hostility toward unions, said "hell [would] freeze over" before he would allow trade unions in his Company. Under O'Leary's leadership, Ryanair crushed several attempts by Ryanair pilots and crew to unionize and set policies in place to prevent or penalize workers from attempting to unionize in the future. Just a few of these instances include:

(a) In 1997, the Irish Services Industrial Professional and Technical Union ("SIPTU") requested improved pay and conditions and union recognition on behalf of approximately 40 ground-handling agents at Dublin Airport. Ryanair refused the demands, and refused to recognize SIPTU. After several work stoppages and demonstrations, Dublin Airport was closed. A government enquiry team was sent to mediate between the sides in an effort to reopen the airport. At Ryanair's request, the team met with 16 groups of employees and found that the majority were against trade union organization because it would decrease flexibility and be unlikely to result in significant enhancement of pay and benefits. Tellingly, it was not explained how the employees were selected for these meetings, and Ryanair's legal advisor and/or head of operations also attended each meeting. While the government enquiry team was able to successfully settle the issue, Ryanair never recognized the baggage handlers' union. O'Leary was quoted as saying that the government's "recommendations will result in an orderly return to normal working by these employees without compromising Ryanair's principle of ***only dealing with its own people directly***." The Company noted that if it were "forced to recognise SIPTU by a minority of its employees, it will be forced out of business by an increasing number of competitors. The scope for growth in employment will be diminished and jobs will be lost as the unions seek to replicate the inefficient work practices and attitudes which prevail at Dublin Airport, within Ryanair."

(b) In 2001, the British Airline Pilots Association ("BALPA") attempted to obtain union recognition from Ryanair after successfully obtaining recognition at competitor airline easyJet. When BALPA brought its case to the U.K.'s Central Arbitration Committee ("CAC"), the regulatory body that decides statutory union recognition questions in the U.K., the CAC ordered a secret postal ballot to be conducted of Ryanair pilots, in which they voted "for" or "against" union recognition. The ballot results, shockingly, showed 81% of pilots against recognizing the union. It has since been suggested that Ryanair artificially expanded the electorate by bringing its third-party agency-contracted pilots into the ballot and ordering them to vote no or otherwise be collectively fired.

(c) In 2004, Ryanair's offers to train pilots on new aircraft were made contingent on the pilots' agreement that there would be no union recognition, and no claims brought against the Company under Ireland's Industrial Relations Act. The deal was that training would cost €15,000, which Ryanair would cover; but if Ryanair was forced to engage in collective bargaining with a union within five years, each pilot would be liable to pay back his or her €15,000 training costs to the Company. Pilots who did not accept the training offer would be dismissed or have to pay the training fees out of pocket.

(d) In 2015, Ryanair closed its base at Billund Airport in Copenhagen, Denmark, after coming under attack from unions and government officials accusing it of violating workers' rights in the country. When a Danish labor tribunal ruled that unions even without Ryanair members could take sympathy industrial action against the airline anywhere in the country, Ryanair used its prized "flexibility" to close the bases and move its planes, pilots, and crew elsewhere. O'Leary complained during the incident about the "sea of negative publicity and the fact that nobody would give us a fair hearing in Denmark." He claimed that, "[i]f we sign a collective agreement with the Danish unions, we will then be asked to sign 15 French collective agreements, 55 Spanish collective

agreements and a lot of Italian collective agreements. We are not going to do that." Speaking about the dispute several years later during the Company's February 6, 2017 earnings call, O'Leary noted that "the SAS unions were effective . . . in forcing us to close the base." He continued, "I think they celebrated loudly for a whole about a week or two until they realized we can (expletive) move the aircraft out of Copenhagen."

56. Until changing its tack abruptly during the Class Period, Ryanair legally circumvented the issue of unionization by using "employment representation councils" ("ERCs") at each of its 85+ bases. The ERC for each base was required to negotiate with Ryanair separately, which effectively minimized any single ERC's power to negotiate with Ryanair. In 2007, the Irish Supreme Court agreed that Ryanair's ERCs were sufficient to satisfy the country's Industrial Relations Act. The Supreme Court also stated that, "as a matter of law, Ryanair is perfectly entitled not to deal with trade unions nor can a law be passed compelling it to do so." For years, Ryanair used this decision as both a sword and a shield, insisting that while its employees are "free to join unions," the Company is "free" not to negotiate with those unions.

57. The Supreme Court's decision aside, the Company's ERCs provided (intentionally) weak protection and bargaining power for employees. First, the employee representatives on each ERC were generally chosen by Ryanair, not elected by the employees. Second, Ryanair management unilaterally set the rules for the ERCs. Finally, and most importantly, employees reported that the employee representatives serving on the councils did not actually get to negotiate with management through the ERC process. According to Ryanair employees, at ERC meetings, "management would tell the employee representative of forthcoming changes to terms and conditions of employment, the meeting would end, and a letter would be circulated to staff informing them of the 'agreement' that had been reached."

### E. Leading Up to the Class Period, Ryanair Promises Continued Growth and Cost Discipline and Dismisses Reports of Labor Unrest

58. In the months leading up to the Class Period, investors and analysts found the Company an attractive investment, crediting Ryanair management's representations that the Company was growing rapidly and that it would continue to do so in the future. They also credited representations that this growth was predicated on a sustainable, low-cost base. For example, a January 4, 2017 report by financial analyst company Redburn stated that it "continue[d] to view Ryanair as best placed due to it having the lowest cost base versus its peers." A January 13, 2017 report from Morgan Stanley emphasized that the Company's anti-union labor model was key to its share price: "One key driver of relative share price performance last year was the wide divergence in unit cost performance and labour discontent among the [airline's] group. . . . Carriers that are able to keep unit costs ex fuel flat or even down in 2017 are likely to emerge as winners . . . . Ryanair remains a compelling structural winner . . . ."

59. Ryanair encouraged the market's impression that it was peerless among low-fare airlines in controlling costs while maintaining impressive growth. During the Company's February 6, 2017 earnings call for the third quarter of FY17 ("3Q17"), O'Leary bragged that "airports all over the UK and Europe compete for Ryanair's growth," that the airline's "***low cost base . . . continues to be the key differentiator with all other airlines***," and that "[n]ot only have we the lowest passenger cost but these costs are falling at a time when many other so-called low-fare competitors are forecasting flat or rising costs. As this gap widens, we'll continue to pass on even lower fares to customers to ensure we grow safely and profitably." O'Leary promised shareholders the Company would "grow to 200 million passengers a year by 2024."

60. Indeed, by the start of the Class Period, it was readily evident that Ryanair's ability to control costs was of prime importance to analysts and investors. For example, on February 6, 2017,

Credit Suisse noted that it "continue[d] to view cost control as the key to RYA at least protecting margins and returns into the long term." On February 3, 2017, Davy Research, in discussing Ryanair, emphasized that, "[a] key point of differentiation relative to peers will be cost: we expect its ex-fuel costs to have continued to fall while they have been flat (Wizz) or rising (easyJet) at competitors." Further, on February 6, 2017, Davy Research added: "Ryanair's business model continues to outperform, notably on costs . . . further widening its competitive advantage."

61. In early 2017, however, cracks were beginning to appear in the façade surrounding Ryanair's low personnel costs. The German media began publishing investigations of Ryanair's employment conditions in that country, and the German government began an inquiry into Ryanair's use of contracting agencies to hire "self-employed" pilots, suggesting that the contractors were only "pseudo-self-employed" and that Ryanair was possibly requiring its pilots to use shell companies to avoid relevant labor regulations and evade social and welfare taxes. Faced with these reports, Ryanair insisted that it fully complied with European Union and Irish employment and tax law and required all of its pilots and crew to be fully tax compliant. It further stated that it used a mix of staff and contractor pilots "in exactly the same way that many other airlines do" and that, as a desirable employer, it had a waiting list of more than 3,000 qualified pilots waiting to take up jobs with the Company.

62. Asked specifically about the German tax investigations and German union complaints during the Company's 3Q17 earnings call on February 6, 2017, O'Leary dismissed any suggestion that the Company would change its policy of dealing directly with "its people" as "rubbish":

> The pilot unions across Europe are a busted flush. They preside over the death of many of the flag-carrier airlines. They haven't played much of a contribution, apart from to repeatedly strike in Lufthansa or rescue [A]irberlin in the last year.

> And I think what they tend to do is run around and generate a bit of noise about, oh there's issues in Ryanair, more as a way of distracting from the failure of the legacy carriers in which they are recognized and which they are members of.
>
> We've had no demands for pilot recognition in Germany. If we had at the moment we'd politely decline them because we continue to deal directly with our own people.
>
> * * *
>
> ***So the union activity around Europe is a load of (expletive). I think it's really, if you look at their effort and the continuing success of the unionized airlines in Europe, it's a model whose day is largely dead***.
>
> * * *
>
> And if we got a lot of jip from some pilots in Germany or a particular base in Germany I would have no compunction about closing the base and moving the aircraft out of there. If you don't want our jobs and our high pay, fine. We'll move the aircraft somewhere else. We'll still fly into that airport but the jobs will disappear somewhere else.

63. Despite O'Leary's vehement assurances, analysts and investors remained increasingly focused on Ryanair's labor practices and whether it could sustain its cost-advantage and growth plan for 2024 if labor relations soured. Financial analysts recognized that without union recognition Ryanair was not "socially (union) acceptable" in France and the Nordic countries and that these countries were therefore "off limits for Ryanair." For example, an analyst noted that pre-unionization, "given Ryanair's labour platform," "countries like Denmark, Norway and even France" were "restricted." Another recognized that Ryanair's low labor costs, while a substantial advantage over competitor easyJet in many markets, "also buys easyJet its strong position in France, where Ryanair's employment practices are not accepted by the authorities."

64. While most financial analysts echoed the Company's position that it would certainly maintain its labor cost advantage, a few raised concerns. For example, on May 6, 2017, the *Financial Times* reported that "[s]even European pension schemes overseeing nearly €300bn of assets have pulled their investments in Ryanair due to concerns about high-profile labour disputes

involving the budget airline." O'Leary called those raising concerns about the Company's labor practices "'idiots,'" and stated unequivocally: "'***We don't have any labour issues***.'" O'Leary also hyped the Company's share price and added that: "'***We have excellent relations [with staff], no strikes, and no threat of a strike***. Our shares are up 10 percent year to date.'" On May 8, 2017, two days after O'Leary's assurance that Ryanair did not "have any labour issues," Morgan Stanley increased its price target by 15% and recommended that investors buy Ryanair shares based on the Company's "[s]tructural cost advantage" versus its peers.

### F. Ryanair Continues to Hide the True Extent of Employee Unrest and the Tenuousness of Its Low-Cost Model During the Class Period

65. On May 30, 2017, Ryanair filed with the SEC a release on Form 6-K announcing its financial results for FY17. The release stated that Ryanair had experienced "a 6% increase in full year net profit to €1.316bn." It continued: "The combination of a 13% cut in average fares, coupled with Year 3 of the 'Always Getting Better' (AGB) programme delivered 13% traffic growth to 120m customers, and an industry leading 94% load factor. Unit costs fell by 11% (ex-fuel down 5%)." In Ryanair's earnings presentation released the same day, the Company highlighted its successes "[o]n the people front," with O'Leary bragging that Ryanair "recruited over 1,000 people last year" and "promoted internally more than 900 people," and expressing expectations that the Company would "replicate or repeat those numbers again this year as we grow to carry 130 million passengers." O'Leary reiterated that commentary out of Scandinavia concerning questionable labor practices at Ryanair was "misinformed," and that labor relations at the Company "remain excellent."

66. Financial analysts cheered on this news. For example, on May 31, 2017, J.P. Morgan lifted its Ryanair share price target 21% and recommended that investors buy.

67. Company management continued to promote its "growth story" and "cost discipline" themes during Ryanair's July 24, 2017 earnings call for the quarter ending June 30, 2017. The

Company reported a 55% increase in profits to just under €400 million, an increase in traffic of 12%, and a decrease in unit costs of 6%. Answering analyst questions concerning the makeup of the Company's costs, and its relative cost performance versus peers, O'Leary stated: "We don't have peers. We have . . . there is a basket of other people out there claiming to be peers. But when you analyze their cost performance, it becomes pretty (expletive) evident that we don't have any peers in the marketplace." He further emphasized that "[w]e have all these uncontrollable costs that easyJet and others seem to whine on about. . . . I think the key message is, if you go through each of our cost lines, staff, airport and handling, route charges, maintenance and materials, even the others, we are – there is unit cost reductions across all of those classes." In the pre-recorded earnings presentation released that day, Chief Financial Officer ("CFO") Neil Sorahan ("Sorahan") reiterated that Ryanair "expect[s] to see our numbers grow to 200 million customers by March 2024, thanks to our low fares and our Boeing order."

68. On May 31, 2017, Ryanair disclosed a €600 million share buyback program. That same day, shares hit an all-time high price of €18.26. Just two days later, on June 2, 2017, with Ryanair shares trading near that all time high, O'Leary sold 4,000,000 shares at €18.00 per share. The transactions – his first sales in over five years – netted him €72 million. *See* §VI.G., *infra*.

69. Financial analysts recognized this positive news and again recommended that investors buy shares. For example, on July 24, 2017, Davy Research published a report and stated: "Ryanair have reported very strong Q1 results with net profit up 55% to €397m (Davy €339.3m, consensus €366m)." Davy Research further emphasized that "[u]nit costs again stand out from peers down 6% (incl. fuel) and 3% (excl. fuel)." And, on July 25, 2017, HSBC Global Research ("HSBC") upgraded its recommendation to "Buy." HSBC also highlighted that key to Ryanair's share price was the Company maintaining its labor cost advantage over peers, noting that if it had to

employ staff locally it could "face some cost pressure from higher social costs," and "the threat of unionisation [would] be greater if its employees are contracted on a national rather than Pan European basis."

70. Then, on September 14, 2017, it was announced that the European Court of Justice in Luxembourg had ruled in favor of Ryanair cabin crew members based at Belgium's Charleroi Airport on the issue of what national court system had jurisdiction over their employment-related complaints (the "*Mons* decision"). The employees, who, like all Ryanair staff, were employed on Irish employment contracts, had brought their complaints against the Company to their local court in Belgium, believing Belgian law would be more favorable. Ryanair argued, as it always did, that the Irish courts had jurisdiction but this time it was not successful.

71. Ryanair attempted to spin the ruling in its favor, claiming that it supported Ryanair's position that "where people are based" should not be the "only determinant on what their governing legislation" was. O'Leary stated on a September 18, 2017 conference call that the *Mons* decision "is likely to lead to there being more . . . local jurisdiction over our Irish contract, but it will not be changing the fact that we will continue to have people employed on Irish contracts." Defendants also denied that there would be any cost impact from the *Mons* decision, or that the decision would alter Ryanair's crucial cost-depressing self-employment model.

72. Some analysts were more skeptical. For example, on September 14, 2017, HSBC stated that it "[m]odel[ed a] hypothetical 10% labour cost increase[]" in each of the next two years if Ryanair were required to employ staff locally and speculated that the ruling may "increase risk of unionisation." But HSBC also emphasized that it still forecasts "Ryanair to be a profitable, value creating cash generative business." On September 15, 2017, HSBC published a "clarification" about its September 14 report and stated: "Certain details on the ECJ court ruling were not accurately

represented in yesterday's note . . . . [Y]esterday's ECJ judgement did not rule against Ryanair's use of Irish labour contracts for staff across the EU [and] [i]t did not explicitly rule that crew's place of work, which defines where disputes should be heard, is the same as the home base . . . ." The September 15 HSBC report noted that its "[e]stimates are unchanged from yesterday," and emphasized: "We think this labour issue should be of particular focus to investors because labour costs are Ryanair's key differentiation versus competitors." And, while noting that HSBC analysts perceived a "risk" to the Company's "key" labor cost advantage, HSBC also stated that Ryanair "will remain highly profitable, value and cash generative, with a leading market share and strong management team."

73. Similarly, on September 21, 2017, Kepler Cheuvreux reasoned that:

> Despite Ryanair's CEO saying that this 'will not affect our self-employed model,' we see a risk that a pilot classified as a freelancer under Irish law, might be considered as a regular employee in another country (e.g., Germany), which is likely to result in higher social contributions for Ryanair that may have to be paid retroactively. We see a risk that the ECJ verdict will result in an increased number of claims against Ryanair all over Europe.

74. Societe Generale also expressed concern that the *Mons* decision would impact Ryanair's legal costs, noting in a September 17, 2017 report that "RYA was always tough and stringent in labour disputes, helped by the fact that its labour contracts cited Ireland as the place of jurisdiction. We think last week's ruling might encourage many employees to go to court across Europe."

75. Yet even these mild skeptics took Ryanair at its word that the case would not increase labour costs, as O'Leary claimed. Societe Generale added in its September 17, 2017 report that "[w]hile we do believe that RYA may now be compelled to review its employee benefits over time, fears of an excessive increase in personnel costs in the near future appear overdone to us." Societe Generale concluded: "To make it very clear: we don't expect any immediate financial impact from

the court decision." Likewise, on September 18, 2017, Credit Suisse published a report highlighting that "***RYA confirmed the 'Mons' ruling would not alter its Irish contracts or its labour costs***." As a result, Credit Suisse maintained its "Outperform" rating and emphasized that it was "[c]omfortable on [the] court ruling." Also crediting Defendants' claims, that same day, Morgan Stanley concluded that "the financial impact of the issues will be limited."

76. J.P. Morgan also endorsed O'Leary's claims and recommended that investors "Buy," emphasizing that "***RYA does not perceive heightened unionization risk on EU court ruling***." J.P. Morgan added that "RYA refutes the premise that this is a negative due to a misconception that Irish law is somehow relatively less compliant with EU labor law." Likewise, in a September 18, 2017 report, UBS credited the Company's statements and emphasized that the *Mons* decision would have "limited if any impact." UBS added that the "[r]uling won't change the fact that the crew fly under Irish law and people still remain free to join unions." And, UBS highlighted that O'Leary "confirms court ruling won't lead to an increase in pay or unionisation. The self-employment model won't be impacted and actually to pay self-employed cost more than direct contract."

**G. The September 2017 "Rostering Failure" Raises Red Flags**

77. Following directly on the heels of the *Mons* decision came bad news for Ryanair investors and customers. On September 15, 2017, Ryanair announced that it would be cancelling up to 50 flights per day for the next six weeks, affecting approximately 400,000 travelers. It claimed that the cancellations were necessary in order to bring the Company's typically high punctuality rate of 90% back on track after it had fallen below 80% during the first two weeks of September. At a conference call held to address the cancellations on September 18, 2017, the Company asserted that several factors had contributed to the loss in punctuality, including: air traffic control delays and strikes, bad weather, and a one-time "rostering failure" which led to crew shortages. Specifically,

Defendants claimed that due to a change in Irish Aviation Authority regulation, the airline was required to realign the fiscal year timeframe it had previously been using to allocate pilot leave, running from April to March, to a calendar-year period instead. According to defendant O'Leary, the need to allocate 20-day blocks of leave to pilots during a truncated 9-month period, which included the summer peak schedule, required the Company to over-allocate leave in September, October, and November 2017. Due to a "rostering failure," by those responsible for Ryanair's scheduling, the Company did not have sufficient pilots, excluding those on leave, to cover its rostered flights when extenuating circumstances such as bad weather delays prevented scheduled pilots and crews from starting their next flight on time.

78. Analysts and investors were surprised and concerned by the announcement, and some were skeptical of the reasons for the cancellations provided by the Company. RBC Capital Markets ("RBC Capital") stated in its September 17, 2017 report: "European summer ATC issues and strikes (especially in France) are predictable . . . . In our view, the company's reasons for its actions, while seeking to restore punctuality, sound like 'football manager excuses'. Sitting outside the company these seem like compounding issues to a lack of staff planning – that risks over-trading when there was little slack in its system for the unpredictable, or per BBC reports (17/9/17) loss of flight deck crew to other LCCs like Norwegian." Liberum echoed that sentiment in its September 18, 2017 report, noting its understanding that "the airline has been suffering from a pilot shortage that has been exacerbated by other sources of operational disruption."

79. Still, the majority of analysts accepted the Company's explicit assurances that the cancellations were not caused by a pilot shortage at Ryanair and denials of labor problems causing pilots to leave Ryanair *en masse*. UBS, for example, reported that the "[c]ause of the issue is that Ryanair . . . moved from a calendar leave period to a fiscal leave period and this has impacted

rostering," while Credit Suisse emphasized that "RYA has a long track record of operational quality and we expect a swift resolution of rostering issues."

80. And, on September 19, 2017, J.P. Morgan stated that in spite of the flight cancellations, "our long-term bullish thesis remains," and recommended that investors "Buy." Morgan Stanley added that the "scheduling issues," would have "minimal financial impact." And analysts at Liberum emphasized that "[f]light cancellations should not impact long-term fundamentals," and maintained their "Buy" recommendation. Similarly, on September 19, 2017, Societe Generale credited O'Leary's claims of a "mistake with its crew rostering," and that the Company "has no structural crew shortage." Thus, Societe Generale stated that the news represented "a buying opportunity" because "the business model is structurally intact."

81. But the September 15, 2017 cancellations gave credence to reports that had been circling throughout the first half of 2017 that Ryanair had lost hundreds of pilots to its competitors due to its unacceptable labor practices – particularly captains, at least one of which was required to be on board for a flight to take off. Indeed, Norwegian's Head of Communications stated the airline had hired nearly 140 Ryanair pilots so far in 2017. Ryanair had also recently reported in its 2017 Form 20-F that, for the second year in a row, its average pilot age – a proxy for pilot experience – was 34. This was a decrease from 35 in fiscal years 2014 and 2015, despite reports it was employing more pilots than ever. HSBC's Andrew Lobbenberg put the case bluntly in his September 28, 2017 report: "Labour relations are at the heart of the current situation: We believe Ryanair is short of pilots. The leave year change placed pressure on staffing, but this bottleneck was well flagged in advance."

82. Amid a media frenzy surrounding the extensive cancellations (and Ryanair's woefully inadequate customer service during the aftermath), media outlets also began giving more attention to

reports about Ryanair's precarious employment situation. A September 27, 2017 article from *MailOnline* quoted a senior Ryanair pilot who confirmed that a pilot exodus was underway: "'This is rubbish. It is not just normal pilots who are leaving. We are losing training captains – the guys needed to train replacement cadets and captains. They are leaving in droves. All the experience is being washed out.'" Meanwhile, the Irish Airline Pilots' Association ("IALPA") estimated that up to 700 pilots had left the carrier since FY18 began on April 1, 2017. Ryanair continued to deny that it had any pilot shortage, let alone a shortage of experienced pilots.

83. Due to Ryanair's cancellation of approximately 20,000 flights, the Company incurred significant costs, with many of the 700,000 impacted customers entitled – in addition to a refund or rescheduled booking – to additional compensation of up to €250 for flights delayed for more than three hours or cancelled with less than 14 days' notice under European Union Regulation 261 ("EU 261"). Although Ryanair initially tried to mislead customers regarding their entitlement to compensation, implying in customer communications that they were only entitled to a refund, rebooking, ***or*** the EU 261 compensation, the Company was ultimately required to correct the misimpression they had intended by civil aviation authorities, leading to tens of thousands of compensation claims being filed at a cost of approximately €25 million.

### H. Ryanair's Pilot Shortage Emboldens Employees to Demand Improved Pay and Working Conditions

84. Ryanair, facing mounting costs and a figurative tsunami of negative press as a result of the cancellations, was desperate to convince its pilots to work through the shortage so no further flights would be grounded. It offered pilots bonuses of up to €12,000 if they agreed to give up one week of leave time and work ten days during their allocated holidays. But while bases were still considering the offer, O'Leary aggravated the situation further. O'Leary claimed at the Company's September 22, 2017 annual general meeting that pilots were "self-important" and "precious about

themselves," and dismissed those complaining about working conditions, stating that he "would challenge any pilot to explain how this is a difficult job or how it is they are overworked." O'Leary also threatened to simply reclaim one week of pilots' annual leave in order to reduce further flight cancellations in the event that insufficient volunteers stepped forward. He claimed "***hell [would] freeze over***" before Ryanair welcomed unions, and affirmed that "***there is no threat of industrial action. There's no union in Ryanair***."

85. Outraged and insulted by O'Leary's rhetoric, Ryanair pilots were spurred to action. Over 46 bases across the European Union joined forces and soon rejected the bonus offer, instead demanding improved terms and conditions. On September 27, 2017, *The Guardian* reported that Ryanair pilots were even considering unionization and industrial action, quoting one pilot as explaining that "'[s]triking is only a last resort, as we don't want to harm the passengers. We only want Ryanair to reason with us and give similar contracts compared with other airlines, easyJet for example, so ultimately it's up to Ryanair, and I'm sure they will not listen until we take collective action.'" On September 29, 2017, the *Irish Daily Mail* reported that Ryanair was "facing a full-scale revolt by its pilots" as pilots at 60 airports signed a letter condemning O'Leary's ridicule and demanding changes in their contract terms – including the provision of permanent local contracts that followed local laws.

86. Ryanair, growing desperate to quell the pilot unrest, offered to raise the base pay of pilots at several bases beginning in October 2017 by €10,000 for captains and €5,000 for first officers, withdraw threats to unilaterally revoke the pilots' leave, and engage in discussions with the ERCs regarding other terms. But the offer was too little, too late. On October 2, 2017, *The Guardian* reported that Ryanair pilots had formed an "unofficial trade union," undermining Ryanair's long-standing strategy of negotiating separately with each base's ERC.

87. Cabin crew were equally incensed at their substandard employment practices and took the cancellations as an opportunity to finally be heard (though at first, whistleblowers preferred to remain anonymous for fear of retaliation). A September 27, 2017 article in *The Telegraph* contained scathing allegations from one unnamed Ryanair cabin crew member accusing the airline of only paying for approximately half the time actually worked by crew, charging staff full price for water and sandwiches, demanding that winter crew accept last-minute base transfers (and pay for all associated moving costs) or be laid off for months, and encouraging crew members to compete against each other for in-flight sales. But analysts still credited the Company's claims that the publicized staffing issues would have a limited financial impact. For example, a September 27, 2017 report by financial analysts at Redburn reiterated its "Buy recommendation" based on Defendants' positive statements. Then, on October 4, 2017, *The Telegraph* reported that Ryanair cabin crew were planning to walk out on the airline over working conditions before leaving *en masse* to join Ryanair rivals Norwegian and easyJet.

88. By September 29, 2017, Ryanair had announced yet another round of flight cancellations, this time removing 25 airplanes from rotation and eliminating 462 flights from its winter schedule in order to "slow its growth." The Company indicated that another ten airplanes would be removed from its summer 2018 schedule. Meanwhile, further details continued to emerge suggesting that Ryanair did, in fact, have a pilot shortage and that its employees' working conditions were not as idyllic as Company management assured. In an October 6, 2017 *MailOnline* article, a Ryanair pilot was quoted as saying that "'Everyone at Ryanair has known about the pilot shortage for months and months. It's a running joke that "no we're not short of pilots," when it's crystal clear we are. Pilots are continually being sent out of base to operate from 1 to 5 days in other bases. This can be anywhere in the network with contractors having to organise and pay for everything

themselves and get an extra [€]20 per block hour. If your accommodation costs more than you make you are out of pocket.'" Still financial analysts echoed the Company's claims that there would not be any impact on Ryanair's key cost base. For example, on October 9, 2017, noting O'Leary's recent statements about pilots, Credit Suisse concluded: "Undeterred by staff cost question marks, we see RYA's current network as a fortress that will be very difficult for competitors to sustainably penetrate given its cost base and balance sheet."

89. On October 12, 2017, Ryanair pilot Imelda Comer wrote an open letter to CEO O'Leary as a representative of the pilots' unofficial trade union, the "European Employee Representative Council" or "EERC," accusing the airline of refusing to listen to staff and asserting that its way of interacting with staff members was "not in line with the normal practices of any of the companies to which our colleagues have gone in increasing number." Captain Comer stated in her letter that, "[t]he company insists that [it] will only engage one base at a time. I respectfully suggest that this approach has failed the company, as evidenced by the shortage of pilots that has led to the cancellations crisis." Ryanair maintained it would not meet with the EERC.

90. The following day, on October 13, 2017, Ryanair issued a press release emphasizing what it referred to as the "truth" about Ryanair pilots' working conditions – that they had "'industry leading pay, excellent working conditions, unrivalled career progression,'" and that the Company was readily attracting "'hundreds of pilot applicants from other airlines.'"

91. On October 17, 2017, Ryanair announced that Peter Bellew ("Bellew") would be replacing COO Michael "Mick" Hickey ("Hickey"), who had resigned in early October as a result of the cancellations and "rostering (expletive) up." Bellew, who had worked with Ryanair until 2014 as the Director of Flight Operations, was CEO of Malaysia Airlines at the time he was brought back to Ryanair and had a reputation for a gentler, more approachable manner with staff relations than

O'Leary and his executive team. The Company announced that among his other responsibilities, Bellew would have a "specific responsibility for pilot production, training and career development with a mission to ensure that the pilot rostering failure which Ryanair suffered in early September will never be repeated."

92. On October 19, 2017, the *Irish Daily Mail* revealed that, despite the Company's repeated claims that it had no pilot shortage, its "flight operation managers" had been contacting former Ryanair pilots on LinkedIn, describing "'significant changes'" that were taking place at the Company including "a pay rise of around 20% for pilots and first officers" as well as "'significantly increased resources in pilot rostering, crew control, bases and training.'" The managers also expressed interest in the former pilots' return to Ryanair.

93. By October 24, 2017, Ryanair pilots in the EERC were threatening to strike. Ryanair remained unwavering in its refusal to negotiate with the EERC, stating that "[a] list of demands from EERC, which itself has no status or validity, clearly has no value when Ryanair is receiving and recruiting many hundreds of new pilot applications from Monarch, Air Berlin and Alitalia."

94. In its October 31, 2017 Form 6-K filed with the SEC, the Company reiterated that it had, "for over 30 years, operated a sophisticated collective bargaining process, supported fully by our pilots and cabin crew," and that it "[would] not, and cannot, be forced to meet with any outside group such as the so called EERC." During the Company's half-year earnings call later that day, O'Leary conceded that the rostering failure had "highlighted the need for us to improve pilot payment in Ryanair," but argued it had corrected the problem by "rolling out significant pay increases of up to EUR 22,000 for captains, EUR 11,000 for first officers." He insisted that the rostering failure had been used "by competitor pilot unions as an opportunity to generate some negative PR for Ryanair," but that was "***[a]ll it is, is PR***. ***We continue to be an excellent employer***

***of pilots***." He further emphasized that "[t]he relationship with the pilots is very good, despite what you might read in the papers," and that "***operating costs will continue to be flat or fall slightly***, although we're now going to add some EUR 100 million a year in terms of additional pay for our people." O'Leary insisted that, although "[w]e have seen all of the speculation about industrial action . . . none of it [] is backed up by any facts whatsoever." He affirmed that "we are determined, as has always been, we have been a nonunion company for 30 years. ***We will remain a nonunion company*** . . . ." According to O'Leary, "the board are 100%, in fact, if anything, more supportive, of our determination that we will not be bullied or intimidated by competitor pilot unions into offering union recognition to people who tell lies about Ryanair safety, about our employment structures. We intend to continue to negotiate directly with our pilots. And I think, if anything, the board is absolutely united and – on that issue."

95. On December 8, 2017, after months of seething unrest among pilots and crew, *The Times* reported that Ryanair pilots across Europe were balloting as to whether to take strike action in protest at the Company's negotiating policy. Pilots in Portugal and Italy served formal notices of industrial action. Ryanair responded with further insistence that it would not accept unionization or actions by "competitor" unions such as IALPA (whose president, Evan Cullen, was an Aer Lingus pilot). Ryanair's Chief People Officer, Eddie Wilson ("Wilson"), wrote to the Company's pilots in Dublin that strike action "'***simply will not happen***,'" and that "'[i]f pilots intend to support this organised industrial action then we intend to meet this head on . . . . If any such action occurs, then we must assume that Dublin pilots for the moment no longer wish to deal directly with Ryanair and we will withdraw those benefits which are dependent on our direct dealing collective agreement.'" Wilson threatened that promotions would be "'frozen until further notice,'" and that the airline would possibly move some aircraft based in Dublin elsewhere in Europe, where pilots continued to

deal with the Company directly. Financial analysts took note of all the Ryanair "unflattering headlines," but continued to credit Defendants' claims. For example, on December 11, 2017, Deutsche Bank published a report and "urge[d] caution when reacting to these headlines since the business fundamentals, in our view, remain very solid." And Deutsche Bank maintained its "Buy" recommendation citing Ryanair's "substantially lower cost base than peers."

### I. Investors Begin to Learn the Truth but Defendants Continue to Mislead the Market

96. Despite their best efforts to assure shareholders that concerns of industrial action were overblown, Defendants could only conceal the true extent of Ryanair's employment crisis for so long. The truth was ultimately revealed in a series of partial disclosures causing a series of sharp declines in the Company's ADS price. The declines would have been swifter and steeper, but Defendants continued to downplay the negative news and mislead the market with misrepresentations and omissions minimizing the significance of the threat posed to the Company's low-cost operations. By continuing to mislead the market in this manner, Defendants kept the Company's ADS price artificially inflated throughout the remainder of the Class Period. This section details the partial revelations of truth, the resulting Ryanair ADS price declines, and Defendants' continued misrepresentations and omissions that kept the Company's ADS prices artificially inflated even as the truth began to leak out.

#### 1. Ryanair Concedes that It Needs to Recognize Employee Unions in the Face of Mounting Employee Unrest

97. In a startling reversal – and in direct contradiction to statements made by Defendants only weeks previously – on Friday, December 15, 2017, Ryanair conceded that it needed to recognize employee unions in the face of mounting employee unrest. In a Form 6-K filing, the Company announced that it had invited discussions with unions in Ireland, the U.K., Germany, Italy,

Spain, and Portugal in order to stave off expected employee strikes that threatened to disrupt flights during the critical holiday travel season. The Company claimed it was changing its anti-unionization policy "in order to avoid any threat of disruption to its customers and its flights from pilot unions during Christmas week." In the Company's December 15, 2017 press release, O'Leary stated that, "'[p]utting the needs of our customers first, and avoiding disruption to their Christmas flights, is the reason why we will now deal with our pilots through recognised national union structures and we hope and expect that these structures can and will be agreed with our pilots early in the New Year.'" A few days later, insisting that its agreement to recognize unions would not undercut its business model, Ryanair also extended its offer to recognize unions to its cabin crew.

98. In response to the December 15, 2017 disclosure Ryanair's ADS price fell sharply. After closing at $112.44 per ADS on Thursday, December 14, 2017, the ADS price closed at $106.59 on Friday, December 15, 2017, on unusually high trading volume.

99. In the wake of this disclosure a number of financial analysts and financial press outlets published reports highlighting the economic significance of the information for the Company's cost base and profitability and linking the disclosure to prior statements by Defendants. For example:

(a) On December 15, 2017, the *Financial Times* noted that "Ryanair shares fell" in response to the disclosure that "Ryanair to recognise pilot unions for first time in bid to avoid strikes." According to the article, "Dublin stockbroker Goodbody said it believed the move would not have 'any impact' on a proposed pilot pay offer already on the table which is estimated to add €100mn to Ryanair's cost case and is 'already built in to market numbers.'"

(b) In a December 15, 2017 report, Credit Suisse stated that Ryanair "Pilot bargaining power continues to increase . . . Pilot union recognition a clear victory for labour as

management continues on the path of harmonising practices with the market . . . ." The report also emphasized that this "departure from its position of not recognising unions," causes "[i]nflation risk [to be] heightened." As Credit Suisse put it, "the key questions surrounding this move include: i) does pilot unionisation open RYA up to persistent inflationary headwinds? . . . ii) will pilot unionisation ultimately be followed by cabin crew unionisation? . . . iii) how sustainable is RYA's cost advantage to competitors on the low cost carrier and network carrier side? . . . [and] iv) does unionisation open up network opportunities? RYA's refusal to recognise unions has resulted in no bases in France or Denmark."

(c) On December 15, 2017, J.P. Morgan published a report titled: "Major shift as RYA agrees to recognize national unions; long-term cost implications unclear." The report recognized that the disclosure was "a major about-face" for the Company and O'Leary.

(d) In a December 18, 2017 report, Credit Suisse stated that "Labour inflation risk set to linger," dropped its rating from "Outperform" to "Neutral," and dropped its "target price" 16% from €19.32 to €16.18. The downgrade was based on Credit Suisse questioning the Company's credibility: "we downgrade the stock to Neutral based on concerns that staff costs will rise significantly beyond the company's guidance of a €100m uplift in FY18/FY19, and risk that labour issues continue to dominate the investment case for an extended period."

(e) In a December 18, 2017 report, RBC Capital similarly stated that "Ryanair's unexpected announcement that it would recognize unions was an adverse surprise." In analyzing the announcement, RBC Capital also specifically questioned Ryanair's prior claims about having "above market" pay and noted that "[u]nionization could bring other indirect costs."

(f) In a December 18, 2017 report, Davy Research noted that the unionisation announcement had caused shares to drop significantly: "The €1.5bn taken off Ryanair's valuation

following the announcement of its agreement to recognise unions clearly reflects market surprise and uncertainty." But Davy Research maintained its "Outperform" rating, crediting the Company's claims that it would continue as the industry leader in cost base and returns.

(g) In a December 18, 2017 report, Morgan Stanley labeled labor union recognition "evolution not revolution." Morgan Stanley credited the Company's claim that it "doesn't expect material change to its labour cost structure." Morgan Stanley noted that – despite O'Leary's recent statements that it would recognize unions when hell froze over – "[g]iven the scale of the Ryanair operation today – 400+ aircraft and the planned increase to 580+ by FY24 – it should be somewhat expected that unionisation was likely to be on the table during the group's evolution." Thus, Morgan Stanley maintained its €20.00 "price target."

(h) In a December 18, 2017 report, J.P. Morgan also credited the Company's claims about future costs and declared that Ryanair stock was now a "[b]uying opportunity."

(i) In a December 18, 2017 report, Deutsche Bank emphasized the economic significance of the news: "Ryanair agreeing to recognise its pilot unions is unprecedented in its history." The report noted that the disclosure caused the stock price drop: "[t]he market understandably reacted badly to this surprise negative announcement." Deutsche Bank assessed what this may mean for Ryanair's cost base (analyzing the impact pilot unionization may have on the components of Ryanair's staff wage bill: pay, productivity, benefits, and social security): "We estimate an immediate very negative scenario could add an incremental E150m of cost and knock 9.4% from our annual net profit forecasts." But, echoing the Company's claims, the analysts stated that the incremental increase "would barely dent Ryanair's cost advantage over its major European peers." Deutsche Bank maintained its "Buy" recommendation.

(j) On December 19, 2017, the *Irish Independent* reported that shares "slumped" 9% on the news that the Company would recognize unions. According to the article, the decline began "after the airline dramatically announced that it will recognise unions, reversing a 32-year practice of keeping the door firmly shut on organized labour." The article also highlighted that, according to J.P. Morgan analysts, "the market reaction to unionization 'appears overdone.'" And the article noted that O'Leary "indicated to pilots last Friday that the unionization of Ryanair could also help the airline expand in the longer term in countries including France and Denmark."

(k) In a January 5, 2018 report, HSBC declared: "***Hell has frozen over***; the world changes." HSBC stated that the "quantum of change" was being underestimated by the market and lowered its "target from EUR14.50 to EUR13.50." While HSBC said that unionization would help "build[] a path towards a more sustainable business model, which will see Ryanair adopting, local, direct and unionised employment, in line with peers. The path to achieving the new equilibrium will be challenging." Simply put: "A unionised Ryanair will still be profitable, cash generative and value creating in our view but will be a markedly different company."

(l) In a January 12, 2018 report, Goodbody stated that its analysis showed that "unionisation will result in labour cost inflation of over €170m." The report contrasted this estimate with the Company's "guidance for up to €100m next year." But the Goodbody report also echoed Ryanair's claims of continued cost advantage, stating "***[w]e think the concern over Ryanair's narrowing cost advantage over its peers is wrong***." Goodbody maintained a "Buy" recommendation.

(m) In a January 30, 2018 article, the *Evening Standard* reported on the unionization disclosure and specifically linked the disclosure to the Company's earlier statements: "Michael O'Leary made to eat his words as Ryanair becomes unionised." The *Evening Standard*

discussed the recent announced deal with BALPA, including a 20% pay rise to U.K. pilots and noted that "[o]nly in September last year O'Leary said that 'hell will freeze over' before Ryanair was unionised." The *Evening Standard* also credited the Company's statements that the decision to recognize trade unions would not affect profits.

### 2. Contrary to Management Assurances, Union Negotiations and Labor Relations Do Not Progress Smoothly in the First Half of 2018

100. On February 5, 2018, Ryanair held its third quarter of 2018 ("3Q18") earnings call, its first since announcing that the Company would recognize unions. The Company was eager to assure the public and shareholders that its union negotiations were going well. It touted the fact that it had "successfully concluded our first recognition agreement with BALPA in the U.K.," which it called a "milestone because it is by far and away our largest market and accounts for over 25% of our traffic, and over 25% of our pilots are based there in the U.K." O'Leary emphasized that the agreement was a "reflection of our ability to change the model, ***enter into union recognition and do so without disrupting the growth or the operations or our growth***." O'Leary also reiterated that "union recognition may add some complexity to the business and it may cause short-term disruptions and some negative union PR, but ***it does not alter our cost leadership in European aviation or alter our plan to grow to 200 million passengers per annum by March 2024***." O'Leary, while emphasizing that "the key theme of this morning's conference call will be our unit cost discipline," also noted that the Company's "[e]x-fuel unit cost increased by 3%, but primarily due to the higher staff and the one-off EU261 costs arising from the September rostering failure and our decision to cancel flights in September and October." He insisted, however, that while "analysis since last September when, mea culpa, we had a major rostering (expletive), which we have now fixed . . . [that] either the ECJ

or the Mons case or unionization will blow up Ryanair's labor costs" was "rubbish," and that "labor costs are a tiny fraction of our unit cost advantage over every other airline in Europe."

101. During the same call, O'Leary noted that the Company had already begun efforts to develop bases in France and Scandinavia, areas it had previously avoided because of their pro-unionization policies. Chief People Officer Wilson stated that he had met with the French unions and would shortly speak with Danish unions. According to Wilson, "once we're sort of compliant with the local common labor agreements, there they've no difficulty." O'Leary later informed shareholders that the Company's upcoming base opportunities would largely be in "those countries where we have avoided in recent years because of the threat of unionization, so we think the new base opportunities arise in France in Scandinavia." He went on to add that "Eastern Europe will continue to be a focus of very significant growth for us. We see, a, it's an area where – and it is an area where we have lower kind of staff costs and more efficient staffing."

102. When asked by analysts whether Ryanair knew of impending strikes, O'Leary hedged, saying that "[i]f you're dealing with unions, strike threats are pretty frequent, actual strikes and actual walkouts tend to be a lot less frequent because people don't want to lose out on money, which is what will happen when they do. But . . . you should expect some strikes and you should expect us to face down either some disruptions or some strikes." In concluding the call, he stressed that where "some silly people decided they want to challenge either our cost base or our operational efficiency, we will face down those disruptions. And if necessary, we will move aircraft out of those bases and there will be job losses in those bases where there was that kind of – where that kind of challenge[] to the model take[s] place."

103. Also on February 5, 2018, the Company announced a €750 million stock buyback in a continued effort to maintain the stock and ADS price following the unionization

announcement. Analysts called the buyback (worth 3.9% of the market cap, €19 billion) "a positive surprise." For example, in a February 15, 2018 report, Deutsche Bank stated: "Ryanair clearly has the capacity to return cash to shareholders but we do not think anybody expected it to come so soon after the staffing issues." The same day, analysts at Societe General stated that the "€750m share buyback, to start in February and slated to end in October, is indeed positive."

104. Analysts responded positively to Defendants' February 5, 2018 statements. For example, that same day, Davy Research published a report and, citing the Company's claims about staff costs, maintained its "Outperform" rating. Davy Research stated that: "While costs will rise next year . . . , these were as expected and we believe that the competitive advantage Ryanair has in the market will be maintained, indeed enhanced as it continues to roll out its high volume (138m customers) low fares model." UBS and RBC Capital also issued positive reports recommending "Buy" and "Outperform," respectively. On February 7, 2018 financial analysts at Liberum also credited Defendants' claims about the financial impact of unionization and concluded: "The reversal of yet another long-standing and strongly-asserted policy would seem to reduce the differentiation compared to legacy airlines. However, we do not see [unionization] as impacting Ryanair's cost advantage materially."

105. That same day, following their "meeting with management," analysts at Goodbody cheered, "[b]ring it on," and stated that "[w]hile some additional costs may rise over the pay review, there is no expectation that this will be material given progress made with key unions." Also summarizing the analyst meeting with the Company, Societe Generale concluded: "The key message, in our view, was addressed right at the beginning: 'nothing has changed', meaning that, despite the recent union recognition and pilot wage increases, ***RYA will remain the cost leader among European airlines and actually plans to even expand its cost leadership***."

106. Later, on February 11, 2018, discussing the Company's agreement to recognize unions with *The Sunday Times*, O'Leary denied having ever said the much-quoted remark that he would "cut his arms off before negotiating with unions," instead admitting that "'[t]he reality is ***we were always going to be unionised*** at some point in time.'"

107. Ryanair continued to insist that unionization would have no material impact on its cost base or business model over the next several months. On April 27, 2018, for example, *The Times* quoted Ryanair's Chief Marketing Officer, Kenny Jacobs, as explaining that "'[o]n the staff costs we've flagged that yes, there's going to be an increase in staff costs, but if you look at our staff costs relative to other airlines we still have a big, big advantage . . . and we have a massive advantage on the cost per passenger flown compared to easyJet and Wizz Air.'"

108. On May 21, 2018, Ryanair announced that its full-year profits had risen ***10%*** to €1.45 billion. The Company attributed the success to its lower fares (down 3%), which stimulated 9% traffic growth to over 130 million customers. It assured investors that it would continue to deal "openly and fairly with our people and their unions, but we will not make concessions on pay or productivity which threatens either our low cost model or our cost leadership in Europe."

109. During Ryanair's FY18 earnings call on May 21, 2018, O'Leary bragged that "we've made significant progress with our union recognition negotiations," and minimized the impact that the unions would have on the Company's costs, stating, "we are not going to accept any ridiculous inefficiencies. And if that means we have occasional strikes such as the ones we had with the German pilots in December or with the Portuguese cabin crew in Easter, we think they will be reasonably small in number and will be on a country-by-country basis but only where we're dealing with unreasonable demands or expectations." He also emphasized that the union recognition process had opened up "huge growth opportunities at the regional French airports where frankly – where Air

France or easyJet who tend to focus on Paris aren't delivering any growth at all," and that "it is likely in the next 12 months that you'll see us open a base or reopen the base in Copenhagen with – working hand in hand with the unions where previously we closed [a] base 2 years [ago] because of unionization."

110. The Company also reported on May 21, 2018, that its ex-fuel unit cost had risen 3% over the prior year due to the costs of the September 2017 cancellations, which included EU 261 costs, passenger refunds, and higher staff costs in the second half of the year. Although O'Leary noted during the earnings call that day that labor costs had increased somewhat (17% over the prior year) and that there was "certainly a tightening in the markets for pilots in the last 12 months," he also said that the increase was not a surprise, noting that five-year pay deals had been put into place with pilots and cabin crew, and that "a lot of the pay was front-ended." He dismissed the idea that unionization "could cost us anything up to EUR 140 million, actually between EUR 140 million and EUR 240 million of pay increases." Again, O'Leary was adamant that unionization would not have a continuing impact on its key cost base: "The number is EUR 100 million. We felt we've indicated we felt it will be EUR 100 million, and I think we cap it out at that."

111. In the Company's pre-recorded earnings presentation released that day, O'Leary reiterated that the Company had restarted negotiations with airports in France and Scandinavia, where it had previously "avoided establishing bases because of our antipathy to union recognition." He noted that "[n]ow that we have union recognition, there's nothing to stop us opening bases in some of – in those countries and those base negotiations have already begun." O'Leary also acknowledged that "one of the key criticisms" for its employees' unions had been that pilots "were all in a base they didn't want to be in," and stated that "we have rebased more than 900 pilots over the last 12 months."

112. Following Defendants' positive statements about the minimal cost impact of unionization, financial analysts credited these statements and recommended that investors "buy." For example, on May 21, 2018, Davy Research published a report and stated that according to its analysis, "Ryanair's industry-leading competitive advantage remains." The same day, analysts at Liberum stated that they, "anticipate[d] further adverse news flow as Ryanair attempts to reach agreements for the first time with trade unions in each of the countries it has operating bases in." But, according to Liberum, "this does not dilute Ryanair's sound and attractive long-term fundamentals." Based on the Company's claims, Deutsche Bank concluded: "It seems to us that Ryanair's business model is actually much more stable than the market gives it credit for."

113. Shortly after Ryanair reported a 10% increase in full-year profit and O'Leary again claimed that unionization would not materially impact Ryanair's key labor cost advantage, he cashed in again. On May 30, 2018, O'Leary sold another 2,000,000 shares at €16.49 per share, reaping proceeds of €32.98 million. *See* §VI.G.

114. As the summer's critical peak travel season picked up, Ryanair customers remained rightly concerned over reports of further industrial action leading to more cancelled flights. In July, traditionally one of Ryanair's busiest months of the year, strikes were planned across its European bases. On July 4, 2018, media outlets began reporting that up to 6,000 cabin crew had threatened to strike over management's failure to meet crew demands for better sick pay and a change in the sales-focused and competitive culture imposed on crew members. On July 6, 2018, *The Irish Times* reported that cabin crew in Portugal, Belgium, and Spain had officially announced a 48-hour strike on July 25 and 26, while crew in Italy announced a one-day strike on July 25 as well. Ryanair cancelled 300 flights due to the strikes. As it turned out, these were just the first of many strike announcements to be made over the summer.

115. On July 12, 2018, approximately one-third of Irish-based pilots went on a one-day strike over their dispute with management on seniority. Ryanair cancelled 30 flights as a result, impacting approximately 6,000 customers' travel plans and entitling them to EU 261 compensation. The following day, IALPA announced that two additional one-day strikes would occur on July 20 and July 24. In response to the July 20 and July 24 strikes, Ryanair cancelled 24 and 16 flights, respectively, impacting approximately 6,500 more travelers.

116. Ryanair's cancellation predicament escalated dramatically on July 19, 2018, when Ryanair announced that up to 600 flights – 12% of its daily schedule – would be grounded due to the cabin crew strikes in Portugal, Belgium, and Spain on July 25 and 26. The cancelled flights impacted nearly 100,000 passengers. By this point, public confidence in Ryanair's reliability was severely damaged and customers flocked to other airlines in order to avoid having their vacations ruined by last-minute cancellations.

### 3. On July 23, 2018, Ryanair Discloses a 20% Decrease in Quarterly Profits Due in Large Part to a 34% Increase in Staff Costs

117. On July 23, 2018, Ryanair reported its financial results for the first quarter of 2019 ("1Q19"), ended June 30, 2018, in a release filed with the SEC on Form 6-K (the "1Q19 Release"). In the 1Q19 Release, the Company disclosed a 20% decrease in quarterly profits to €319 million, due in large part to a 34% increase in staff costs. Ryanair also disclosed that fares would rise about 1% in the second quarter, down from the previous target of 4%. The Company also disclosed that strikes had damaged its operations and financial results, stating in pertinent part:

**Strikes**

In recent months we implemented a series of initiatives to make Ryanair more attractive to pilots and cabin crew, including (a) a 20% pay increase under 5-year pay agreements which makes our pilots significantly better paid than competitor (Norwegian & Jet2) B737 pilots; (b) we cut training/bonding costs for new pilot and cabin crew recruits; (c) we facilitated over 700 pilot transfers to their preferred base; (d) we invested heavily in new simulators and in house training capacity; and, (e) we announced we would recognise trade unions.

Despite signing pilot and cabin crew union recognition agreements in our major markets (the UK and Italy, and a recent agreement in Germany for cabin crew), progress has been slower in smaller markets where competitor pilots are impeding both progress and process. ***We suffered 2 unnecessary strikes by a small minority (25%) of Irish based pilots in July (with a 3rd strike threatened for 24 July). Cabin crew have also threatened strikes in Spain, Portugal, and Belgium on 25 & 26 July. We have minimised the impact of these strikes on customers by cancelling a small proportion of our flight schedule, well in advance of the day of travel, to allow our customers to switch flights or apply for full refunds. While we continue to actively engage with pilot and cabin crew unions across Europe, we expect further strikes over the peak summer period as we are not prepared to concede to unreasonable demands that will compromise either our low fares or our highly efficient model***.

***If these unnecessary strikes continue to damage customer confidence and forward prices/yields in certain country markets then we will have to review our winter schedule, which may lead to fleet reductions at disrupted bases and job losses in markets where competitor employees are interfering in our negotiations with our people and their unions. We cannot allow our customers flights to be unnecessarily disrupted by a tiny minority of pilots***.

118. In response to this disclosure Ryanair's ADS price fell sharply. After closing at $116.70 on Friday, July 20, 2018, the ADS price closed at $106.70 on Monday, July 23, 2018, on unusually high trading volume. However, Ryanair ADSs maintained artificial inflation as Defendants continued to make material misstatements and conceal the extent and severity of the labor disruptions and the resulting impact to Ryanair's financial results.

119. In the wake of this disclosure, a number of financial analysts and financial press published reports highlighting the economic significance of the information and its impact on the ADS price and linking the disclosure to prior statements by Defendants. For example:

(a) On July 23, 2018, *Bloomberg* reported that the disclosure caused the ADS price decline, stating that, "[l]abor strife is starting to weigh on Ryanair Holdings Plc."

(b) On July 23, 2018, *The Economist* reported on the announcement and observed that shares were down because of the disclosure: "investors have been sent into a flap by its announcement on July 23rd that its profits in the first quarter fell 20% year-on-year, which sent its share price down nearly 7% on the day." *The Economist* also linked the disclosure to the Company's earlier statements about unionization and the pilot shortage: "Last September the airline was forced to cancel over 2,000 flights owing to a pilot shortage. To attract enough staff to keep up with its breakneck expansion it has been improving pay and conditions, as well as recognising trade unions for the first time."

(c) On July 23, 2018, analysts at Goodbody published a report noting that the new disclosure was "impacting" share prices. But the report also credited the Company's claims that union strikes are "less of an issue than the headlines tell us," because "the company is explicit in its view that where strikes are damaging returns, assets could be moved to better growth opportunities." Thus the report recommended that investors "Buy" Ryanair, stating that the price decline represented "a buying opportunity."

(d) On July 23, 2018, analysts at Credit Suisse noted the disclosure and stated that the Company's "[t]ransitional period continues to weigh." And, specifically linking the disclosure to the December 2017 decision to recognize unions, the report stated that "RYA's investment case remains somewhat complicated." Additionally, the report emphasized that "strike threats around Europe, highlight[] that it remains challenging for RYA to participate in what we see as a strong market to the same effect as competitors such as easyJet and IAG."

(e) On July 23, 2018, analysts at Societe Generale reporting on the Company highlighted that the "[r]est of year 'to be challenging.'" In particular, Societe Generale noted that "the unit revenue (per passenger) guidance was reduced vs May . . . due to 'the recent weaker fare environment and the expected impact of crew strikes on forward pricing.'"

(f) On July 23, 2018, analysts at Kepler Cheuvreux reporting on the disclosure stated they expected a negative share price reaction: "We expect the market to start to question Ryanair's equity story more and more." The report focused on the disclosure that "management now expects a fare increase of just 1% (vs. 4% before) during the current quarter." Simply put, Kepler Cheuvreux "consider[ed] today's newsflow rather negative."

(g) On July 23, 2018, analysts at RBC Capital published a report highlighting that "Staff costs – Up: Q1 saw a 34% increase in staff costs."

(h) On July 23, 2018, analysts at Mainfirst published a report that also emphasized the significance of the cost increase, +7% "on higher labour costs (mainly pilots)." Mainfirst also highlighted the disclosure that "Q2 yields are now expected to be +1% (was: +4%)." In their view, "the strong cost inflation in Q1 and the cut yield outlook for Q2" are the key negative developments. Thus, "[l]onger-term we continue to believe the impact of unionization is underestimated: We think it means gradual cost inflation beyond just wage inflation."

(i) On July 23, 2018, analysts at Davy Research published a report titled: "Business model endures; full year guidance maintained." Davy Research noted the negative disclosure, stating: "While Q1 is marginally ahead, Ryanair expects Q2 fares to rise by only 1% (previously guided +4%), citing the recent weaker fares environment and the expected impact of crew strikes on forward pricing." The report also noted the higher labor costs, but credited the Company's statements:

> We expect the competitive advantage to continue and do not see the recent strikes as having a lasting effect on the cost base or flexibility of Ryanair's highly efficient model. Pilot and cabin crew recognition in large markets such as the UK, Italy and recently with cabin crew in Germany is encouraging. Ryanair is not prepared to compromise either its low fares or its highly efficient model; if strikes continue in certain countries, it will review its winter schedule in those markets.

Thus, Davy Research retained its "Outperform" rating.

(j) On July 23, 2018, Morgan Stanley published a report crediting the Company's claims about labor costs and thus maintained its "Overweight" rating. But the report did note that "[m]ajor changes to labour cost structure – beyond recent company guidance for new wage and headcount plans – could impact future earnings."

(k) On July 24, 2018, HSBC published a report critical of the Company's disclosure and linked the news to both the union recognition decision and Ryanair's earlier pilot shortage. HSBC stated:

> Recognising unions requires more change: In December 2017 Ryanair announced it would recognise unions for the first time ever. Ryanair has established union recognition deals for pilots in the UK and Italy, for cabin crew in the UK, Italy and Germany. But it has not defined collective labour agreements with unions. It has faced strikes in Germany and Ireland with further strikes in Spain, Portugal and Belgium next week. Negotiating with unions represents a major cultural adjustment for Ryanair: we see few signs of the company making this change. We see its threats to move aircraft away from markets where there are strikes as likely to fail. There is a pilot shortage in Europe. Ryanair faced pilot attrition and hence shortages not because of pay, but over terms and conditions and the relationship between staff and crew. We expect strikes to continue this summer.

(l) On July 24, 2018, Barclays published a report that largely credited Defendants' claims about the impacts of unionization on labor costs: "we retain our OW rating as we believe that the Ryanair model remains efficient and flexible in the medium term. Productivity and unit costs remain best in class despite the short term pressures, and ultimately this should help drive market share. In our view, internal disruption will simply lead to a reallocation of aircraft for the upcoming seasons . . . ."

(m) On July 26, 2018, Kepler Cheuvreux analysts reduced their target price in response to Ryanair's disclosure about moving aircraft out of Dublin: "In a market characterized by a shortage of pilots, we think this decision is risky."

(n) On August 19, 2018, *The Guardian* published a story about Ryanair noting that the disclosures about unionization and the resulting financial impact had caused the Company's share price declines: "Ryanair shares have lost a fifth of their value in the past year while its low-cost rival easyJet, which has long-standing union agreements, saw its share price rise by a fifth." The article also noted that: "[m]ost equity analysts" were still crediting the Company's claims and "argue[d] Ryanair will be able to get through the turmoil." For example, Gerald Khoo at broker Liberum said: "'There is space for Ryanair management to reach sensible agreements so that Ryanair will have the same profitability in the long term.'"

(o) On August 14, 2018, Redburn published a report siding with the majority of equity analysts and crediting Defendants' claims about the impact of unionization on costs: "Ryanair will continue to have a cost advantage over" peers. Redburn did, however, observe that the alleged corrective disclosures caused the price declines: "The reaction throughout this year to the news of unionisation and the lacklustre financial performance has seen the shares collapse 30% from peak."

120. Ryanair's industrial relations did not improve after its July 23, 2018 disclosures. Instead, on July 30, 2018, Ryanair pilots in Germany overwhelmingly voted to strike. The next day, on July 31, 2018, Dutch pilots announced that they would be taking industrial action as a "wake up call" to Ryanair in its negotiations. On August 3, 2018, Ryanair cancelled 20 more flights as Irish pilots announced a fourth 24-hour strike. Then, over the next week, the Company announced that on August 10 it would be cancelling approximately 400 flights – or one-sixth of its daily flights across Europe – as employees from Germany, Ireland, Belgium, Sweden, and the Netherlands each

announced a 24-hour simultaneous strike. In total, over 67,000 passengers were affected, generating a frenzy of negative publicity and public complaints about Ryanair's reliability and distressingly insufficient customer service. One analyst estimated that the airline could face costs of as much as €26 million if even one-quarter of the passengers affected by the strikes asked for compensation.

121. Throughout the tumult, Ryanair maintained that its pilots "enjoy excellent working conditions," and that the strikes would not significantly impact Ryanair's business model. The Company also insisted it would not pay EU 261 compensation to the passengers impacted by the summer's strikes, claiming that the flight cancellations were caused by "extraordinary circumstances." According to a Company spokesman, "'[u]nder EU261 legislation, no compensation is payable when the union is acting unreasonably and totally beyond the airline's control. If this was within our control, there would be no cancellations.'" The British Civil Aviation Authority disagreed, stating that EU 261 applied on the days of separate cabin crew strikes across Europe because the strikes were within the Company's control and that Ryanair owed impacted customers due compensation.[4]

122. On September 13, 2018, cabin crew from Belgium, the Netherlands, Italy, Spain, and Portugal announced a 24-hour, simultaneous work stoppage on September 28, 2018. Ryanair cancelled 190 of its flights scheduled for September 28 as a result, impacting 30,000 more passengers.

123. On September 20, 2018, the *Irish Independent* ran an interview with O'Leary discussing O'Leary's future with Ryanair. O'Leary claimed he had "'no idea when I'll have had enough,'" claiming that it had still been "'fun'" running the Company through the labor strife and

---

[4] This was ultimately decided on a country-by-country basis. While the U.K. required Ryanair to pay up, Germany and Italy did not.

strikes of the past year. O'Leary admitted that "'[t]he rostering thing last September was a balls-up. That was painful. We recovered very quickly from it. ***Recognising unions was not one of my best days in Ryanair, but it was inevitable at some point in time***.'"

124. Then, on September 26, 2018, *MailOnline* reported that the European Commission had ordered Ryanair to give workers contracts in their country of residence rather than Ireland, where its planes are registered. O'Leary was quoted as calling the "'issue of applicable law . . . irrelevant in Ryanair's case since Ryanair has already written to the unions in Belgium (and all other EU countries) offering to agree [to] the implementation of local (Belgium) law, social taxes and court jurisdiction by agreement with the national unions.'"

#### 4. On October 1, 2018, Ryanair Discloses a 12% Decrease in Full-Year Profits Due in Large Part to Decreased Fares and Ballooning Costs Related to Strikes and Labor Issues

125. After a summer rife with damaging industrial actions, on October 1, 2018, the Company revealed that it could not meet its annual profit guidance due to decreased fares and ballooning costs related to strikes, flight disruptions, and labor issues. Ryanair cut its earnings guidance by 12%. The Company further stated that it could be subject to even "further disruptions in Q3, which may require full year guidance to be lowered further and may necessitate further trimming of loss making winter capacity."

126. In response to this disclosure Ryanair's ADS price fell sharply. After closing at $96.04 on Friday, September 28, 2018, the ADS closed at $80.93 on Monday, October 1, 2018, a decline of over 15% on unusually high trading volume.

127. In the wake of this disclosure a number of financial analysts and financial press published reports highlighting the economic significance of the information and its impact on the ADS price and linked the disclosure to prior statements by Defendants. For example:

(a) On October 1, 2018, Berenberg published a report highlighting the fact that "much of Ryanair's 12% earnings guidance cut appears company-specific." Specifically, Berenberg stated, "[m]anagement reiterated the impact of strike actions for the need to reduce fares to respond to customer perception of reliability due to disruption." And, Berenberg noted that the continued labor unrest as the Company seeks agreements with various unions and "the recurring impact of labour cost pressures into FY 2020, . . . remains a key uncertainty that adds to our caution on the stock."

(b) On October 1, 2018, Societe Generale published a report titled "Guidance cut with threat of more strikes." The report analyzed the disclosure and concluded that the guidance cut was primarily due to the "company-specific strikes and strike threats."

(c) On October 1, 2018, *Business Insider* reported that Ryanair shares were "down" on the news that "Ryanair Cuts FY19 View Due To Recent Strikes."

(d) On October 1, 2018, *BBC News* published an article titled "Ryanair warns on profits as strikes hit income," that stated "Ryanair has warned investors its full-year profits will be lower than expected, partly due to the recent wave of industrial action." *BBC News* added that this news caused Company share prices to open 8% lower.

(e) On October 1, 2018, *Reuters* reported on the guidance cut and noted that "Goodbody Stockbrokers analyst Mark Simpson said the warning came as a surprise given that O'Leary had said there was no change to guidance just two weeks ago." *Reuters* added that shares were down on the disclosure to "their lowest level in almost two years, having fallen 27 percent since the industrial action ramped up in mid-July."

(f) On October 1, 2018, Credit Suisse published a report and cut its target price by 9% on the news, "given the challenges in calling an end to strike-related fare disappointments."

(g) On October 1, 2018, Morgan Stanley issued a report stating that the guidance cut was "owing primarily to strike impacts experienced in September as well as impacts on forward bookings into the 3Q19."

(h) On October 4, 2018, the *Financial Times* reported on the October 1, 2018 disclosure and stated that Ryanair's share price had dropped in response. The *Financial Times* article also linked the disclosure to Ryanair's "unique" "employment practices," and quoted HSBC analyst Andrew Lobbenberg as stating they were "not sustainable." The *Financial Times* also reported that it had recently interviewed O'Leary and in discussing O'Leary's repeated statements about his dislike of unions (including his statement that "'hell would freeze over'" before Ryanair recognized them), ***O'Leary admitted to the Financial Times that, "he had long anticipated the evolution" to unionization***. And, O'Leary added that "'for as long as we can postpone unionisation, we would try to postpone unionisation.'"

(i) On October 5, 2018, HSBC published a report titled "Quagmire," reduced its price target, and stated "***[p]rofit warning confirms pain of transition***." HSBC concluded by stating: "Even if investors are keen to look through the current turbulence as Ryanair evolves to its future equilibrium, we think its sustainable business model will be lower margin than consensus anticipates as the costs associated with local labour contracts, with less contract staff and some form of seniority structure will weigh more than expected."

(j) On October 22, 2018, Cantor Fitzgerald published a report about Ryanair and, commenting on the "recent cut" to full year guidance, reduced its target price citing Ryanair's "'new normal' margins," due to "higher employee expenses."

(k) On October 23, 2018, HSBC published a report commenting on the October 1, 2018 profit warning and Ryanair's representation that it would maintain its "cost leadership

position" in the industry. HSBC's analysts stated that they did not share Ryanair's view of the impacts of unionization: "We think the unionisation process and new group structure will add complexity and cost." Simply put, "***Ryanair's key labour advantage relative to peers is now gone***."

**J. Summary of Class Period Events**

128. In sum, leading up to the Class Period, Ryanair was widely considered the cost-cutting champion of the airline industry, achieving massive success by minimizing its operation costs in order to offer the lowest possible fares. Customers knew they would get an unabashedly "no-frills" experience and utter lack of customer service at Ryanair, but they flocked to the airline due to the extremely cheap prices and its reputation for punctuality and reliability. And, analysts recommended that investors "Buy" Ryanair shares over its peers based on its "key" labor cost advantage.

129. But Defendants concealed that the Company's strategy for keeping its airport access and personnel costs low – its key competitive advantage over other low-fare airlines – was unsustainable, dependent on the imposition of unreasonable working conditions, "self-employment" contracts based on Irish law regardless of the employee's residence, and unreasonable "productivity" goals, and its flight staff had had enough. Pilots, particularly those with experience, had left *en masse* and Ryanair could not recruit enough to fill those important gaps. Nevertheless, Defendants repeatedly (and falsely) touted Ryanair's "industry leading" pay and conditions and "excellent" labor relations. Knowing the importance to its cost base and share price, Defendants constantly assured investors that "hell [would] freeze over" before Ryanair would recognize unions, despite knowing internally that union recognition was "inevitable" and even a "planned for" eventuality. Importantly, Defendants also knew that union recognition would come at a cost – their use of contract employees

and zero-hour contracts would never fly with employee unions. In turn, their flexibility to shift employees at will would be impacted.

130. Then, in a startling turnaround, Defendants disclosed (as O'Leary had "always" planed) that the Company would recognize unions. The Class Period was rife with pilot and cabin crew labor strikes, causing mass cancellations of flights which drove up costs and greatly damaged Ryanair's reputation for punctuality and reliability. Unions demanded that the Company provide better terms and conditions for its flight staff, including permanent contracts that relied on the local law of the country where the employee resided. But Defendants still emphasized to investors that the recognition of unions, and the changes in its employment policies that resulted, would not impact its cost bases or profitability or its business model. As discussed in §V, *infra*, these representations were materially false and misleading and omitted material facts. As the market learned the truth in a series of partial disclosures, and the artificial inflation Defendants' representations had maintained left the stock, the price of Ryanair ADSs plummeted.

**K. Post-Class Period Revelations**

131. Following the Class Period, Ryanair's financial downturn continued and additional revelations came out about the nature and severity of the problems Ryanair had experienced throughout the Class Period.

132. Despite the arduous negotiations that had taken place between Ryanair, its pilots, and its cabin crew that resulted in Ryanair's recognition of labor unions, Ryanair soon abandoned its "union-friendly" story and fell back into old habits. In late 2018, Ryanair blocked the unionization of staff working with Ryanair's Poland-based subsidiary, Ryanair Sun. Ryanair refused to accept the appointment of the Cabin Crew Union in Poland to negotiate on behalf of staff and forced the subsidiary employees to accept "self-employed" contracts or be dismissed. As a result, Ryanair Sun

employees were denied employment rights such as paid sick leave and permanent employment contracts that had already been granted to their counterparts at the "main" airline, Ryanair DAC. As aptly stated by the Secretary General of the European Cockpit Association: "'On the one hand, Ryanair [was] busy reaching out to unions to show a new socially responsible face,'" but at the exact same time "'they [were] busy working in the opposite direction building up a potentially union-free — by design union-free — company, Ryanair Sun.'"

133. Because Ryanair Sun operated in Poland, Ryanair's largest market in Eastern Europe and the country from which Ryanair intended to launch further expansion into the region, Ryanair's denial of local and permanent contracts for pilots and staff had significant implications for both its costs and its public relations. Indeed, O'Leary had expressed plans to grow Ryanair Sun and its co-subsidiary, Laudamotion, "'as quickly as they're able to grow.'" Plainly, despite maintaining during the Class Period that unionization and associated union pay and contracting demands presented no threat to Ryanair's ultra low-cost business model, the Company knew that these factors would significantly affect its cost-base and ability to offer the lowest fares possible. Indeed, the Company commented that while its staff prices were on par with primary competitor in Eastern Europe, Wizz, before the staffing crisis (€5 per customer flown), they had grown after to €6 per passenger. Consequently, Defendants were willing to exploit any loophole to prevent its low-cost model from being undermined during its planned Eastern European expansion and inevitable head-on competition with Wizz.[5]

134. On January 18, 2019, the Company announced another cut to its full-year profit guidance. Ryanair stated that it now expects an after-tax profit in the range of $1 billion to €1.1

[5] As seen in the figure in ¶54 above, Wizz was the only airline during the Class Period that beat Ryanair in employee productivity versus cost.

billion, excluding its new Lauda unit, for the year through March compared with €1.1 billion to €1.2 billion previously. The Company's labor issues continued to be the main driver of the guidance cut. *Bloomberg* reported that on this news Ryanair shares fell to a three-year low, bringing the decline since a 2017 peak to almost 50%.

135. On March 7, 2019, in an interview with the *Financial Times*, O'Leary admitted that his reputation has been a negative distraction for the airline and is part of the reason he will step back from the day-to-day running of the airline this year. O'Leary said: "'I think one of the negatives of Ryanair is its association with me, I'm an easy person to target . . . Too much of the negativity that attracts itself to Ryanair attaches itself because of something stupid I said 25 years ago.'" According to the *Financial Times*, O'Leary was referring to such statements as saying "hell [would] freeze over" before Ryanair recognized unions.[6] According to O'Leary, he will no longer be at the forefront of Ryanair's day-to-day affairs. The *Financial Times* reported that O'Leary views the move as a chance to "reboot" the Company's reputation.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

136. The Class Period begins on May 30, 2017. On that day, Ryanair filed a release on Form 6-K with the SEC announcing its financial results for its fiscal year ended March 31, 2017. The release stated that Ryanair had experienced "a 6% increase in full year net profit to €1.316bn." It continued: "The combination of a 13% cut in average fares, coupled with Year 3 of the 'Always Getting Better' (AGB) programme delivered 13% traffic growth to 120m customers, and an industry leading 94% load factor. Unit costs fell by 11% (ex-fuel down 5%)." The release highlighted the

6 As noted, O'Leary made his "hell [would] freeze over" statement just months before the shocking flip-flop, in an interview after the Company's September 21, 2017 annual general meeting. *See* ¶¶9, 55, 84, 99(m).

Company's treatment of its employees as a significant reason for its success. In particular, the release noted that:

> In April we negotiated new pay and condition agreements with 10 of our pilot and cabin crew bases which means that all of our 86 bases now enjoy 5 year agreements, which guarantee them industry leading rosters, and pay increases each year. At a time when many of Europe's airlines are cutting pay, pensions and jobs, ***this combination of job security and annual pay increases is a key attraction for Ryanair's people***.

137. In the Company's pre-recorded earnings presentation for FY17, also released on May 30, 2017, O'Leary further touted the Company's recent pay agreements with its employees, bragging that "that process has been led by the worker representatives at each of those bases, and then the bases have voted on those deals in secret ballot."

138. O'Leary further reiterated the excellent pay Ryanair's employees received during the Company's FY17 earnings call later that day:

> In April we negotiated new pay and condition agreements . . . with 10 of our pilot and cabin crew bases, which were outstanding. It means now that all of our 86 bases are covered by five year pay and condition agreements, which guarantees [them] industry leading rosters, [and] pay increases every year.
>
> At a time when many of Europe's airlines are cutting pay, pensions and jobs; ***this combination of job security and annual pay increases is a key attraction for Ryanair's people***.

139. O'Leary was also careful to emphasize to the market that, "excellent" pay deals aside, Ryanair was still controlling strongly for costs. He told one analyst that 2% wage inflation over the course of the five-year pay deals was "a reasonable assumption":

> On the wage deals, yes Mark, 2% is a reasonable assumption. That's certainly our budgeted year assumption and that's locked away not just for this year, but for the next three or four years. I think that's important at a time when you see airlines across Europe either being threatened with strikes by their pilots and their cabin crew. We've seen it in . . . some of the French airlines . . . . ***We don't have that kind of wage inflation in Ryanair.***

140. O'Leary also emphasized that reports of labor relations problems at Ryanair were baseless, stating:

> ***We still scratch our heads at some of the recent coverage that came out of Scandinavia where a couple of investment funds said they weren't going to invest in Ryanair because of concerns about our labor policies***. It is being driven by some not very accurate coverage from some of these proxy firms.

141. O'Leary stressed that labor relations were "excellent," asserting:

> ***There's been some misinformed commentary up in Scandinavia recently about our labor relations, which remain excellent.*** In 30 years, we've never had a strike. ***We are – remained a nonunion company, but all of our employees are organized into collective bargaining units at their bases***.

142. O'Leary later reaffirmed that the reports were false, stating that "[w]e reject some of the idiotic criticism that came out of some Scandinavian pension forums recently that ***somehow we don't deal with our employees, our employees are not covered by collective bargaining when they are. And we do not see unionization being an issue for the foreseeable future***."

143. O'Leary also touted the Company's system of "sophisticated" employee representation:

> It's also important that I emphasize to investors too that ***we have a very sophisticated collective bargaining infrastructure within Ryanair at all of our 86 bases***. This was tested by the Irish unions and it went all the way to the Irish Supreme Court who confirmed that actually we do have a collective bargaining and ***all of our people are covered by collective bargaining***.

144. He continued:

> ***Everybody who works in Ryanair is also protected by the Irish Constitution where they're entirely free to join a union*** and they're entirely free if they so wish to have a union representative. Now ***the vast majority of our people don't want to be represented by unions***, they prefer to deal directly with us and we'll continue to encourage that.

145. O'Leary also dismissed the idea that the Company would seek to expand its operations by setting up bases in France, stating:

> But I think the issue for us in French bases is more and more we dislike the legal system in France, we dislike the kind of proper union culture, we dislike the fact that they can strike whenever they feel like it and the employers have no stick to beat them with, and frankly we don't need France. We're growing very strongly in Germany, Italy, Spain, Portugal, all over Europe. ***We can wait for the French system to come around to our way of thinking*** . . . .

146. O'Leary also noted that the Company would not "be blackmailed or held to ransom by anybody else's union," and claimed that:

> [T]here is a case coming up, the model case which will come out sometime later this year is likely to result in more local contracts, which may require a change in Irish legislation where currently pilots and cabin crew have to pay their taxes in Ireland, which by the way Ireland is a high tax country for personal taxes*. **It would be good for us if we have a system in Europe of local contracts*** and the model case may bring that about sometime later this year. ***It will not lead to unionization.*** If we're threatened by unionization in any one base, I think we will be considering either freezing or closing those bases. ***But it would be much more helpful to us to move to a structure of local contracts as we increasingly establish what are much more now permanent bases across 34 countries in Europe***.

147. As Defendants knew, or were reckless in not knowing, the statements in ¶¶136-146 were false and misleading when made for the following reasons:

(a) Although Ryanair's ERCs had been found to technically constitute "collective bargaining" structures by Ireland's Supreme Court, the truth was that the ERCs provided little to no employee protections or bargaining power. Instead, management selected which employees would serve on the ERCs from each base and it informed the employee representatives of updated terms and conditions, offering no meaningful representation for employees. ¶¶56-57.

(b) Most of Ryanair's "employees" were technically self-employed at shell companies Ryanair had required the employees to set up or join, and then contracted through third-party agencies. These employees were not represented by the ERCs at all. ¶¶42-48.

(c) Ryanair employees were not, in fact, "entirely free to join a union," because the Company actively penalized those workers who did join a union and threatened workers who

wished to unionize Ryanair with worse pay, promotion opportunities, and terms and conditions. ¶55(a)-(d).

(d) A great many Ryanair pilots and cabin crew would have liked to unionize, as shown by efforts to unionize throughout Ryanair's operating history. Indeed, O'Leary admitted in 2015 that if Ryanair agreed to recognize unions in Denmark, it would soon be required to do so in its other countries of operation, something it did not want to do. ¶55(a)-(d).

(e) Ryanair's labor relations and policies were, in fact, far from "excellent." Ryanair pilots, particularly those with experience, such as captains and first officers, had left for competitor airlines "in droves" over the past 12 months due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture. ¶¶42-54, 81-82. Cabin crew were similarly unhappy due to the poor pay and the economic uncertainty that Ryanair's zero-hour and agency contract structures provided, the excessive pressures placed on crew members to sell during flights, and the generally toxic atmosphere engendered by the Company's no-holds-barred strategy of cost-cutting. ¶¶49-54.

(f) Ryanair could not simply wait for unionized countries, including France, to "come around to [its] way of thinking" on unions. In fact, without expanding its operations into France and Scandinavia, Ryanair would not be able to meet the growth target it had set and repeatedly promised shareholders, of carrying 200 million passengers by 2024. As O'Leary would later admit, the Company "always" knew that it would have to unionize in the near future (¶¶34, 106, 101, 111, 123), that union recognition was "inevitable," and he "had long anticipated the evolution" to unionization (¶¶10, 34, 123, 127(h)).

(g) Ryanair was actively fighting against "local contracts," which Defendants knew would increase the Company's cost base substantially, as the Company would, in most countries, be required to pay increased social contributions and taxes. Moreover, as some countries had stricter employment regulations with regards to which employees could be considered "self-employed," Ryanair's use of contract and agency employees, a staple of its ultra low-cost model, would be heavily impacted by any required use of local contracts. ¶¶29, 42-48.

148. On July 24, 2017, Ryanair filed a release with the SEC on Form 6-K announcing its financial results for the first fiscal quarter of 2018, ending June 30, 2017. The release stated that Ryanair had experienced "a 55% rise in Q1 profit to €397m" and that "[t]raffic grew 12% to 35m as Ryanair's lower fares and 'Always Getting Better' (AGB) programme delivered a record 96% load factor."

149. During the earnings call held later that day, defendant O'Leary attributed the Company's ongoing success to its unit cost discipline:

> Our unit cost discipline continues. We are continuing to deliver unit cost declines when most – in fact, all of our competitors are delivering unit cost increases. ***And [it's that] widening unit cost gap between us and the competition that will continue to enable Ryanair to succeed***, but ***particularly as we expand the amount of head-to-head competition we have with these so-called peers***.

150. In the Company's pre-recorded earnings presentation released the same day, CFO Sorahan responded to the question, "What would Brexit mean for your growth plans?" as follows:

> It'll have no impact on our growth plans. ***We still have ambitions to grow to 200 million customers by March 2024 and that's going to happen***. It just may mean that we will do so in Mainland Europe, where there's lots of opportunities with restructuring going on at the moment and move some growth out of the U.K.

151. The statements in ¶¶148-150 were false and misleading when made. As Defendants knew or were reckless in not knowing:

(a) Ryanair's "widening unit cost gap" was based in substantial part on its staff costs, which it had been able to suppress through substandard pay, terms and conditions for its employees, and its "flexibility," stemming from its use of zero-hour or self-employment contracts, to move its airplanes and their crews on short notice where economically preferable. These practices caused significant unrest among Ryanair employees in the 12 months prior to Defendants' statements and were not a sustainable driver of a continued "widening unit cost gap." ¶¶29, 42-48, 59, 61-64.

(b) Ryanair could not attain 200 million customers by March 2024 unless it also expanded its operations into unionized regions like France and Scandinavia, a move it had specifically disavowed in the prior months due to its stated "antipathy" to union recognition. ¶¶61-63, 101, 111. That simple fact was only compounded by the possible need to move Ryanair's operations out of the U.K. market, which comprised approximately 24% of its operations in FY17, into mainland Europe if no Brexit deal was reached. ¶100.

152. On July 25, 2017, Ryanair filed its FY17 annual financial report on Form 20-F with the SEC, which was signed and contained a signed certification by defendant O'Leary attesting to the report's accuracy and compliance with U.S. federal securities laws (the "2017 20-F"). The 2017 20-F highlighted the Company's recently negotiated long-term contracts with all of its employees and their access to collective bargaining units, stating in pertinent part:

> ***Ryanair currently conducts collective bargaining negotiations with groups of employees, including its pilots and cabin crew, regarding pay, work practices, and conditions of employment, through collective-bargaining units*** called Employee Representative Committees ("ERC"). Following negotiations through this ERC system, pilots at all of Ryanair's 86 bases are covered by four, five or six year collective agreements on pay, allowances and rosters which fall due for negotiation at various dates between 2018 and 2023. Cabin crew at all of Ryanair's bases are also party to long term collective agreements on pay, allowances and rosters, which expire in March 2021.

153. The 2017 20-F also stated that Ryanair's relationship with its employees was "good," based on "regular" discussions on "all aspects of the business" with employee collective bargaining units by "Ryanair's senior management," and that the Company would "***not face significant difficulty in hiring and continuing to employ the required personnel***" sufficient to meet its growth plans, stating in pertinent part:

> Based on its experience in managing the airline's growth to date, management believes that ***there is a sufficient pool of qualified and licensed pilots, engineers and mechanics within the EU to satisfy Ryanair's anticipated future needs in the areas of flight operations, maintenance and quality control and that Ryanair will not face significant difficulty in hiring and continuing to employ the required personnel. Ryanair has also been able to satisfy its needs for additional pilots and flight attendants through the use of contract agencies***.
>
> * * *
>
> ***Ryanair considers its relations with its employees to be good. Ryanair currently negotiates with groups of employees, including its pilots through "Employee Representation Committees" ("ERCs") regarding pay, allowances, rosters, work practices and conditions of employment, including conducting formal negotiations with these internal collective bargaining units***. Ryanair's senior management meets regularly with the different ERCs ***to consult and discuss all aspects of the business and those issues that specifically relate to each relevant employee group and where necessary to negotiate*** with these collective bargaining units. Following negotiations through this ERC system, pilots and cabin crew at all Ryanair bases are covered by long term collective agreements ***which provide certainty on cost, pay and conditions***.

154. As Defendants knew, or were reckless in not knowing, the statements in ¶¶152-153 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Although Ryanair's ERCs had been found to technically constitute "collective bargaining" structures by Ireland's Supreme Court, the truth was that the ERCs provided employees little to no protection or bargaining power. Instead, management selected which employees would serve on the ERCs from each base and it informed the employee representatives of updated terms

and conditions, offering no meaningful representation for employees. Management also did not "negotiate" with the ERCs "regarding pay, allowances, rosters, work practices and conditions of employment," or "consult" the ERCs "to discuss all aspects of the business"; rather, employee representatives were simply told the terms and conditions their colleagues would receive. There was no negotiating. ¶¶56-57.

(b) The "long term collective agreements" that employees received did ***not*** provide "certainty on cost, pay and conditions." Because the majority of Ryanair's first and second officers and cabin crew were on "self-employed" or agency contracts, they often had little certainty as to the number of hours they would be able to work (many had zero-hour contracts), ***where*** they would be working (both pilots and crew were frequently moved across Ryanair bases on short notice when Ryanair wanted to fill vacancies or obtain an economic advantage), and even where they should pay their taxes. Indeed, many pilots and crew members reported that the uncertainty of their employment conditions was a main reason for the staff exodus from Ryanair. ¶¶42-54, 61-64.

(c) Contrary to Ryanair's misleading impression that it merely used contract agencies "to satisfy its needs for ***additional*** pilots and flight attendants," the fact was that Ryanair's low-cost business model depended on keeping labor costs low by contracting the ***majority*** of first officers, second officers, and cabin crew through agencies. Indeed, Ryanair required pilots upon hiring to form Irish shell companies using accountants it recommended, so that their labor could then be contracted to a third-party agency largely set up for this purpose (*e.g.*, Brookline Aviation) and Ryanair could arrange with that agency for the pilot's employment. This allowed Ryanair to avoid paying higher taxes and providing benefits like sick leave and a permanent base location to the majority of its employees. ¶¶42-48. Ryanair was, in fact, facing significant difficulties recruiting and retaining experienced pilots due to the substandard pay and terms and conditions Ryanair

offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and its reputation among pilots of having a general disregard for employees' well-being embedded in its management culture. ¶¶42-54, 61-62, 81-82, 87.

(d) Ryanair's labor relations were, in fact, far from "good." Ryanair pilots, particularly those with experience, such as captains and first officers, had left for competitor airlines "in droves" over the past 12 months due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture. ¶¶42-54, 81-82. Cabin crew were similarly unhappy due to the poor pay and the economic uncertainty that Ryanair's zero-hour and agency contract structures provided, the excessive pressures placed on crew members to sell during flights, and the generally toxic atmosphere engendered by the Company's no-holds-barred strategy of cost-cutting. ¶¶42-54.

(e) The Company's 2017 20-F failed to disclose to the market (in violation of the disclosure requirements of Item 5 of SEC Form 20-F and Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303")) that it was experiencing pilot shortages and that it was losing significant numbers of experienced pilots, despite the importance of those trends to Ryanair's operations, growth capacity, and labor costs.

155. On September 14, 2017, defendant O'Leary discussed the *Mons* decision with *The Irish Times*. O'Leary denied that the decision would lead to a change in Ryanair's Irish contracts, stating "'[u]ltimately, they cannot and will not be changing the Irish contracts or the structure of the Irish contracts. . . . ***This won't change Ryanair's cost base by one cent***.'"

156. Defendant O'Leary's statement was false and misleading when made. Actually, O'Leary knew that the *Mons* decision would inevitably add to Ryanair's legal costs as it would be

required to litigate in foreign jurisdictions and would be subject to increased litigation once employees located in other countries were not required to travel to Ireland to challenge Ryanair's employment practices in court. It also knew that the *Mons* decision could lead to more direct contracts, as several European jurisdictions defined "self-employment" more strictly than Ireland. That would, in turn increase the Company's costs and decrease the crucial "flexibility" on which its business model depended.

157. On September 18, 2017, Ryanair filed a release with the SEC on Form 6-K providing an update on its massive flight cancellations. The release quoted defendant O'Leary, who forcefully rebutted reports that the cancellations were due to a loss of pilots, stating in pertinent part:

> ***Ryanair is not short of pilots – we were able to fully crew our peak summer schedule in June, July and August*** – but we have messed up the allocation of annual leave to pilots in Sept and Oct because we are trying to allocate a full year's leave into a 9 month period from April to December. ***This issue will not recur in 2018*** as Ryanair goes back onto a 12 month calendar leave year from 1st Jan to 31st December 2018.

158. Also on September 18, 2017, Ryanair held a conference call with analysts and investors to discuss its massive flight cancellations and the *Mons* decision. Defendant O'Leary claimed that the flight cancellations were the result of "***a management (expletive) up, it's not a pilot shortage***." He stated that any media reports to the contrary were false and that the Company had experienced only a minimal rate of employee turnover because of its "good pay" and "excellent rosters," stating in pertinent part:

> I have seen some comments out of Norwegian in recent days that they have hired 140 of our pilots in the last 12 months. We don't believe that figure is accurate. We have lost some pilots to Norwegian, mainly pilots of Scandinavian nationality. ***The figure, according to our records, [is] well under 100, or it's under 100 in the last 12 months***.
>
> And to put that in some context, as of today we employ over 4,200 pilots. We would not have noticed 100 – or less than 100 pilots going to Norwegian. ***It is part of our normal pilot turnover, which on an annualized base is less than 5%***.

> ***And we believe that we have a low rate of pilot turnover, it is under 5%, because of good pay, our excellent rosters*** where we have fixed four – or five on, four days off and the banks of four weeks of annual leave, which give the pilot in effect not just 20 days of leave but also another 16 days [off], because we bank the leave in five day blocks with four days off.
>
> * * *
>
> The unions are much beloved of this the world is running out of pilots. Pilots by law can't fly more than 900 hours a year, which is about 18 hours a week. Our captains are paid between EUR150,000 and EUR180,000 a year. It does take about three years to train somebody from being a first officer, junior first officer to being a captain.
>
> ***But people getting paid that kind of money to do that – those kind of duty are flight hours less than 18 – are about 18 a week, you would never run out of the supply of***.

159. O'Leary reiterated that "Ryanair is not short of pilots," and attributed the need to limit its flight schedule strictly because of a change in how the pilots' vacation time was calculated over the year:

> ***Ryanair is not short of pilots*** – we were able to fully crew our peak summer schedule in June, July and August – but we have messed up the allocation of annual leave to pilots in Sept and Oct because we are trying to allocate a full year's leave into a 9 month period from April to December.

160. When asked by an analyst at Raymond James & Associates what additional cost would be required by the need to increase the Company's crewing ratios to avoid similar cancellations in the future, O'Leary replied that it would be "reasonably small":

> I think it would be reasonably small in terms of – we may have to increase our crewing ratios by maybe 5% or 10%. That might be . . . . ***You're talking something of the order of maybe EUR20 million or EUR30 million over a full 12-month period. It's not something you're going to notice [truthfully] in our numbers***.

161. As Defendants knew, or were reckless in not knowing, the statements in ¶¶155-160 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair was very much facing a pilot shortage. In addition to the fact that Ryanair knew the market for pilots had been tightening since May 2017 (¶¶61-64), Ryanair pilots, particularly those with experience, such as captains and first officers, had left for competitor airlines "in droves" over the past 12 months due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture (¶¶42-54, 81-82). Far from the normal 5% per year pilot turnover O'Leary highlighted, IALPA estimated that over 700 pilots left Ryanair for other airlines between April and September 2017. Many of those pilots were captains and training captains, without whom planes could not take off and cadets could not be properly trained. ¶¶81-82.

(b) Defendants' representation of the "rostering failure" as a one-time occurrence simply due to a "management (expletive) up" knowingly and misleadingly minimized the significance of the incident – that it signaled that pilots were unhappy and that the experienced pilots' flight from Ryanair to competitor airlines posed a substantial threat to Ryanair's continued growth and cost bases. ¶¶29, 59, 61, 78, 81-82.

(c) Defendants knew that it would take more than simply adding "5% or 10%" to their crewing ratios – which were by far the lowest in the industry (¶49) – in order to prevent future cancellations due to "rostering failures." As described above, Ryanair had a problem with pilot recruitment and retention, and knew that it would have to financially incentivize those pilots it currently had to stay and new pilots to join. Defendants' knowledge of the seriousness of the situation was soon evidenced by the announcement that Malaysian Airlines CEO Bellew would be returning to Ryanair as COO to specifically improve pilot relations and recruitment. ¶¶61-62, 81-82, 91.

162. O'Leary also adamantly denied reports of any employment discontent or desire to unionize, stating that while employees were "free to join a union," the "reality" was that they preferred to deal directly with Ryanair:

> Everybody in Ryanair is free to join the union. Nobody in 30 years has ever managed to make a claim that they were somehow denied.
>
> And I've even seen some particularly inaccurate research which claims that somehow Ryanair's contract prohibits people joining unions. ***Nothing could be further from the truth. . . . People are free to join a union, but the reality is that over our 30 years they prefer to deal directly with us and not through third-party unions and we expect that situation to continue.***
>
> * * *
>
> ***There is simply no great demand for unionization here at Ryanair because in the main we have over a 30-year period managed to pay our people better, give them better rosters, give them more rapid promotion opportunities and give them more – better leave allocation if they continue to deal directly with us and we think that will continue to be the case.***

At a press briefing later that day, O'Leary added:

> There's this misleading kind of impression, mainly created by unions, that somehow Ryanair prohibits people joining unions. The Irish constitution has for many years guaranteed freedom of association, everybody in Ryanair who works for us is free to join a union, and if they want to do so they are free to do so. We however are free to continue to negotiate directly with our people, and we will continue to do so. ***It will not lead to unionization in Ryanair***.

163. Also during the September 18, 2017 call, O'Leary emphasized the Company's "very competitive pay and Ts and Cs," making Ryanair an attractive employer and successful in pilot recruitment, stating that, "[w]e have very competitive pay and Ts and Cs, which is why we have a reasonably low rate of ***pilot turnover, as said less than 5% a year***." O'Leary bragged that "[o]ur captains are paid between EUR 150,000 and EUR180,000 a year," and denied that pilots were hired under Company's self-employment model as a "cost savings":

> Bear in mind our self-employment model is largely speaking for the first officers and the junior, the cabin crew juniors. The reason we have that is because of the need for those to move flexibly around the system as vacancies arise.

* * *

> . . . In actual fact it is a misunderstanding and some of the research, as you know, Daniel, ***is that somehow this is a cost savings. We pay the contractors or the self-employed people more than directly employed people***.

164. Assuring an analyst that Ryanair had no concerns about pilots leaving the airline, O'Leary claimed that there were only "two reasons" pilots would leave Ryanair for Norwegian: "One, you happen to be Scandinavian yourself and therefore you are drifting towards working for a Scandinavian airline . . . . The other reason you'd go is because, oh, they've got big, shiny long-haul aircraft."

165. As Defendants knew, or were reckless in not knowing, the statements in ¶¶162-164 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair employees were not, in fact, "free to join a union," because the Company actively penalized those workers who did join a union and threatened workers who wished to unionize Ryanair with worse pay, promotion opportunities, and terms and conditions. ¶55(a)-(d).

(b) Defendants knew a great many Ryanair pilots and cabin crew would have liked to unionize, as demonstrated through efforts to unionize throughout Ryanair's operating history and Ryanair's active suppression of possible unionization. Indeed, O'Leary admitted in 2015 that if Ryanair agreed to recognize unions in Denmark, it would soon be required to do so in its other countries of operation, something it did not want to do. ¶¶34, 55(a)-(d).

(c) Defendants knew that pilots were not simply leaving Ryanair because of a desire to return to Scandinavia or to fly long-haul planes, and that the Company did not offer "very competitive pay, Ts and Cs." Ryanair pilots, particularly those with experience, such as captains and first officers, left for competitor airlines "in droves" due to the substandard pay and terms and

conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture. ¶¶42-54, 81-82.

(d) Regardless of whether self-employed pilots were individually paid more than directly employed pilots (and employee accounts strongly indicate they were not) (¶¶43-44), the statement that Ryanair did not use a self-employment model for "cost savings" was false and misleading. Actually, the savings derived from Ryanair's self-employment model were crucial to its staff costs remaining lower than its competitors'. The majority of Ryanair's first and second officers and cabin crew were on "self-employed" or agency contracts, and Ryanair saved a substantial amount on social benefits (*e.g.*, paid sick leave) and taxes by contracting those employees through third-party agencies rather than hiring them directly. Moreover, the model saved the Company substantial sums by allowing Ryanair to move pilots and crew across Ryanair bases on short notice when Ryanair wanted to fill vacancies or obtain an economic advantage, and providing them the "flexibility" to lay its employees off for months at a time if economically preferable to do so. ¶¶29, 42-54, 59.

166. Speaking on the *Mons* decision on September 18, 2017, O'Leary assured shareholders and analysts that it would have no impact on Ryanair's bottom line, stating in pertinent part:

> ***So any of this concern that the Mons case will somehow – is some breaking down of Irish contracts or weakening our advantageous [Ts and Cs] is simply untrue. We do not believe it will add to our pay, our latest pay. And certainly these claims that there will be 10% increases in pay is completely bogus and untrue.***

167. According to O'Leary, "[t]he most significant difference" that would result from the *Mons* decision "is that in Germany you will have to reduce our probationary period from 12 months to six months. ***But there are no other significant – and certainly nothing in relation to cost***."



1548445_1

168. As Defendants knew, or were reckless in not knowing, the statements in ¶¶166-167 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair's terms and conditions were far from "advantageous." In fact, they were notoriously poor. Ryanair crew were paid only for in-flight working hours, which typically only constituted half of their working day. Both pilots and crew had substantial percentages of their pay dependent on meeting performance targets such as number of hours flown or sales targets, and were penalized for failing to meet those targets through lower compensation, withdrawal of promotion opportunities, and favorable rosters, and even threats of dismissal. ¶¶49-54.

(b) Defendants knew that the *Mons* decision would cause the Company to incur significant cost increases as it would be required to face an increased amount of employee litigation and do so in foreign jurisdictions. Defendants were also aware that, as some countries had stricter employment regulations with regards to which employees could be considered "self-employed," than Ireland, Ryanair's use of contract and agency employees, a staple of its ultra low-cost model, would be heavily impacted if foreign jurisdictions decided their law trumped that of the Irish contracts. ¶¶29, 43-44, 70-74.

169. Nevertheless, reports that Ryanair's cancellations had not merely been caused by a one-time "rostering failure," and instead were caused by employee discontent and flight to other airlines persisted. On September 27, 2017, Ryanair issued a press release to address the reports and answer frequently asked questions, stating in pertinent part:

> (E) We have also written to our pilots to correct last week's ***false claims made about our pilot recruitment. In the current year under 100 Captains have left (mainly to retirement or long haul airlines) and less than 160 F.O's (mostly to long haul airlines)***.

* * *

5. Is Ryanair short of pilots?

A. **No.** ***Ryanair with 400 aircraft currently employs over 4,200 pilots a ratio of over 10 pilots per aircraft***. Only 4 pilots are needed per aircraft per day.

6. Is Ryanair struggling to recruit pilots?

A. **No.** ***Ryanair has more than 2,500 pilots on a waiting list hoping to join Europe's No. 1 airline***. We have offered jobs to over 650 new pilots who will join us between now and May 2018.

7. Are lots of pilots leaving Ryanair?

A. ***No in the current year less than 100 of over 2,000 captains left Ryanair (mainly retirements or to long haul airlines) and less than 160 F.O's who have mainly left to join long haul airlines***.

* * *

18. How much will the 2,100 cancellations cost Ryanair?

A. ***The refunds and EU261 costs will cost Ryanair under €25m while we expect the free flight vouchers will cost less than €25m***.

* * *

25. Will Ryanair meet with other airlines' pilots or pilot unions?

A. ***No. Ryanair only meets directly with its people. It will not meet with competitor pilots or their unions***.

* * *

28. Do Ryanair pilots suffer low pay or poor working conditions?

A. ***No. Ryanair pilots enjoy great pay and industry leading T's & C's as follows***:

- Captains earn between €120,000 to €180,000 p.a.
- At Dublin and 3 other bases this has recently increased by €10,000 p.a.
- F.O's can expect to be promoted to Captain within 4 years of joining Ryanair
- Pilots enjoy a fixed roster of 5 days duty followed by 4 days off which equates to a double bank holiday weekend after every 5 days of work

- Pilots by law cannot fly more than 900 hrs p.a.

170. The Company also denied any suggestion that the "rostering failure" or reported employee discontent would cause it to meet with unions, and noted that it would

> not respond or accede to anonymous demands made via unsigned emails for group or regional meetings, or for union interference at these internal ERC meetings. Many of our pilots and ERC's have confirmed that these unsigned letters were drafted by pilots/unions of competitor airlines who wish to pursue an industrial relations agenda at the expense of Ryanair and its pilots.

171. As Defendants knew, or were reckless in not knowing, the statements in ¶¶169-170 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair's terms and conditions were far from "industry leading." In fact, they were scandalously poor. Ryanair crew were paid only for in-flight working hours, which typically only constituted half of their working day. Both pilots and crew had substantial amounts of their pay dependent on meeting performance targets such as number of hours flown or sales targets, and were penalized for failing to meet those targets through lower compensation, withdrawal of promotion opportunities, and favorable rosters, and even threats of dismissal. Pilots and crew were charged full price for in-flight beverages and snacks, for their uniforms, for their training, and were required to pay for any meals and accommodations if they ended up stranded away from their home base at night due to flight delays or cancellations. Indeed, Defendants knew that their conditions were not "excellent" at the time this statement was made because pilots across Ryanair's bases had rejected a proposed bonus package to work through the September 2017 "rostering failure" and instead demanded that the Company negotiate changes in pilots' terms and conditions. ¶¶49-54, 84-87.

(b) Defendants' insistence that Ryanair would not meet with unions, and would not permit its employees to unionize was false. As O'Leary would later admit, the Company

"always" knew that it would have to unionize in the near future (¶¶7, 34, 106, 123), that union recognition was "inevitable," and he had "long anticipated the evolution" to unionization. ¶¶7, 34, 106, 123.

(c) Ryanair was very much facing a pilot shortage. In addition to the fact that Ryanair knew the market for pilots had been tightening since May 2017 (¶¶61-64), Ryanair pilots, particularly those with experience, such as captains and first officers, had left for competitor airlines "in droves" over the past 12 months due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture. ¶¶42-54, 81-82.

172. On October 13, 2017, Ryanair issued a press release highlighting its successful recruitment of 860 pilots since January 1, 2017. The release quoted Chief Pilot Ray Conway as saying, "'it's no surprise that we continue to attract hundreds of pilot applicants from other airlines, who join Ryanair for our ***industry leading pay, excellent working conditions, unrivalled career progression*** and brand new aircraft.'"

173. As Defendants knew, or were reckless in not knowing, the statements in ¶172 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair's pay, terms, and conditions were far from "industry leading." In fact, they were scandalously poor. A substantial portion of pilot pay was dependent on their meeting performance targets such as number of hours flown, and they were penalized for failing to meet those targets through lower compensation, withdrawal of promotion opportunities, base transfers, and/or favorable rosters, and even threats of dismissal. Pilots were charged full price for in-flight beverages and snacks, for their uniforms, for their training, and were required to pay for any meals

and accommodations if they ended up stranded away from their home base at night due to flight delays or cancellations. ¶¶49-54. Indeed, Defendants knew that their terms were not "industry leading," at the time this statement was made because pilots across Ryanair's bases had rejected a proposed bonus package to work through the September 2017 "rostering failure" and instead demanded that the Company negotiate changes in pilots' terms and conditions. ¶¶84-89. Ryanair's problems with pilot retention and recruitment were further evidenced by the average age of their pilots, which had shifted from 35 in fiscal years 2014 and 2015 to 34 in fiscal years 2016 and 2017. ¶81. This corroborates publicly available employee accounts that not only was Ryanair's base primarily comprised of young, inexperienced pilots, but that older and more experienced pilots were leaving for greener pastures. ¶¶81-82.

(b) Ryanair's working conditions were far from "excellent." Ryanair pilots, particularly those with experience, such as captains and first officers, had left for competitor airlines "in droves" over the past 12 months due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture. ¶¶42-54, 81-82.

174. On October 31, 2017, Ryanair filed a press release on SEC Form 6-K announcing its financial results for the first half of 2018, which included an 11% increase in half-year profit to €1.29 billion, an increase in traffic of 11% and a decrease in unit costs of 5%. O'Leary stated in pertinent part that:

> ***We are not short of crews, with over 4,200 pilots (5.2 crews per aircraft) and have hired over 900 new pilots this year to date***. We operated the peak summer schedule in July & August (12.5m customers monthly) without incident. ***However as we entered September, a series of poor planning decisions created a perfect storm of one-off pilot shortages*** . . . .

175. He noted that the "rostering failure" had "challenged [Ryanair] to address the competitiveness of our pilot pay, as well as pilot concerns about communications, career progression and basing." He claimed that:

> While our pay was already slightly higher than B737 competitor airlines, we could have responded sooner to a tightening market for experienced F.O's with pay increases for our experienced pilots . . . . We will now move from being "competitive" to offering materially higher (over 20%) pay with better career prospects, superior rosters, and much better job security than Norwegian, among others, can offer. We expect these measures, if/when accepted by all our pilot bases, will add some €45m to our FY18 crew costs (and up to €100m in a full year) ***but will not significantly alter the substantial unit cost advantage we have over all other EU airline competitors***.

176. O'Leary also denied what he called a "renewed campaign of misinformation by competitor airline pilot unions" concerning Ryanair's labor policies:

> ***Since Ryanair has, for over 30 years, operated a sophisticated collective bargaining process, supported fully by our pilots and cabin crew*** – confirmed and validated by the Irish Supreme Court – the only way our existing 5 year base agreements can be changed (some of which run to 2020) is by negotiation between the airline and our base ERC's. . . . ***However, we will not, and cannot, be forced to meet with any outside group such as the so-called EERC*** which like REPA (2004) and RPG (2012) is a front for competitor airline pilot unions (BALPA, IALPA, ECA and even more bizarrely some U.S. pilot unions).

177. O'Leary stated that the "misinformation" about Ryanair's labor policies was being used "to denigrate Ryanair . . . because their airlines cannot compete with us":

> I'm sorry that our people have had to listen to ***misinformation about Ryanair promoted by competitor pilot unions***, however we have been here before, and we will be again. We understand that the reason they wish to denigrate Ryanair is because their airlines cannot compete with us. ***As usual when these union airlines fail, such as Monarch, Air Berlin and Alitalia in recent months, their pilots all come to Ryanair seeking jobs that pay up to €175,000 p.a., deliver a double bank holiday weekend every week, with the best promotions record and, the best job security in Europe***. We will continue to work hard to deliver for our people, our customers and our shareholders while these competitor unions will continue to rail and fail.

178. As Defendants knew, or were reckless in not knowing, the statements in ¶¶174-177 were false and misleading, or omitted material facts needed to make them not misleading, when made, for the following reasons:

(a) Ryanair was very much facing pilot shortages. Defendants knew that the market for pilots had been tightening since May 2017 (¶¶61-64), and that Ryanair pilots, particularly those with experience, such as captains and first officers, had left for competitor airlines "in droves" over the past 12 months due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture. ¶¶42-54, 81-82.

(b) Contrary to Ryanair's misleading impression that offering materially higher pay to its pilots would not "significantly alter the substantial unit cost advantage we have over all other EU airline competitors," the fact was that Ryanair's low-cost business model depended on keeping its labor costs low. Indeed, Ryanair required pilots upon hiring to form Irish shell companies using accountants it "recommended," so that their labor could then be contracted to a third-party agency largely set up for this purpose (*e.g.*, Brookline Aviation) and Ryanair could arrange that agency for the pilot's employment. This allowed Ryanair to avoid paying higher taxes and providing benefits like sick leave and a permanent base location to the majority of its employees. ¶¶29, 42-48, 59.

(c) Ryanair did not operate a "sophisticated collective bargaining process." Although Ryanair's ERCs had been found to technically constitute "collective bargaining" structures by Ireland's Supreme Court, the truth was that the ERCs provided little to no protection or bargaining power to employees. Instead, management selected which employees would serve on the ERCs from each base and it informed the employee representatives of updated terms and conditions,

offering no meaningful representation for employees. ¶¶56-57. Management also did not "negotiate" with the ERCs "regarding pay, allowances, rosters, work practices and conditions of employment," or "consult" ERCs to "discuss all aspects of the business"; rather, employee representatives were simply told the terms and conditions their colleagues would receive. There was no negotiating. ¶¶56-57.

(d) The alleged misinformation about Ryanair's labor policies by competitors was not misinformation, but actually accurately reflected Ryanair's poor employment practices. Flight crew were unhappy due to the poor pay and the economic uncertainty that Ryanair's zero-hour and agency contract structures provided, the excessive pressure placed on pilots to never miss shifts and go to whichever base they were told to, and the generally toxic atmosphere engendered by the Company's no-holds-barred strategy of cost-cutting. ¶¶42-54.

(e) Defendants' insistence that Ryanair would not meet with unions, and would not permit its employees to unionize was false. As O'Leary would later admit, the Company "always" knew that it would have to unionize in the near future (¶¶7, 34, 106, 123), that recognizing unions was "inevitable," and he had "long anticipated the evolution" to unionization (¶¶7, 34, 106, 123).

179. Defendants repeated the same themes in the pre-recorded earnings presentation also released on October 31, 2017. O'Leary, for example, when asked whether the Company was having difficulty in recruiting pilots, responded: "***No. We have a waiting list of over 2,500 qualified pilots who want to join. We've recruited more than 900 new pilots since January***. We've also, as Neil [Sorahan] said, seen an uptick in pilot applications." He also emphasized that "our pilot pay was competitive. It is ahead of those of other 737 operators," but conceded that "[t]he gap has closed in recent years, and we've responded to that by significantly improving our pilot pay."

180. CFO Sorahan spoke during the presentation about pilot turnover, noting that it was "***probably slightly ahead of where it was in prior years***," but dismissed its impact, stating "***we've seen a lot of applications in previous weeks***, particularly as a number of airlines have gone out of business; and more importantly, ***as we've increased the pay conditions*** at our various bases so that we're the highest paying Boeing 737 operator across the network."

181. When asked whether Ryanair would meet with the "so-called EERC," Sorahan replied unequivocally:

> ***No. We've no plans to meet with competitor pilot unions regardless of what they're called. We engage with our people through our own employee representative committees, which our supreme court has ruled is the correct form of collective bargaining to deal with them***. And we look forward to talking to the ERCs.

182. O'Leary, asked whether the pilots would be going on strike, answered:

> We don't expect so; although our pilots, under Irish legislation, are free to join unions if they so wish and are free to go on strike if they wish to go on strike. . . . ***I'm not really sure what they would wish to strike about.*** But if they have concerns that they want to raise, we've made it quite clear we – our door is open. ***And they can continue to raise those concerns directly with us through their ERC structure***, which has been confirmed by the Irish Supreme Court as meeting all of the tests established for collective bargaining. ***There's a bit of a misinformation campaign out there by the unions saying that the pilots don't want to participate in the collective bargaining within Ryanair.*** That's fine. That's their right, but if they don't want to participate in it, if they want to achieve, change, it can only be done through that collective bargaining process.

183. O'Leary later added that, "the board are 100%, in fact, if anything, more supportive, of our determination that ***we will not be bullied or intimidated by competitor pilot unions into offering union recognition*** to people who tell lies about Ryanair safety, our employment structures. We intend to continue to negotiate directly with our pilots. And I think, if anything, the board is absolutely united and – on that issue."

184. As Defendants knew, or were reckless in not knowing, the statements in ¶¶179-183 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair was having difficulty recruiting experienced pilots, a fact Defendants concealed with their reference to high application numbers. In addition, Defendants knew that the market for pilots had been tightening since May 2017. ¶¶61-64. Defendants also knew that Ryanair pilots, particularly those with experience, such as captains and first officers, had left for competitor airlines "in droves" over the past 12 months due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture (¶¶42-54, 81-82), and that the Company could not replace the experienced pilots quickly enough to keep pace with its schedules and planned growth. ¶¶49, 61-62, 81-83.

(b) Far from being "slightly ahead" of normal, a considerable amount of pilot turnover had occurred at Ryanair that Defendants knew would impact Ryanair's growth. IALPA estimates that over 700 pilots left Ryanair for other airlines during the period from April to September 2017, and many of these pilots were captains and training captains, without whom planes could not take off and cadets could not be properly trained. ¶¶81-82.

(c) Ryanair employees could not raise concerns directly through Ryanair's ERC structure. Although Ryanair's ERCs had been found to technically constitute "collective bargaining" structures by Ireland's Supreme Court, the truth was that the ERCs provided little to no employee protection or bargaining power. Instead, management selected which employees would serve on the ERCs from each base and it informed the employee representatives of updated terms and conditions, offering no meaningful representation for employees. ¶¶56-57.

(d) Many of Ryanair's "employees" were technically self-employed at shell companies that Ryanair had required the employees to set up or join, and then contracted through third-party agencies. These employees were not represented by the ERCs at all. ¶¶42-48.

(e) O'Leary and Sorahan knew that the pilot and cabin crew strikes were not just about pay, but a direct result of the Company refusing to engage in change regarding management's aggressive "low costs at any price" culture, which had for years resulted in penalization of employees who raised complaints or sought unionization with poor promotion opportunities, terms and conditions, and base transfers. ¶55(a)-(d). Similarly, O'Leary was cognizant that cabin crew were unhappy due to poor pay and the economic uncertainty that Ryanair's zero-hour contract structures provided, the excessive pressures placed on crew members to sell during flights, and the generally toxic atmosphere engendered by the Company's no-holds-barred strategy of cost-cutting. ¶¶49-54, 87, 89.

(f) Competitor airlines were not bullying Ryanair to recognize unions. Instead, Defendants knew that Ryanair pilots and cabin crew would have liked to unionize, as demonstrated through efforts to unionize throughout Ryanair's operating history, and Ryanair's active suppression of possible unionization (¶55(a)-(d)). Ryanair also knew that the "competitor" pilot unions such as BALPA and IALPA did have Ryanair pilots among their membership. Similarly, competitor airlines were not disclosing ***mis***information about Ryanair's safety or employment structures. The truth was that Ryanair was fraught with labor issues. Both pilots and crew had substantial percentages of their pay dependent on meeting performance targets such as number of hours flown or sales levels, and were penalized for failing to meet those targets through lower compensation, withdrawal of promotion opportunities, and favorable rosters, and even threats of dismissal. Additionally, Ryanair

crew were paid only for in-flight working hours, which typically only constituted half of their working day. ¶¶42-54.

(g) As O'Leary later admitted, he had "always" known that the Company would unionize, that union recognition was "inevitable," and had "long anticipated" unionization as part of the Company's "evolution." ¶¶7, 34, 106, 123.

185. During the Company's October 31, 2017 earnings call later that day, O'Leary noted that the "rostering failure" had "highlighted the need for us to improve pilot payment in Ryanair," saying that: "We're competitive with Jet2 and Norwegian, but we should be better than them. And that's why we're rolling out significant pay increases of up to EUR 22,000 for captains, EUR 11,000 for first officers." While conceding that "[a] number of the bases, most notably Stansted, have turned down these increases," O'Leary emphasized that the Company "continue[s] to engage with the ERCs at those airports." He stated that it was "***important that they understand that there won't be another or better offer***." In total, O'Leary stated that "if the – when the pilot deals are accepted across all of the bases, they will add something of the order of about EUR80 million per year to the payroll."

186. In addition, O'Leary reiterated that Ryanair's pay and working conditions were excellent, disputing that its employment model was in any way exploitative:

> ***The relationship with the pilots is very good, despite what you might read in the papers. And it will continue to be good because we are paying them extraordinarily well. We're providing excellent job security. We're providing them with a roster that gives them a double bank holiday weekend at the end of every week of flying***.
>
> * * *
>
> And there is a misunderstanding, again, by payments largely by competitor pilot unions about our contractor model. ***I'll say in 2017, a majority of Ryanair pilots will be direct employees. There is a minority of the captains who are contractors because they wish to be contractors. They earn more money. The***

> ***contractors are paid more than the directly employed pilots***. There is a majority of the first officers are contractors, and that is a convenience because, as they move around and for the second officers, the first officers move around more as promotional opportunities arise. It is easier to have them on contract so they are more mobile. . . . ***We do not have 0 hour contracts. Our contract is a guarantee, the minimum number of flight hours. There are no 0 hour contracts in Ryanair***.

187. O'Leary also repeatedly emphasized that there would be no further increase in pay for pilots:

> ***[Pilots] were misadvised by the unions that if you reject this 22% pay increase and Ryanair come back with more. That's not the case. You reject this pay increase, then you're not getting – there won't be more***. You simply stay on the deal you're on. And that's helpful.
>
> * * *
>
> On a per passenger basis, our staff costs are about EUR 5 per passenger. We think that may rise to maybe EUR 6 over the next year or 2. ***But nothing that will close the already formidable and widening gap on per unit costs, so there's no real competitor***. And that's ultimately the point. We have a huge cost leadership over everybody else. Yes, we are – have suffered a rostering failure. In part, we're dealing with that by significantly stepping up pilot pay. I believe the pilots will accept those increased pay terms over the coming weeks and months. But those that don't, then that's fine. They'll continue under existing pay.
>
> * * *
>
> Our operating costs will continue to be flat or fall slightly, although we're now going to add some EUR 100 million a year in terms of additional pay for our people. And by the way, the best way of guaranteeing that there won't be industrial action is to pay your people more than the competition. ***I would be surprised if we were to see industrial action from people who are on a EUR 150,000 – paid EUR 150,000 a year and who have been offered a EUR 22,000 pay increase***.

188. Defendant O'Leary also made clear that the scheduling failure would not lead the Company to recognize unions, stating:

> There is undoubtedly – this mistake has been used by competitor pilot unions as an opportunity to generate some negative PR for Ryanair. It has happened in the past, it will happen again. ***All it is, is PR. We continue to be an excellent employer of pilots. We pay more than the competition. Our pilots enjoy the best rosters in the business with the most rapid promotions and the newest aircraft. And that is demonstrated by the flood of applications we have had in recent months***, both from Monarch pilots who were made redundant, Air Berlin pilots who are being made

> redundant and also pilots from Norwegian and Jet2 who want to share in the pay increases that our people are now enjoying.
>
> * * *
>
> ***We have seen all of the speculation about industrial action that – none of it which is backed up any facts whatsoever***. But if they wish to take industrial action, they are free to take industrial action. . . . But we will move some aircraft out of certain bases if there was industrial action, that there will be consequences.
>
> * * *
>
> Now we continue to engage with Stansted pilots and their ERC. The door remains open to them and to a number of the others. But will there be some third party? ***Are we going to sit down with some pilot unions or competitor pilot unions or this EERC, which is the latest construct of these competitor pilot unions? No, we won't. There won't be any discussions with them now or at any time in the future. We have a – what is it, an exhaustive collective bargaining process***.
>
> * * *
>
> ***And we are determined, as has always been, we have been nonunion company for 30 years. We will remain a nonunion company*** by paying our people more and by fixing the broken elements of communication with pilots that undoubtedly broke this summer.

189. As Defendants knew, or were reckless in not knowing, the statements in ¶¶185-188 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair's labor relations were, in fact, far from "very good" and Ryanair was not an "excellent employer" for pilots. Ryanair pilots, particularly those with experience, such as captains and first officers, had left for competitor airlines "in droves" over the past 12 months due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture. ¶¶42-54, 81-82. Additionally, because the majority of Ryanair's first and second officers and cabin crew were "self-employed" or on agency contracts, they often had little certainty as to the number of hours they would be able to work (many had zero-

hour contracts), ***where*** they would be working (both pilots and crew were frequently moved across Ryanair bases on short notice when Ryanair wanted to fill vacancies or obtain an economic advantage), and even where they should pay their taxes. Indeed, many pilots reported that the uncertainty of their employment conditions was a main reason for the staff exodus from Ryanair. ¶¶42-48, 81-82, 87, 89.

(b) Regardless of whether self-employed pilots were individually paid more than directly employed pilots (and employee accounts strongly indicate they were not) (¶¶42-44), the insinuation that Ryanair employees could choose to be contractors in October 2017 was false and misleading. The majority of Ryanair's first and second officers and cabin crew were forced to be "self-employed" or agency contracts. This allowed Ryanair to save a substantial amount on social benefits (*e.g.*, paid sick leave) and taxes by contracting those employees through third-party agencies rather than hiring them directly. Additionally, Ryanair required pilots upon hiring to form Irish shell companies using accountants it recommended, so that their labor could then be contracted to a third-party agency largely set up for this purpose (*e.g.*, Brookline Aviation) and Ryanair could arrange with that agency for the pilot's employment. This allowed Ryanair to avoid paying higher taxes and providing benefits like sick leave and a permanent base location to the majority of its employees. ¶¶42-48.

(c) O'Leary's statement that Ryanair did not use zero-hour contracts is false. Ryanair regularly utilized employment contracts structured as zero-hour contracts, which would not guarantee to staff a particular number of working hours. Indeed, Ryanair was not required to give them any hours if it chose not to. The zero-hour contract was highly beneficial for Ryanair, as it was not required to pay the outsourced crew members in the event it chose to cut flights or close bases. ¶¶42-48.

(d) O'Leary's statement that pilots were "misadvised by the unions" that rejection of the offered pay increase would lead Ryanair to "come back with more," and that Ryanair's increased labor costs were concretely bounded by the 22% increase offered was materially misleading. O'Leary knew that the unions were not only looking to obtain increases in pay, but also substantial changes in terms and conditions, including the provision of permanent contracts based on local law. O'Leary also knew at the time these statements were made that changes in those terms and conditions would result in significant long-term costs to Ryanair that were not represented simply by increased salary numbers. ¶¶29, 42-54, 81-82.

(e) Ryanair's "widening unit cost gap" was based in substantial part on its staff costs, which it had been able to suppress through substandard pay, terms and conditions for its employees, and its "flexibility," stemming from its use of zero-hour or self-employment contracts, to move its airplanes and their crews on short notice where economically preferable. These practices caused significant unrest among Ryanair employees in the 12 months prior to Defendants' statements and were not a sustainable driver of a continued "widening unit cost gap." ¶¶29, 42-48, 59, 61-62.

(f) Ryanair would not remain a nonunion company. As O'Leary later admitted, the Company had "always" known that unionization would occur at some point and he had "long planned for" unionization as part of Ryanair's "evolution." Defendants also knew a great many Ryanair pilots and cabin crew would have liked to unionize, as demonstrated through efforts to unionize throughout Ryanair's operating history and Ryanair's active suppression of possible unionization. Indeed, O'Leary admitted in 2015 that if Ryanair agreed to recognize unions in Denmark, it would soon be required to do so in its other countries of operation, something it did not want to do. ¶¶7, 34, 55(a)-(d), 106.

190. On December 15, 2017, Ryanair issued a press release on SEC Form 6-K announcing that it would begin recognizing unions. The release stated that "'[p]utting the needs of our customers first, and avoiding disruption to their Christmas flights, is the reason why we will now deal with our pilots through recognised national union structures and we hope and expect that these structures can and will be agreed with our pilots early in the New Year.'"

191. As Defendants knew, or were reckless in not knowing, the statements in ¶190 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Defendants knew that the Company could not attain its promised 200 million passengers by March 2024 growth targets without expansion into unionized areas such as France and Scandinavia. As O'Leary admitted after the Class Period, unionization had long been anticipated as part of the Company's "evolution." It was therefore materially false and misleading to suggest that the only reason Ryanair was agreeing to recognize unions in December 2017 was to avoid disruption to Christmas flights. ¶¶7, 34, 106, 123.

192. On February 5, 2018, Ryanair filed a press release on SEC Form 6-K reporting a 12% increase in profits in 3Q18. In the release, O'Leary addressed the decision to recognize unions, stating in pertinent part:

> After 30 years of successfully dealing directly with our people it became clear in Dec. that a majority of pilots wanted to be represented by unions. ***In keeping with our policy to recognise unions when the majority of our people wanted it***, we have met pilot unions in Ireland, UK, Spain, Germany, Italy, Portugal Belgium and France to discuss how we can work with them on behalf of our people.

193. O'Leary emphasized that the decision to recognize unions would not impact Ryanair's "cost leadership" or growth plans, stating:

> While union recognition may add some complexity to our business and may cause short-term disruptions and negative PR ***it will not alter our cost leadership in***

> ***European aviation, or change our plan to grow to 200m traffic p.a. by Mar. 2024***. Our aircraft allocations may alter by base as we capitalise on new growth opportunities in France and Scandinavia.

194. As Defendants knew, or were reckless in not knowing, the statements in ¶¶192-193 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair did not have a genuine policy to recognize unions when the majority of its pilots wanted union representation. In direct contrast, Ryanair employees were actively penalized for joining unions and the Company threatened workers who wished to unionize Ryanair with worse pay, withdrawal of promotion opportunities, and negative terms and conditions. ¶¶48, 55, 95. O'Leary had previously recognized during a labor dispute in Denmark in 2015 that if Ryanair agreed to recognize unions in Denmark, it would soon be required to do so in its other countries of operation, something it did not want to do. ¶55(d).

(b) The recognition of unions would significantly change the contours of Ryanair's cost leadership in European aviation. The fact was that Ryanair's low-cost business model was dependent on keeping labor costs low by contracting the ***majority*** of first officers, second officers, and cabin crew through agencies. ¶¶29, 33, 44-45. Indeed, Ryanair required pilots upon hiring to form Irish shell companies using accountants it recommended, so that their labor could then be contracted to a third-party agency largely set up for this purpose (*e.g.*, Brookline Aviation) and Ryanair could arrange with that agency for the pilot's employment. This allowed Ryanair to avoid paying higher taxes and providing benefits like sick leave and a permanent base location to the majority of its employees. ¶¶44-46. With increasing labor costs driven up by unionization, union deals that changed pilots' terms and conditions, and the disappearance of Ryanair's self-employment

model focused on "cost-savings," Ryanair's business model would require fundamental changes to adapt to the new employment reality.

(c) While unionization would not change Ryanair's plan to "grow to 200m traffic p.a. by Mar. 2024," Defendants knew, but did not disclose, that it could never have achieved that growth target ***without*** unionization. Defendants knew that the "new growth opportunities" Ryanair cited in France and Scandinavia had been necessary all along to obtaining the additional passengers required to hit its promised traffic levels, and that since those areas were generally unionized and would require Ryanair to recognize unions if it wanted to further expand operations in those regions. ¶¶55(d), 63, 99(b), (j).

195. In the Company's pre-recorded earnings presentation released on February 5, 2018, O'Leary acknowledged that recognizing the unions had "been a concern," and "was clearly a surprise move in December." According to O'Leary, however, "we've always said that when a majority of our people want union recognition, then we'll deal with the unions." He reassured investors that "even though we are guiding that there will be inflation as a result of our Union Recognition Program, ***it will still not alter the fundamental and very wide cost gap between Ryanair and all of our competitors***." O'Leary stated that even where strikes were threatened, "we will take those disruptions if it means defending either our current pay levels and our current efficiencies. ***We are not – we don't intend to compromise on either***, but that still means that our pilots will enjoy the best rosters . . . ." He affirmed unequivocally that "***fundamentally, unionization and higher pay will not alter the very substantial unit costs advantage Ryanair has over all other airlines in Europe***."

196. When asked whether the Company had changed its guidance of a €45 million increase in staff costs in the second half of FY18, and of €100 million in fiscal year 2019, O'Leary

maintained that the answer was no, stating: "No. We would maintain those numbers. Remember, those are incremental costs in addition to the growth or the normal growth in staff costs that would arise from the 50 additional aircraft we'll add this year."

197. As Defendants knew, or were reckless in not knowing, the statements in ¶¶195-196 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair's "widening unit cost gap" was based in substantial part on its staff costs, which it had been able to suppress through substandard pay, terms and conditions for its employees, and its "flexibility," stemming from its use of zero-hour or self-employment contracts, to move its airplanes and their crews on short notice where economically preferable. ¶¶33-34, 44-55, 69, 72. Unionization, including higher pay and better working conditions (including movement to permanent contracts) for pilots and crew, were not a sustainable driver of a continued "wide cost gap" or a "substantial unit costs" advantage over Ryanair's competitors. ¶¶55, 132-133.

(b) Defendants knew that unionization would require Ryanair to compromise, and at a minimum fundamentally alter the contours of, its ultra low-cost model. The simple fact was that Ryanair's efficient and no-frills business model was contingent on low labor costs, and it had thus far contained those costs through use of a questionable "self-employment" model and forcing Irish contracts on all its employees. ¶¶33, 44-55, 72. Consequently, imposition of "local contracts" and unionization would, in most countries, require Ryanair to pay increased social contributions and taxes. ¶¶44-48. Moreover, as some countries had stricter employment regulations with regards to which employees could be considered "self-employed," Ryanair's use of contract and agency employees, a staple of its low-cost model, would be unsustainable post-union recognition. ¶¶69, 72-74, 132-133.

198. During the Company's 3Q18 earnings call on February 5, 2018, O'Leary again assured analysts and shareholders that:

> [U]nion recognition may add some complexity to the business and it may cause short-term disruptions and some negative union PR, ***but it does not alter our cost leadership in European aviation or alter our plan to grow to 200 million passengers per annum by March 2024***.

199. In addition to confirming that Ryanair's staff cost increase would be confined to "an additional EUR 100 million over the year," O'Leary made clear that strikes would not alter that fact, stating that:

> And if that is strikes, it will be strikes where people want to challenge either our efficiency or our low cost. ***The pay increase is 20%. It's not going to be 21%, it's not going to be 25%, it's going to be 20% and that's it. And so some of you in the modeling who have forecasted labor will rise by an additional EUR 170 million, EUR 240 million, I think EUR 100 million is a reasonable figure***.

O'Leary highlighted Ryanair's purportedly successful handling of the union conflicts to date, claiming that while "we have demonstrated quite a degree of speed and flexibility in our dealings with the unions," the unions "have to understand that we will take strikes, we will not roll over because of the threat of disruptions."

200. O'Leary also dismissed the "rubbish analysis since last September when, mea culpa, we had a major rostering (expletive)" that claimed "either the ECJ or the Mons case or unionization will blow up Ryanair's labor costs," insisting that "our labor costs are a tiny fraction of our unit cost advantage over every other airline in Europe" and that "if anything, the gap between us and them is widening."

201. On February 6, 2018, the Company held an analyst meeting in Dublin, where Defendants emphasized to analysts that "***nothing has changed***" in the Company's business model or growth plans despite the recent union recognition and pilot wage increase.

202. As Defendants knew, or were reckless in not knowing, the statements in ¶¶198-201 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) While unionization would not change Ryanair's plan to attain 200 million customers by March 2024, Defendants knew, but did not disclose, that it could not have met that goal without expanding its operations into unionized areas like France and Scandinavia, a move it had specifically disavowed in the prior months due to its stated antipathy to union recognition. ¶¶55(d), 63, 145. Indeed, O'Leary admitted after the Class Period that unionization had long been anticipated as part of the Company's "evolution." ¶¶123, 127(h).

(b) Ryanair's labor costs would rise above its estimation of €100 million. Defendants knew that the *Mons* decision would cause the Company to incur significant cost increases as it would be required to face an increased amount of employee litigation and do so in foreign jurisdictions. ¶¶46-47, 61, 72-74. Defendants were also aware that, as many countries had stricter employment regulations with regards to which employees could be considered "self-employed," than Ireland, Ryanair's use of contract and agency employees, a staple of its ultra low-cost model, would be heavily impacted if foreign jurisdictions decided their law trumped that of the Irish contracts. ¶¶33, 46-48, 61, 72-74, 132-133.

203. On May 21, 2018, Ryanair issued a press release filed on Form 6-K with the SEC. The Company stated that it would "continue to deal openly and fairly with our people and their unions, but we will not make concessions on pay or productivity ***which threatens either our low cost model or our cost leadership in Europe***."

204. In the Company's pre-recorded earnings presentation released the same day, O'Leary announced that the Company "expect[s] our staff cost [this year] will rise by about EUR 200 million,

EUR 100 million of that was the pay increases negotiated with pilots and cabin crew last year." He stated that "[o]ver the last 6 months, more than 90% of our pilots have voted on and accepted a 20% pay increase, which is key, I think, in a tightening market for pilots that we are not just competitive on pilot pay, in fact we are about 20% ahead of our low-cost 737 competitors on pilot pay and we're seeing a significant surge in pilot applications to us, both experienced pilots and new pilots."

205. O'Leary also minimized the disruption that industrial actions to date had had on the Company's operations, claiming that, "[i]n both cases, the strikes [in Germany and Portugal] were poorly supported mainly because unions were unable to communicate either to us or to our people what exactly it was they were calling a strike over when we're engaged in active discussions with them." He emphasized that the pay increase pilots and crew had received "has gone down very well," as evidenced by the "very little industrial disruption despite we work [sic] our way through the union recognition discussions, and we expect that to continue."

206. As Defendants knew, or were reckless in not knowing, the statements in ¶¶203-205 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair could not both deal with unions fairly while also maintaining its low-cost model unchanged, or without at least somewhat damaging its cost leadership in Europe. The fact was Ryanair's ultra low-cost business model was based in substantial part on its staff costs, which it had been able to suppress through substandard pay, terms and conditions for its employees, and its "flexibility," stemming from its use of zero-hour or self-employment contracts to move its airplanes and their crews on short notice where economically preferable. ¶¶33-34, 44-45, 69, 72, 88, 132-133. Since Ryanair knew that to satisfy the demands of the unions, it would have to make substantial concessions – including moving employees to permanent and local contracts (¶¶85, 130)

– it knew that the contours of its business model that had thus far been successful would have to change.

(b) The Company knew that strikes and continued disruptions would continue over the next few months as, in an effort to keep up with its growth and profit projections, Ryanair could not give into the various union demands of better pay and terms and conditions. Management was thus not prepared to participate positively with unions, as exemplified by management's failure to engage with cabin crew unions just a few weeks later to discuss demands for better sick pay and change in the sales-focused and competitive culture imposed on crew members, leading to the largest strike in Company history. ¶¶114-120.

207. During the Company's live earnings call on May 21, 2018, O'Leary again touted the "significant progress" Ryanair had made "with our union recognition negotiations," and that the Company had "negotiated 5-year pay deals with all of the pilots and the cabin crews, so . . . in the discussions with the unions, it's we're not focusing on pay issues." He assured investors that "we will continue to make progress both on the pilot and with the cabin crew unions, but we are not going to accept any ridiculous inefficiencies." In response to an analyst asking whether the labor cost increase was higher than the Company had expected, O'Leary stated, "[n]o, actually labor is not much that a surprise to us. I don't think labor surprised us. . . . I think a significant achievement by Eddie Wilson and the team was to put in place 5-year pay deals with our pilots and our cabin crew."

208. On the same call, O'Leary also reiterated that the pay deals that had been reached would cost €100 million, and no more:

> And I mean there's a lot of a kind of an analysis or, I think, speculation at the time that the unionization could cost us anything up to EUR 140 million, actually been EUR 140 million and EUR 240 million of pay increases. We're not there. ***The number is EUR 100 million. We felt we've indicated we felt it will be EUR 100 million, and I think we cap it out at that***.

209. O'Leary noted that the Company may "have occasional strikes such as the ones we had with the German pilots in December or with the Portuguese cabin crew in Easter," but stated that:

> [W]e think they will be reasonably small in number and will be on a country-by-country basis but only where we're dealing with unreasonable demands or expectations. We have done an extensive survey of our pilots, more than 50% participation; and have taken great comfort from the degree to which the pilots have reflected that they're happy with the terms and conditions, the rostering and the pay in Ryanair.

210. As Defendants knew, or were reckless in not knowing, the statements in ¶¶207-209 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Defendants knew that the costs of unionization would rise above €100 million. In addition to increases in employee pay that the Company had agreed to, it was also aware that unions had demanded permanent contracts, using local law, for their members. ¶¶85, 130. Ryanair's use of contract and agency employees was a staple of its ultra low-cost model that not only allowed it to avoid paying social benefits and taxes and eliminate "inefficiencies" like paid sick leave, but also gave them the "flexibility" to close bases on short notice when airports threatened to increase access and handling costs or open them when they saw an opportunity to do so, telling employees they could either agree to transfer bases or be fired. ¶¶33-34, 44-45, 69, 72, 88, 132-133. As it was a key element of Ryanair's cost-containment strategy, Defendants knew that the Company would incur significant long-term costs from unionization if the self-employment model was changed. ¶¶69, 72-74, 132-133.

(b) Management knew it was not making "significant progress" with the remaining union negotiations, and that costly industrial action was likely to continue. Management was not prepared to participate positively with unions, as exemplified by O'Leary's referral to their

demands as "ridiculous," and management's failure to engage with cabin crew unions just weeks later to discuss demands for better sick pay and a change in the sales-focused and competitive culture imposed on crew members, resulting in the largest strike in Company history shortly after. ¶¶114, 120.

211. Also on May 21, 2018, in an interview with Bloomberg Markets and Finance, O'Leary was unequivocal that Ryanair did not "have labour issues," stating:

> Firstly, ***we don't have labour issues***. We did agree in December to recognize unions, we have in the last five months though, put in place five-year pay deals with all of our pilots, all of our cabin crew. We are still working through the process of recognizing unions, but ***we don't have a labour problem, people are very happy with the pay increases that they are enjoying at the moment*** . . . .

212. As Defendants knew, or were reckless in not knowing, the statements in ¶211 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair's operations were blighted by labor issues both before and throughout the Class Period, including in May 2018. ¶¶55, 61-64, 77-82, 84-97, 102, 109. Moreover, O'Leary's suggestion that a pay increase had solved its labor issues was false and misleading, as it omitted the fact that many of the unions had threatened industrial action because Ryanair failed to take action to change the Company's overly aggressive culture, which insisted on efficiency and sales over safety, and generally disregarded employees' well-being. ¶¶4, 9, 51, 87. Cabin crew were similarly unhappy due to the economic uncertainty that Ryanair's zero-hour and agency contract structures provided, the excessive pressures placed on crew members to sell during flights, and the generally toxic atmosphere engendered by the Company's no-holds-barred strategy of cost-cutting. ¶¶51-52, 54, 87.

(b) At the time this statement was made, negotiations between Ryanair and its employee unions were not progressing positively. Not only had the Company experienced strikes over Easter (¶109), it knew further work stoppages were likely. Indeed, in the following summer months and up until September, staff continued to strike in Germany, Ireland, Belgium, Sweden, and the Netherlands, thus highlighting continued employee unrest and a failure on Ryanair's part to improve industrial relations. ¶¶114-117, 120, 122.

213. On July 23, 2018, the Company released a pre-recorded presentation in which defendant O'Leary discussed Ryanair's disappointing 1Q19 earnings. He emphasized that there would likely be more strikes in the future as Ryanair would maintain its ultra low-cost model at any price, stating in pertinent part:

> The key thing here is we must, and we will take on strikes and face them down. ***We will not make concessions that would damage either our low-cost leadership, our product – people productivity***. But we want to minimize the impact of these strikes on the customers, and so far, that seems to be working out reasonably well.
>
> * * *
>
> We do expect that there will be more strikes. We expect that these will be reasonably minor, and that we will be able to manage them sensibly in the interest of our customers by judiciously canceling flights, hopefully 7 – at least 7 days in advance so that we can either reaccommodate or refund our customers. . . . I'm afraid we expect to face more strikes ***because it's important that we defend both the low-cost model and also the high-productivity model***.

Sorahan stated further:

> Yes, I think [further strikes] can't be ruled out. There's a likelihood of more strikes since – at the peak summer months and potentially over the winter as well. So just like our competitors, IAG and Lufthansa, ***if it means protecting our model, and we got a low cost, high-productivity model, then in some instances, we will have to take strikes***.

214. In a Bloomberg Markets interview later that day, Sorahan reiterated that while there would likely be more strikes, maintaining low costs was critical to Ryanair's operational model:

> So I think there probably will be some more strike action, but ***Ryanair will protect its model, its key to us that we have a highly productive but highly paid workforce and that we retain the cost advantage over everybody else***.

215. As Defendants knew, or were reckless in not knowing, the statements in ¶¶213-214 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Defendants knew that Ryanair could not have it both ways: negotiating with unions while also failing to make concessions and defending its low-cost model. The fact was that Ryanair's low-cost business model was dependent on keeping labor costs low by contracting the ***majority*** of first officers, second officers, and cabin crew through agencies. Indeed, Ryanair required pilots upon hiring to form Irish shell companies using accountants it recommended, so that their labor could then be contracted to a third-party agency largely set up for this purpose (*e.g.*, Brookline Aviation) and Ryanair could arrange with that agency for the pilot's employment. ¶¶44-46. This allowed Ryanair to avoid paying higher taxes and providing benefits like sick leave and a permanent base location to the majority of its employees. ¶¶44-46, 61. Ryanair also knew that its emphasis on staff "efficiency," would necessarily decrease as it met union demands to increase crewing ratios and decrease the portion of crew salary that was dependent on generating ancillary revenue through inflight sales. Finally, as the unions had demanded permanent contracts under local law for their employees (¶¶85, 130), Defendants knew that resolution of labor issues with the unions would require Ryanair to alter its low-cost business model.

216. During the 1Q19 earnings call also held on July 23, 2018, O'Leary spent much of the call minimizing the impact of the summer's industrial actions, stating:

> As you know, we have suffered a number of strikes ourselves. Despite signing pilots and cabin crew recognition agreements in most of our major markets, most notably the U.K, and Italy; and the recent agreement, as recently as last week, with our German cabin crew, we're making slower progress in smaller markets, most

> notably Ireland, Belgium and Portugal, largely where competitor employees, pilots and cabin crew are involved in and impeding progress. ***To date, we have suffered 2 unnecessary strikes by a small minority just last quarter of our Irish-based pilots***. There's a third one taking place tomorrow.
>
> * * *
>
> And I think we've demonstrated, too, quite an impressive ability to manage our way around disruptions. Having had 3 days of pilot strikes in Ireland, the fact that we have now cancelled less than – well, if you take it all, the 3 days, an average of 25 flights, and when we do more than 2,500 flights per day, I think it indicates ***what limited impact these strikes have had***.
>
> * * *
>
> But if we have to take strikes in those uncertain markets over the next number of weeks and months, we will and we'll continue to work our way around it. ***But the kind of key message I would want to communicate to our – both our customers and our investors is these are reasonably limited. Their impact, despite some of the kind of crazy PR and some of the coverage, even in some of the analysts' notes, their impact on the overall operation is reasonably small***. But it is damaging certain geographic markets, which is why we said today, we are now actively relooking at some of our base allocations of aircraft for the winter schedule. And we'll be communicating those decisions in the coming days and weeks, depending on whether we – how much progress we make in our negotiations with our people and their unions in those country markets.

217. O'Leary also emphasized to shareholders that the company was "not antiunion," claiming that "some lazy media . . . wants to characterize us as being antiunion. ***We're not antiunion. We recognized in December that we were going to negotiate with unions***. We're open to doing that, and we're open to reasonable, very reasonable accommodations with our people, particularly our very well-paid pilots and cabin crew who enjoy very good conditions of – terms and conditions of employment and very favorable rosters." Nevertheless, O'Leary stated that:

> [I]t's important if we're going to preserve our low-cost model and our cost advantage over other airlines, is that while we don't want to invite strikes, we want to resolve these issues by negotiation with our people. We're inviting our people to meet with us. ***But if we are being dealt with unreasonably, in some cases, by competitor employees interfering in the process, then the strikes are inevitable and we definitely will take strikes and we've demonstrated already that we can work our way around strikes while at least trying to minimize the impact on our customers***. I would far happier take a hit to our earnings this year, but convey the message that we

will face down strikes while trying to resolve these issues negotiate in and negotiate our people.

218. As Defendants knew, or were reckless in not knowing, the statements in ¶¶216-217 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Despite Ryanair's assurances that it would not pay EU 261 compensation to the passengers impacted by the summer strikes, claiming that the flight cancellations were caused by "extraordinary circumstances," Ryanair knew that there was a substantial likelihood it would be liable to pay in at least some countries. The British Civil Aviation Authority had urged passengers in early July 2018 to submit compensation claims, and would ultimately rule that the strikes were within Ryanair's control. ¶121. Fulfilling its compensation obligations to impacted customers would cost the Company tens of millions, also taking into account refunding flights and the loss of ancillary sales on board the multiple flights cancelled during the summer.

(b) The Company's statement that it was "not antiunion" because it had recognized unions for its primary airline operations was false and misleading. As Defendants knew, throughout its history Ryanair had actively prohibited unionization, and penalized its workers who engaged in any union activity. ¶¶48, 55, 95. Moreover, as demonstrated by its post-Class Period actions toward employees of Polish subsidiary Ryanair Sun, whom it actively blocked from unionizing and forced onto self-employment contracts (¶¶132-133), the Company had not actually changed its "antiunion" colors during the Class Period.

219. On August 8, 2018, Ryanair issued a press release announcing it would be "Forced To Cancel 250 Flights To/From Germany" on August 10. Ryanair's Chief Marketing Officer Kenny Jacobs stated in the release that, "'[o]ur pilots in Germany enjoy excellent working conditions[,] . . .

are paid up to €190,000 p.a. and, as well as additional benefits, they received a 20% pay increase at the start of this year.'"

220. As Defendants knew, or were reckless in not knowing, the statements in ¶219 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Ryanair pilots, particularly those with experience, such as captains and first officers, had left for competitor airlines "in droves" due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture. ¶¶42-50, 52-54, 81-82, 85, 88. Additionally, while technically true that some captains in Germany were paid up to €190,000 p.a., most pilots, particularly first and second officers, were paid ***far*** less. Additionally, all pilots had substantial percentages of their pay dependent on meeting performance targets such as number of hours flown or sales targets, and were penalized for failing to meet those targets through lower compensation, withdrawal of promotion opportunities, and favorable rosters, and even threats of dismissal. ¶¶4, 53, 88.

221. On September 12, 2018, O'Leary gave an interview to First On CNBC, discussing the recent strikes. According to O'Leary, "what's important to understand is they [the strikes] have limited impact on the business today. Much as we regret we cancelled 150 or 400 flights in Germany and that affects 27,000 customers today, we will carry over 400,000 customers across Ryanair services across the total of Europe today."

222. O'Leary also engaged in this exchange during the September 12, 2018 First On CNBC interview:

> **Q:** I've taken the opportunity to speak to unions in more than half a dozen different countries around Europe. In Portugal they say you're representatives employ quote,

bullying and intimidation tactics, they do not listen; in Italy they say the attitude is very impolite, your company doesn't respect Italian law; in Germany, they told me that Ryanair undermines German standards in labour law; in Spain, they say they cannot trust you, and that airline management is quote, lying all the time. Is there a problem with the management culture at Ryanair, and are you part of that problem?

**O'Leary:** ***No. The quotes are completely rubbish***.

223. O'Leary went on to state that "[o]ur pay is good, our terms and conditions are great, we have no trouble hiring people or attracting people to work for Ryanair." He emphasized just how good those conditions were, claiming: "We employ eleven and a half thousand people at Ryanair, this year they've enjoyed a 20% pay increase, our pilots earn up to £200,000 a year, cabin crew earn between 40 and 50,000."

224. O'Leary also denied, when pressed, that the unions would be a threat to Ryanair's business model:

**Q:** In Belgium they say that you're scared of the unions. Is that true? Is it a threat to your business model?

**O'Leary:** No. I mean, ***if it was a threat to our business model, we wouldn't have recognized the unions last December***.

**Q:** Did you have a choice at the time?

**O'Leary**: ***Yes, of course we had a choice***.

225. As Defendants knew, or were reckless in not knowing, the statements in ¶¶221-224 were false and misleading, or omitted material facts needed to make them not misleading, when made for the following reasons:

(a) Defendants knew that there was a problem with Ryanair's management culture as it concerned employee relations. As discussed in ¶¶227-229, *infra*, COO Bellew had admitted in September 2017 that the Company had "'a culture that people who knew there was a problem [with employee relations] . . . that they were not listened to, or they were actively discouraged from even raising the issue.'"

(b) That Ryanair's management culture had not truly changed was demonstrated further when, in December 2018, the Company blocked the unionization of Ryanair Sun pilots and forced its employees onto self-employment contracts, denying them the same bargained-for rights enjoyed by their colleagues at Ryanair's primary airline. ¶¶132-133.

(c) The fact was that Ryanair's low-cost business model was dependent on keeping labor costs low by contracting the ***majority*** of first officers, second officers, and cabin crew through agencies. ¶¶33, 44-46. Indeed, Ryanair required pilots upon hiring to form Irish shell companies using accountants it recommended, so that their labor could then be contracted to a third-party agency largely set up for this purpose (*e.g.*, Brookline Aviation) and Ryanair could arrange with that agency for the pilot's employment. ¶45. This allowed Ryanair to avoid paying higher taxes and providing benefits like sick leave and a permanent base location to the majority of its employees. ¶¶44-46, 61. Ryanair also knew that its emphasis on staff "efficiency" would necessarily decrease as it met union demands to increase crewing ratios and decrease the portion of crew salary that was dependent on generating ancillary revenue through inflight sales. Finally, as the unions had demanded permanent contracts under local law for their employees, Defendants knew that resolution of labor issues with the unions would require Ryanair to alter its low-cost business model. ¶¶9, 85, 130. The fact that Defendants blocked the Company's Ryanair Sun subsidiary – its much touted launching point to exploit the growth opportunities in Eastern Europe – from unionizing in December 2018, instead forcing its employees onto self-employment contracts, demonstrates that the Company knew it would not be able to grow its operations as profitably while keeping costs low once unionization took place. ¶¶101, 132-133.

(d) Defendants knew that the Company had not really had a choice in recognizing unions in December 2017. First, Ryanair pilots, particularly those with experience, such as captains

and first officers, had left for competitor airlines "in droves" in 2017 due to the substandard pay and terms and conditions Ryanair offered, Ryanair's overly aggressive insistence on efficiency and sales over safety, and the general disregard for employees' well-being embedded in Ryanair's management culture. ¶¶42-50, 52-54, 81-82, 85, 88. Pilots had rejected a pay increase offered to quell the unrest in favor of negotiating union recognition. ¶¶85-86. Second, Ryanair knew that it could not meet its promised "200 million customers by March 2024" growth target without expanding into unionized regions like France and Scandinavia. ¶¶63, 99(b), 99(j), 101, 109, 111. Thus, as O'Leary admitted, the Company had "always" known it would become unionized as part of its planned "evolution" and that union recognition had been "inevitable." ¶¶106, 123, 127(h). Third, the Company knew that a pan-European strike by Ryanair employees had been planned for December 20, 2017, the start of Ryanair's critical holiday travel period. ¶¶95, 97. Not only would the airline have had to cancel substantial portions of its heavy holiday flight schedule, incurring massive costs through refunds and EU 261 costs, but it would shatter the public's trust in Ryanair's reliability, which had been badly damaged by the September 2017 cancellations. Since reliability and punctuality, aside from low fares, were the only positive attributes Ryanair offered (¶¶2, 128, 130), Defendants knew they had to prevent another round of massive cancellations.

## VI. ADDITIONAL EVIDENCE OF SCIENTER

226. The following additional facts, when considered collectively with those alleged elsewhere herein, support a strong inference that Defendants knowingly made materially false and misleading statements and/or omissions, or acted severely recklessly in doing so, during the Class Period.

### A. In December 2017, Senior Management Admitted to Pilots that O'Leary Was Focused on Employee Relations

227. On December 19, 2017, the *Irish Independent* obtained a recording of Ryanair's recently-hired COO Bellew, and Chief People Officer Wilson, speaking to pilots at the airline's largest base, London Stansted, and published portions of the recording. Bellew is quoted as acknowledging that while the Company had "'been a great place to work in the past,'" "'the tone has gone very miserable . . . even in our head office.'" Bellew told the pilots that the situation between pilots and the airline was "'very inflamed,'" and "'very tense,'" and that "'[i]t seems there was a culture that people who knew there was a problem . . . that they were not listened to, or they were actively discouraged from even raising the issue any further.'"

228. Notably, Bellew emphasized to the pilots that employee relations were O'Leary's "'***biggest focus at the moment***,'" adding: "'***And it will be, and the board's as well. This has got primary attention***. We won't let this happen again.'" According to Bellew, O'Leary wanted to meet pilots to discuss the current situation, and had asked Bellew recently when he could do so. Wilson said that O'Leary "'***does recognise, and of course the board recognises that, that we did take our eye off the ball***. . . . The reason we're in the trouble we're in . . . is that we grew too fast.'"

229. Per the *Irish Independent* article, Bellew also stated that whereas "'[t]raditionally in the past, where people were leaving, we would always have contacted them, or we would have known in advance and say, "why are you leaving?" We'd sort them out and they'd often retract their resignation. There appears to have been little or no effort, and that senior management had told people not to contact people, and had actively discouraged trying to retain people.'" Bellew also stated that "'a lot'" of the airline's co-pilots had recently resigned because simple issues had not been addressed or resolved.

**B. O'Leary's Decades-Long History with Ryanair and Accounting Background Supports an Inference of Scienter**

230. O'Leary has worked for Ryanair for 30 years and spent all of that time in senior management positions: first as financial advisor to airline founder Tony Ryan, then as Deputy Chief Executive and COO before becoming CEO in 1994. He was the founding architect of Ryanair's iteration of Southwest's no-frills, low-fare model. In other words, O'Leary has lived and breathed the operations of Ryanair for decades.

231. During the 25 years in which O'Leary has served as CEO, Ryanair has engaged in several major clashes with its employees and/or trade unions regarding its labor practices. Each time, O'Leary was directly involved in and publicly commented on the disputes. Ryanair was also involved in litigation with employees over its labor practices at the start of the Class Period. Plainly, given O'Leary's centrality to prior labor disputes, he was well aware of employee complaints and desire to unionize as of the start of the Class Period. Indeed, after a 2015 labor dispute in Denmark resulted in the Company closing its Copenhagen base, O'Leary commented, "'[i]f we sign a collective agreement with the Danish unions, we will then be asked to sign 15 French collective agreements, 55 Spanish collective agreements and a lot of Italian collective agreements. We are not going to do that.'" O'Leary thus knew that his people did ***not*** prefer to "deal directly" with Ryanair when stating as much during the Class Period.

232. Similarly, O'Leary's background as a tax accountant at KPMG and as a financial advisor to one of Ireland's leading businessmen belies any inference that he did not know about the substantial tax benefits that Ryanair's self-employment model conferred on the Company's cost base, and the substantial complications it created for Ryanair employees. O'Leary would know that if its self-employment model was threatened – as by the *Mons* decision or unionization – there would be significant negative repercussions for the Company's cost base going forward.

### C. O'Leary's Extensive Knowledge and Close Monitoring of the Company's Operational Model and Costs Supports an Inference of Scienter

233. O'Leary is known across the business, social, and political community as an extremely focused, detailed, cost-conscious, and ruthless businessman. Ryanair insiders have been quoted as saying that O'Leary knows the intricacies of Europe's "open skies" regulations better than most. Indeed, a former colleague described O'Leary as not afraid to "'really roll up his sleeves and get stuck into all that stuff.'"

234. The same is even more true concerning the operational details of Ryanair. During the Class Period, O'Leary held weekly meetings ***every Monday morning*** where he engaged in "flame grillings" of his executive and department heads. According to *The Irish Times*, "[t]hese begin at 9am and run for two hours. Insiders say that O'Leary is always 'incredibly well-prepared' for these gatherings, with a clear picture of what is happening in each element of the business. Woe betide anyone who is not up to speed in their own area." Similarly, at the end of each week, "he spends part of Friday afternoon scrutinising all invoices over a particular value. More or less ***nothing happens in Ryanair without his knowing about it***." Given his involvement in Company minutia, including the labor and cost issues, an inference that he was unaware of the Company's worsening employment issues or that he was not directly involved in the decision-making surrounding the same is untenable.

235. As to the industrial actions and disputes that occurred at Ryanair in the fall of 2017, *The Irish Times* reported that O'Leary "knew the details of virtually every row, down to each protagonist and their grievances." Indeed, he could not avoid it: a substantial number of pilots, mostly captains, personally mailed or hand-delivered letters to O'Leary expressing their discontent with Ryanair, including Captain Comer. ¶89.

### D. The Alleged Misrepresentations and Omissions Concerned Ryanair's Core Operations

236. An inference of Defendants' scienter is further supported by the fact that the subjects of the alleged misstatements and omissions concerned the Company's core operations: its ability to manage its employees, costs, and flight operations. O'Leary, known for being particularly attuned to the Company's operational costs, would certainly be informed of any trends that could impact one of the four primary operational costs that all airlines must manage, and here two were impacted: personnel costs and airport access costs. Ryanair's ultra low-cost business model was based in substantial part on its staff costs, which it had been able to suppress through substandard pay, terms and conditions for its employees, and its "flexibility," stemming from its use of zero-hour or self-employment contracts to move its airplanes and their crews on short notice where economically preferable. ¶¶33, 45-46, 55(d), 88, 129. It would be severely reckless, at a minimum, if O'Leary did ***not*** know that the Company's costs and business model were likely to be substantially impacted by the labor unrest and unionization that occurred during the Class Period.

237. Indeed, the sheer magnitude of the labor cost increases and correlating decrease in profits resulting from Ryanair's employment issues, including costs related to strikes and flight cancellations, as well as structural changes to its employment model, also support a strong inference of scienter. Staff costs trended dramatically upward throughout 2018. The staff costs rose 23% in the last fiscal quarter of 2018 (period ended March 31, 2018), 34% in the first fiscal quarter of 2019, and then another 32% in the second fiscal quarter of 2019. By any account, these increases were massive.

238. The increasing costs also contributed to a substantial negative trend in profit. Profits after tax for 1Q19 were ***20% lower*** year over year, were 7% lower at half-year as compared to the prior year, and the Company was forced to reduce its FY19 profit estimate ***twice***. Also, the

Company's much-touted punctuality – an operational facet purportedly so important to the Company that it was willing to cancel ***thousands*** of flights in September 2017 in order to increase it to higher levels – decreased significantly from 88% of flights being "on time" at the start of the Class Period to a mere 75% by the end. These significant negative trends in crucial measurements of the Company's performance further contribute to an inference that O'Leary and the Company's executive team were aware of the impacts that unionization and its industrial relations problems had and would have on the Company's financial performance and business model during the Class Period.

### E. The Suspicious Replacement of COO Mick Hickey with Peter Bellew, and the Removal of O'Leary from Day-to-Day Management Supports an Inference of Scienter

239. During the Class Period and shortly after Ryanair's 2017 "scheduling" error that affected over 400,000 passengers (*see, e.g.*, ¶77), Ryanair's COO Hickey, a 30-year Ryanair employee whose responsibilities included overseeing pilots and ground crew – the very issues at the heart of this litigation – "resigned" from the Company. His suspiciously timed "resignation" came despite O'Leary's September 21, 2017 statement to shareholders that, in the face of the rostering crisis, "now is not the time to be taking people out and shooting them." However, as reports percolated that the scheduling problems at Ryanair had not taken management by surprise despite O'Leary's representation that false or inaccurate roster management reports had been provided to senior management, and that they were instead the result of a known pilot shortage, Hickey, a 30-year veteran of Ryanair, submitted his resignation.

240. Further suggesting that Hickey was the Company's "fall guy," was the nature and specified assignment of the individual who replaced him – CEO of Malaysian Airlines and former Ryanair Director of Flight Operations, Bellew. Bellew was known for a gentler, more positive style

than O'Leary, had previously commanded the respect of Ryanair's flight crew in his earlier role, and had significantly improved employee morale at Malaysian Airlines. The Company's October 17, 2017 Form 6-K announced Bellew would have a "specific responsibility for pilot production, training and career development with a mission to ensure that the pilot rostering failure which Ryanair suffered in early September will never be repeated," implicitly acknowledging that the Company knew the failure had not been a simple managerial error, but instead due to poor pilot relations and a pilot shortage.

241. Then, on February 4, 2019, Ryanair announced that as part of a corporate reorganization, O'Leary would be stepping back from managing the day-to-day operations of Ryanair's airlines after 34 years of hands-on management. Instead, the Company would create four new airline divisions – Ryanair Europe, Laudamotion, Ryanair U.K. and Ryanair Sun – each with a separate CEO to manage its operations. O'Leary would be the CEO of the new overarching Ryanair Group, with a focus on allocating capital, cutting costs, and buying aircraft. Industry analysts and media have reported that the "shift" in role came after questions were raised "about whether his direct style was best suited to dealing with growing staff unrest" and that his "abrasive style" jarred "with the airline's softer rebrand." O'Leary himself admitted on March 7, 2019, that "'one of the negatives of Ryanair is its association with me . . . [t]oo much of the negativity that attracts itself to Ryanair attaches itself because of something stupid I said 25 years ago.'" ¶135.

242. Financial analysts viewed Ryanair's decision to move away from O'Leary as a positive and linked the announcement back to the December 2017 unionization disclosure. For example, in a February 5, 2019 report, HSBC maintained its "Buy" recommendation and stated "[w]e welcome organisational change." HSBC added:

> In our view, a key advantage of the group structure will come from allowing existing CEO O'Leary distance from the unionisation process at Ryanair Ireland

> given he has a consistent track record of opposing unionisation. Now that unionisation is a reality, we think it would be better for the company to have another personality head Ryanair Ireland as the company evolves to a new business model that works with organised labour.

And, in an analysis published in City A.M., on March 20, 2019, Stepphan Shakespeare concluded that because O'Leary was "a main cause of the employee dissatisfaction that led to the infamous pilot strikes last year," Ryanair would gain from O'Leary "moving aside." O'Leary's removal from his decades-long post at the helm of airline operations and staff to a far less public corporate position just months after the Class Period ended further supports an inference of Defendants' scienter.

### F. Ryanair's Return to Its Anti-Union Stance with Ryanair Sun Demonstrates Defendants' Knowledge

243. Though throughout the Class Period O'Leary and his executives maintained that Ryanair's low-cost model would not be impacted by the *Mons* decision or unionization, their subsequent behavior soon after the Class Period demonstrates that they never believed their own representations. In December 2018, Ryanair blocked employees working at its Polish subsidiary, Ryanair Sun, from unionizing. ¶¶132-133. Still further, as part of the Company's "restructuring" into a holding company with four subsidiaries, including Ryanair DAC (the Company's main airlines operations), Ryanair U.K., Ryanair Sun, and Laudamotion, the Company forced all of Ryanair Sun's employees onto "self-employed" contracts. It denied subsidiary pilots and crew the employment benefits agreed with their unionized counterparts at Ryanair DAC. These actions, combined with Company management's statements that they viewed Eastern Europe as one of the Company's biggest growth opportunities in the future (¶101), supports an inference that during the Class Period, Defendants knew that union recognition and movement away from the self-employment model (as was demanded by unions) was incompatible with maintaining its critical labor cost advantage.

### G. Defendant O'Leary Sold over $120 Million of His Ryanair Stock While in Possession of Material Non-Public Information

244. Defendant O'Leary profited enormously from the scheme to misrepresent the truth about Ryanair's business. While in possession of material, nonpublic information, as detailed above, defendant O'Leary sold substantial amounts of Ryanair stock from his holdings at artificially inflated prices. The price at which defendant O'Leary sold his stock far exceeded the closing price of Ryanair stock after the Company revealed the truth.

245. On May 31, 2017, Ryanair announced that profits after tax grew by 6% and also disclosed a €600 million share buyback program. That same day, shares hit an all-time high price of €18.26. Two days later, on June 2, 2017, with Ryanair shares trading near that all-time high, defendant O'Leary cashed in by selling 4,000,000 shares at €18.00 per share, reaping proceeds of €72 million. This stock sale was suspicious in timing and amount because: (i) defendant O'Leary made this sale when he was aware that he was misrepresenting Ryanair's financial condition; (ii) prior to making this massive stock sale, he had made no stock sales for approximately five and a half years (since December 2011); (iii) he made this sale at a time when Ryanair's stock price was near its all-time high; and (iv) he sold a massive number of shares (4 million) for enormous proceeds (€72 million).

246. On May 30, 2018, O'Leary cashed in again, selling another 2,000,000 shares at €16.49 per share, reaping proceeds of €32.98 million. This stock sale was suspicious in timing and amount because: (i) defendant O'Leary made this sale when he was aware that he was misrepresenting Ryanair's financial condition; (ii) prior to his Class Period sales he had made no stock sales for approximately five and a half years (since December 2011); (iii) he sold a massive number of shares (2 million) for enormous proceeds (€32.98 million); and (iv) he made this sale at a suspicious time, just days after issuing May 21, 2018 statements claiming (again) that costs of

unionization would be capped at €100 million and reporting a 10% increase in full year profit, but before revealing the full truth about the financial impact union recognition would have on costs and profitability.

247. In total, during the Class Period, O'Leary sold 6,000,000 shares for proceeds of €104.98 million.[7] The amount of stock sold and proceeds gained is massive by any measure. And, as noted, these were his first sales in over five years and represented the sale of approximately 12% of his holdings in just two days during the Class Period.

248. The suspiciousness of O'Leary's stock sales and their proximity to the market learning of the Company's true financial condition raises a strong inference that he knew about the Company's true financial condition when he sold his shares and used that information in connection with the sales. The Ryanair stock chart below illustrates the price of Ryanair shares when defendant O'Leary sold stock during the Class Period compared to the price when the Company's true financial condition was disclosed.

[7] As of May 30, 2018, €104.98 million converted to $122,485,415.00.




249. Many in the financial press commented on the timing and magnitude of O'Leary's stock sales. For example, on June 16, 2017, the *Financial Times* reported on O'Leary's June 2017 sale of €72 million and noted that it was well-timed: "***Nothing presents a time to sell like a share price peak***." Specifically, the *Financial Times* stated that "the chief executive sold at just under Ryanair's all-time share price high of 1,826¢, reached on May 31 this year." *The Irish Times* also commented on O'Leary's June 2017 sale, stating he "sold off a significant volume of his shares in the Irish airline."

250. Defendant O'Leary's significant insider stock sales while in possession of material non-public information regarding Ryanair's true financial condition further support a strong inference of his scienter.

## VII. LOSS CAUSATION/ECONOMIC LOSS

251. During the Class Period, Defendants made numerous false and misleading statements and omissions of material facts necessary to render those statements not false or misleading, which maintained artificial inflation in Ryanair's ADS price.

252. As detailed herein, Defendants' false and misleading statements and omissions maintained artificial inflation in the price of Ryanair ADS by misrepresenting and concealing the relevant truth about Ryanair's business, operations, and financial condition. Plaintiff and investors purchased Ryanair ADS at these inflated prices and suffered damage when the price of Ryanair ADS declined upon the revelations of the relevant truth and/or the materialization of the risk that had been concealed by Defendants occurred.

253. The inflation in Ryanair's ADS was dissipated through a series of partial disclosures of the relevant truth about Ryanair's need to recognize employee unions and the resulting declining profits due to increased costs. The resulting significant ADS price declines upon release of truthful information and related increased risks were due to firm-specific fraud-related disclosures, and not a result of market or industry. The following examples are not exhaustive because fact and expert discovery have yet to commence.

254. As a result of disclosures on December 15, 2017, July 23, 2018, and October 1, 2018, Ryanair's ADS price suffered significant declines. *See* §IV.I. Individually and collectively, these drops removed the inflation from Ryanair's ADS price, causing real economic losses to investors who had purchased the ADS during the Class Period.

255. The following chart demonstrates the clear divergence of Ryanair's ADS prices from its peer index (NASDAQ Transportation) and the overall market index (NASDAQ Composite), as the relevant truth became known to the market:




256. In sum, as detailed above, the rapid declines described herein served to remove artificial inflation from the price of Ryanair's ADS, and were direct and foreseeable consequences of the revelation of the relevant truth concealed by Defendants.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET DOCTRINE

257. At all relevant times, the market for Ryanair ADSs was an efficient market for the following reasons, among others:

(a) Ryanair ADSs met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) according to the Company's July 30, 2018 annual financial report filed on Form 20-F, ADSs accounted for approximately 43.7% of Ryanair's issued ordinary shares as of June 30, 2018 (assuming conversion of all ADSs into ordinary shares); with over 1.17 billion ordinary shares outstanding as of March 31, 2018, this demonstrates a very active and broad market for Ryanair ADSs;

(c) as detailed above, dozens of financial analysts covered the Company and frequently published analyst reports about Ryanair;

(d) as a regulated issuer, Ryanair filed regular periodic public reports with the SEC;

(e) Ryanair regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(f) unexpected material news about Ryanair was rapidly reflected in and incorporated into the Company's ADS price.

258. As a result of the foregoing, the market for Ryanair ADSs promptly digested current information regarding Ryanair from publicly available sources and reflected such information in Ryanair's ADS price. Under these circumstances, a presumption of reliance applies to Plaintiff's purchases of Ryanair ADSs.

259. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Ryanair's business and operations, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that

the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. NO SAFE HARBOR

260. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying specific facts or circumstances facing the Company that could cause actual results to differ materially from those in the purportedly forward-looking statements.

261. Indeed, the risk warnings that were provided by Defendants in their Class Period statements included boilerplate statements,[8] such as:

- "The Company's business is to provide a low-fares airline service in Europe, and its outlook is predominately based on its interpretation of what it considers to be the key economic factors affecting that business and the European economy."
- "Forward-looking statements with regard to the Company's business rely on a number of assumptions concerning future events and are subject to a number of uncertainties and other factors, many of which are outside the Company's control, that could cause actual results to differ materially from such statements."
- "Although customer reaction to the measures has so far been positive and management expects these initiatives to be accretive to the Company's results over time, no assurance can be given that the financial impact of the initiatives will be positive, particularly in the short to medium term."
- "If growth in passenger traffic and Ryanair's revenues do not keep pace with the planned expansion of its fleet, Ryanair could suffer from overcapacity and its results of operations and financial condition . . . could be materially adversely affected."

---

[8] *See* Ryanair Holdings plc Form 20-F for the year ended March 31, 2017, at Part I, Item 3 ("Risk Factors").

- "The Company's operations and financial performance can therefore be significantly affected by fluctuations in the values of the U.K. pound sterling and the U.S. dollar."

- "It is not reasonably possible to itemize all of the many factors and specific events that could affect the outlook and results of an airline operating in the European economy."

- "A variety of factors, including, but not limited to, challenges to the applicability of Irish Labor Law and Ryanair's profitability, may make it difficult for Ryanair to avoid increases to manpower levels and loss of productivity. Consequently, there can be no assurance that Ryanair's existing employee compensation arrangements will not be subject to change or modification at any time."

- "Limitations on Ryanair's flexibility in dealing with its employees or the altering of the public's perception of Ryanair generally could have a material adverse effect on Ryanair's business, operating results, and financial condition."

- "Ryanair estimates that the change in legislation will have an adverse impact over time in the majority of jurisdictions in which Ryanair currently operates."

- "Ryanair's operations and the airline industry in general are sensitive to changes in economic conditions."

- "These [labor relation] risks could lead to deterioration in labor relations in Ryanair and could impact Ryanair's business or results."

262. These or other materially identical risk disclosures were disseminated throughout the Class Period and did not serve to adequately inform the market of the true risks and actual operational experience of the Company. Indeed, that these stated warnings were inadequate and provided no new, meaningful information, is evidenced by the market's reaction to the revelation of the alleged relevant truth. *See, e.g.*, ¶¶IV.I.

263. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ryanair who knew that the statement was false when made. Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and

misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## X. CLASS ACTION ALLEGATIONS

264. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Ryanair ADSs between May 30, 2017 and September 28, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

265. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ryanair ADSs were actively traded on the NASDAQ. The exact number of Class members can be determined only by appropriate discovery, but Plaintiff believes that there are likely thousands of Class members that are geographically dispersed, if not more. Record owners and other members of the Class may be identified from records maintained by Ryanair or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

266. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

267. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained competent counsel with experience in class action securities litigation.

268. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

269. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants' publicly disseminated statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants failed to convey material facts;

(d) whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(e) whether the price of Ryanair ADSs was artificially inflated during the Class Period due to the material nondisclosures and/or misrepresentations complained of herein; and

(f) to what extent the members of the Class have sustained damages and if so the appropriate measure of damages.

## XI. CLAIMS FOR RELIEF

### COUNT I:

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

270. Plaintiff incorporates the foregoing paragraphs by reference.

271. Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

272. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Ryanair ADSs.

273. Plaintiff has suffered damages in that, in reliance on the integrity of the market, Plaintiff paid artificially inflated prices for Ryanair ADSs. Plaintiff would not have purchased Ryanair ADSs at the prices paid, or at all, if Plaintiff had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

274. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Ryanair ADSs.

**COUNT II:**

**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

275. Plaintiff incorporates the foregoing paragraphs by reference.

276. Ryanair and O'Leary acted as controlling persons within the meaning of §20(a) of the Exchange Act.

277. By virtue of his high-level positions, stock ownership, control over SEC filings, participation in and awareness of the Company's operations, and intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, defendant O'Leary had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Plaintiff contends are false and misleading. Defendant O'Leary was provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Ryanair, meanwhile, controlled defendant O'Leary and all of its employees.

278. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff's reasonable costs and expenses, including attorneys' fees and expert fees; and

D. Awarding such other relief as the Court may deem just and proper.

## XIII. JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 5, 2019

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
ROBERT R. HENSSLER JR.
HILLARY B. STAKEM
TING H. LIU

s/ ROBERT R. HENSSLER JR.

ROBERT R. HENSSLER JR.

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
rhenssler@rgrdlaw.com
hstakem@rgrdlaw.com
tliu@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DOMINIC C. LoVERDE
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
dloverde@rgrdlaw.com

Lead Counsel for Lead Plaintiff and the Class

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 5, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ ROBERT R. HENSSLER JR.
ROBERT R. HENSSLER JR.

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: rhenssler@rgrdlaw.com

# Mailing Information for a Case 1:18-cv-10330-JPO City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Ryanair Holdings plc et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Robert R. Henssler , Jr**
  bhenssler@rgrdlaw.com,kmccormack@rgrdlaw.com
- **Ting Liu**
  tliu@rgrdlaw.com
- **Dominic LoVerde**
  DLoVerde@rgrdlaw.com
- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,2879289420@filings.docketbird.com,e_file_sd@rgrdlaw.com
- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Hillary B. Stakem**
  hstakem@rgrdlaw.com
- **Mitchell M.Z. Twersky**
  mtwersky@aftlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)