UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF BIRMINGHAM FIREMEN'S
AND POLICEMEN'S SUPPLEMENTAL
PENSION SYSTEM,
                              Plaintiff,

                    -v-

RYANAIR HOLDINGS PLC and
MICHAEL O'LEARY,
                              Defendants.

18-CV-10330 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

        For years, Ryanair Holdings plc, an airline, and Michael O'Leary, its Chief Executive

Officer, touted the airline's low-cost business model and expressed antipathy to unionization.  In

September 2017, however, the cancellation of hundreds of Ryanair flights due to a pilot

"rostering" error caused some observers to question Ryanair's labor practices and the

sustainability of its anti-unionization stance.  That December, Ryanair reversed its longstanding

position and announced it would accept the unionization of its employees.  During and after

these events, Ryanair downplayed the effect on its bottom line.  But subsequent announcements

about increased personnel costs and decreased profitability caused Ryanair's stock price to fall.

        As a result, Plaintiff City of Birmingham Firemen's and Policemen's Supplemental

Pension System filed this putative class action, asserting claims against Defendants under section

10(b) of the Exchange Act, Rule 10b-5, and section 20(a) of the Act.  The complaint alleges that

Defendants misled the market about the sustainability of Ryanair's labor practices, resulting in

an inflated stock price during the Class Period (from May 30, 2017, to September 28, 2018).

Defendants have moved to dismiss the complaint for failure to state a claim.  For the reasons that

follow, the motion is granted in part and denied in part.

I.      **Background**

The following facts are taken from the operative complaint (Dkt. No. 22 ("Compl.")), and are assumed true for purposes of this motion to dismiss.

Defendant Ryanair Holdings plc owns and operates an "ultra-low fare" airline based out of Europe.  (Compl. ¶ 27.)  Ryanair's Chief Executive Officer is Defendant Michael O'Leary. (Compl. ¶ 1.)  Ryanair's business model relies on minimizing operating costs in order to offer comparatively lower fares.  (Compl. ¶ 29.)  Specifically, Ryanair's success in the market is premised on its ability to minimize costs in four primary areas: "(i) aircraft equipment and finance costs; (ii) customer service costs; (iii) airport access and handling costs; and (iv) personnel costs."  (Compl. ¶ 30.)

Two events in 2017 had an effect on Ryanair's personnel relations.  The first event was a 2017 decision by the European Court of Justice (the "*Mons* decision").  Historically, Ryanair's employment contracts were both governed by Irish law and limited to the jurisdiction of Irish courts, irrespective of the location of the employee.  (Compl. ¶ 46.)  In the *Mons* decision, however, the European Court of Justice held that Ryanair employees were, in some instances, entitled to bring employment disputes in their local courts.  (Compl. ¶ 70.)  At the time, Ryanair acknowledged that the *Mons* decision would lead to more local jurisdiction over employment disputes but denied that it would affect personnel costs.  (Compl. ¶ 71.)

The second event was Ryanair's 2017 decision to recognize employee unions.  (Compl. ¶ 97.)  Historically, Ryanair had opposed the recognition of employee unions and had opted to negotiate with its employees via local "employment representation councils," each of which was required to negotiate with Ryanair separately.  (Compl. ¶ 56.)  Despite some evidence of labor unrest and personnel shortages over the course of 2017, including a pilot rostering issue in September 2017 that led to the cancellation of hundreds of flights (Compl. ¶¶ 77, 86–95),

2

Ryanair denied facing any problems with pilot hiring or retention and affirmed a commitment to "remain[ing] a nonunion company" (Compl. ¶ 94).  In December 2017, however, in response to the threat of imminent strikes, Ryanair announced for the first time that it would recognize unions for both its pilots and cabin crew.  (Compl. ¶¶ 95–97.)  The volte-face triggered a drop in Ryanair's stock price.  (Compl. ¶ 98.)

During the next year, over the course of union negotiations, Ryanair experienced labor disruptions.  In July 2018, Ryanair cancelled almost 1,000 flights because of employee strikes.  (Compl. ¶¶ 114–116.)  Further strikes in August and September led to more flight cancellations.  (Compl. ¶¶ 120, 122.)  Throughout these disruptions, Ryanair maintained that the strikes would not significantly impact its business model.  (Comp. ¶ 121.)  But in October 2018, Ryanair disclosed a thirty-two percent increase in personnel costs and a twelve percent fall in projected earnings.  (Compl. ¶¶ 125, 237.)  In response, Ryanair's stock price dropped.  (Compl. ¶ 126.)

On November 6, 2018, Plaintiff filed this action, asserting claims against Ryanair and O'Leary under section 10(b) of the Exchange Act, Rule 10b-5, and section 20(a) of the Act.  The complaint alleges that Ryanair and O'Leary knowingly made false or misleading statements about Ryanair's personnel relations, profitability, and growth targets, resulting in an inflated stock price over the Class Period.  Defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).[1]

## II.    Legal Standard

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

---

[1] Plaintiff has moved to strike the appendices and certain exhibits attached to Defendants' motion to dismiss.  (Dkt. No. 37.)  The Court has not relied on any of the appendices or exhibits at issue.  Accordingly, the motion is denied as moot.

*Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible if the well-pleaded factual allegations of the complaint, presumed true, permit the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  The heightened pleading requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737.  A securities fraud complaint based on misrepresentations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotation marks omitted).

**III.     Discussion**

Plaintiff brings claims under section 10(b) of the Exchange Act, Rule 10b-5, and section 20(a) of the Act.  Each set of claims is discussed in turn.

**A.      Claims under Section 10(b) and Rule 10b-5**

To state a claim under section 10(b) or Rule 10b-5, a plaintiff must plead, among other things, (1) "a material misrepresentation or omission by the defendant" that (2) was made with the requisite "scienter."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  Here, Plaintiff has identified three categories of potentially actionable statements: those concerning Ryanair's labor relations, those concerning Ryanair's profitability, and those

concerning Ryanair's ability to meet its growth targets.[2]  Plaintiff has adequately pleaded materiality, falsity, and scienter with respect to Defendants' statements regarding the likelihood of unionization.  Plaintiff's allegations with respect to Defendants' other statements, however, do not pass muster.  Accordingly, Plaintiff's claims under section 10(b) and Rule 10b-5 are dismissed, except for those relating to Defendants' statements addressing the likelihood of unionization.

### 1.      Scienter

Under the securities laws, the requisite scienter is "an intent to deceive, manipulate, or defraud."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000)).  Further — because a complaint asserting securities fraud must comply with the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act — a plaintiff stating a claim under section 10(b) or Rule 10b-5 must raise a "strong inference" of scienter by alleging facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  None of Plaintiff's allegations meet the first prong.  And none of Plaintiff's allegations — with the exception of those regarding the likelihood of unionization — meet the second prong.

---

[2] The Court adopts Plaintiff's own characterization of its allegations.  (*See* Dkt. No. 35 at 8 & n.3.)

a.      **Fraudulent Motive and Opportunity**

Plaintiff first argues that Defendants had the motive and opportunity to commit fraud because O'Leary sold six million shares of Ryanair stock during the Class Period, which establishes an incentive to inflate the stock price.  But the existence of insider stock sales establishes the requisite scienter under the "fraudulent motive and opportunity" prong only if Plaintiff demonstrates that the stock sales were somehow "unusual" or suspicious.  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).  Here, Plaintiff fails to allege that O'Leary's stock sales were unusual.

First, the complaint lists only O'Leary's stock sales while excluding stock purchases. (Compl. ¶ 247.)  As a result, Plaintiff has "demonstrate[d] only gross proceeds without identifying net profits."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011).  And "proceeds alone say nothing about a seller's motive."  *Id.*; *see also In re eSpeed*, 457 F. Supp. 2d at 290 (finding complaint deficient because it "d[id] not disclose whether [defendants] made any *profit* from the sales").

Second, O'Leary sold only twelve percent of his Ryanair stock holdings.  (Compl. ¶ 247.) The fact that O'Leary retained the vast majority of his stock holdings substantially undermines Plaintiff's claim that O'Leary was motivated to commit fraud.  *See, e.g.*, *Acito*, 47 F.3d at 54 (allegation that insider sold "less than 11% of his holdings" "failed to establish that [the insider's] stock sales were 'unusual'"); *Wyche v. Advanced Drainage Sys., Inc.*, No. 15-CV-5955, 2017 WL 971805, at *13 (S.D.N.Y. Mar. 10, 2017) ("[A] defendant's sale of shares comparable to 10.1% of his total holdings is not 'unusual.'").

In light of these considerations, the Court concludes that Plaintiff has failed to adequately allege a fraudulent motive.

6

b.      **Conscious Misbehavior or Recklessness**

A plaintiff who has failed to demonstrate fraudulent motive may nonetheless raise a

"strong inference" of scienter under the "conscious misbehavior or recklessness" prong, "though

the strength of the circumstantial allegations must be correspondingly greater" if there was no

underlying motive to commit fraud.  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting

*Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).  Accordingly, to survive

dismissal, the complaint must contain particularized allegations indicating either "actual intent"

to commit fraud or "conscious recklessness" — *i.e.*, a state of mind "approximating actual

intent."  *Novak*, 216 F.3d at 312 (internal quotation marks and citation omitted).

Here, Plaintiff has met this bar with respect to Defendants' statements regarding

unionization — specifically, the statements indicating a near certainty that Ryanair would not

recognize employee unions.  (*See, e.g.*, Compl. ¶ 84 (quoting O'Leary claiming that "hell

[would] freeze over" before Ryanair welcomed unions) (alteration in original); *id.* (quoting

O'Leary claiming that "there is no threat of industrial action" and that "[t]here's no union in

Ryanair"); Compl. ¶ 94 ("We will remain a nonunion company . . . .").).  These statements are

impossible to reconcile with O'Leary's subsequent admission that he had "long anticipated"

unionization — *i.e.*, that he had "two stances: [Ryanair] will ultimately be unionised . . . but for

as long as [Ryanair] can postpone unionization, we would try to postpone unionization."  (Dkt.

No. 31-33 at 3–4.)  This admission is direct evidence of Defendants' knowledge of the true

likelihood of unionization at the time they made the statements denying the existence of any

likelihood.[3]

---

[3] Plaintiff's other evidence of scienter is less compelling.  Other post-unionization
"admissions" from O'Leary, for example, are better read as statements of a present-sense
understanding, not a pre-unionization understanding.  *See* Compl. ¶ 106 ("[T]he reality is we

Defendants counter that any definite statements that unionization would not occur were "undercut by [Ryanair's] repeated, fact-specific warnings" that unionization was a possibility. (Dkt. No. 32 at 30.)  And it is true that Defendants occasionally tempered their predictions about unionization.  (*See* Dkt. No. 32 at 4 n.3 (noting that in 1998, O'Leary stated that Ryanair "will recognise unions when a majority of our people wish[] to do so"); Compl. ¶ 162 (quoting O'Leary as saying that Ryanair employees "are free to join a union, but the reality is that over our 30 years they prefer to deal directly with us and not through third-party unions and we expect that situation to continue").)  But Defendants did not always do so.  (*See, e.g.*, Compl. ¶ 162 ("[E]verybody in Ryanair who works for us is free to join a union, and if they want to do so they are free to do so.  We however are free to continue to negotiate directly with our people, and we will continue to do so.  *It will not lead to unionization in Ryanair*.").  For the latter category of statements, Plaintiff has adequately pleaded the requisite scienter.[4]

Plaintiff has failed, however, to plead scienter with respect to any of Defendants' other statements.[5]  For those statements, Plaintiff's various factual allegations, either evaluated *in*

---

were always going to be unionised at some point in time."); Compl. ¶ 123 ("Recognizing unions . . . was inevitable at some point in time.").  Statements indicating a present-sense understanding of a prior state of affairs do not give rise to an inference of scienter.  *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud."); *Holbrook v. Trivago N.V.*, No. 17-CV-8348, 2019 WL 948809, at *13 (S.D.N.Y. Feb. 26, 2019) ("[The CEO's] post hoc description of the extent of the ultimate impact . . . does not speak to what the Company knew or should have known at the time . . . .").

[4] Because Plaintiff has adequately alleged scienter, Plaintiff has also sufficiently alleged falsity.  *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018) ("[The] falsity and scienter requirements are essentially identical with regard to" "defendants' projections.").

[5] The Court observes in passing that allegations of scienter must be made with respect to *each particular statement* alleged to be false.  *See* 15 U.S.C. § 78u-4(b)(2) (requiring scienter to be established "with respect to each [statement] alleged to violate [the Act]").  Many of the

*seriatim* or *in toto*, fail to raise a strong inference of intent.  Plaintiff first relies on various "admissions" from Ryanair executives, but none of them suffice.  For example, Plaintiff cites December 2017 comments from Chief Operating Officer Peter Bellew that "a lot" of Ryanair pilots had recently resigned (Compl. ¶ 229) and that "there was a culture that people who knew there was a problem . . . were not listened to, or they were actively discouraged from even raising the issue any further" (Compl. ¶ 227).  But these general impressions fail to identify the time period during which any "problems" occurred or who knew about them.  Accordingly, these allegations cannot support a "strong" inference that either Ryanair or O'Leary made any particular false statement with the requisite scienter.  *See Novak*, 216 F.3d at 306 ("[A plaintiff must] specify the statements that the plaintiff contends were fraudulent . . . [and] explain why the statements were fraudulent." (internal quotation marks omitted)); *see also* 15 U.S.C. § 78u-4(b)(2) (requiring scienter to be established "with respect to each [statement] alleged to violate [the Act]").

Second, Plaintiff relies on the "core operations" doctrine to establish scienter.  (Dkt. No. 35 at 30–31.)  Under that doctrine, fraudulent intent can be inferred whenever "[a] defendant ma[k]es false or misleading statements" if "those statements concern[] the core operations of the company."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).  As an initial matter, it is "questionable" whether the core operations doctrine is good law after the enactment of the PSLRA.  *Glaser*, 772 F. Supp. 2d at 596 n.17; *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (Sullivan, J.) (calling the doctrine's future "tenuous").  But in any event, the doctrine, standing alone, cannot support

---

statements listed in the complaint lack any accompanying allegations whatsoever addressing scienter.

an inference of scienter.  The doctrine "at most constitutes 'supplemental support' for alleging scienter but does not independently establish scienter." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (collecting cases).

Third, Plaintiff argues that the "suspicious" resignation of Chief Operating Officer Michael Hickey supports an inference of fraudulent intent on the part of Defendants.  (Dkt. No. 35 at 33–34.)  While resignations can sometimes support an inference of scienter, they must be "highly unusual and suspicious" to do so.  *Glaser*, 772 F. Supp. 2d at 598 (quoting *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007)).  Plaintiff has pleaded no specific "facts [that] indicate that the resignation was somehow tied to the fraud alleged . . . or that defendants' scienter was otherwise evident." *Id.*  Absent such evidence Hickey's departure lends no support to a strong inference of scienter.

Fourth, Plaintiff cites the "context and timing" of Defendants' various statements.  (Dkt. No. 35 at 32–33.)  For instance, Plaintiff asserts that O'Leary "held himself out to investors as having a basis for confidently making [the] statements" while "having access to information suggesting those statements were untrue."  (Dkt. No. 35 at 32.)  This bare assertion falls far short of the particularized showing required for scienter.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004) ("[A] plaintiff [asserting] that contradictory facts were available to the defendants when they made certain statements . . . [must] describe[] [those sources] adequately.").  As for timing, Plaintiff notes that, for example, O'Leary asserted Ryanair would "remain a nonunion company" less than two months before Ryanair's bouleversement.  (Dkt. No. 35 at 32 (quoting Compl. ¶ 94).)  But "temporal proximity alone does *not* raise a circumstantial inference of fraud."  *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015) (quoting *Fant v. Perelman*, No. 97-CV-8435, 1999 WL

199078, at *13 (S.D.N.Y. Apr. 9, 1999)).  Accordingly, the allegations regarding timing cannot alone furnish the requisite evidence of scienter.

Fifth, Plaintiff argues that the sheer "magnitude" of the effect on Ryanair's operating costs supports an inference of scienter.  (Dkt. No. 35 at 34.)  The "magnitude of the alleged fraud" — assuming there was indeed fraud — "provides some additional circumstantial evidence of scienter."  *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (quoting *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008)).  But "the size of the fraud alone does not create an inference of scienter."  *Id.*

Ultimately, the inquiry is one that turns on the totality of the circumstances — *i.e.*, one that asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter."  *Tellabs*, 551 U.S. at 322.  Here, considering the complaint in its entirety, the Court concludes that Plaintiff has failed to plead facts that collectively give rise to an inference of scienter "at least as compelling" as other, innocuous explanations for Defendants' statements and conduct.  *Id.* at 324.  Accordingly, Plaintiff's remaining claims are dismissed for failure adequately to plead scienter.

### 2.        Falsity and Materiality

The complaint is independently defective because it oftentimes fails to plead a "misrepresentation or omission" by Defendants that was "material."  *Stoneridge*, 552 U.S. at 157.  To plead falsity, the plaintiff "must allege that the identified statements were either false at the time they were made or failed to contain other information that would have made them not misleading."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 577 (S.D.N.Y. 2014).  And to plead materiality, the plaintiff must demonstrate "a substantial likelihood that the disclosure of the [deception] would have been viewed by the reasonable investor as having significantly

11

altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224,

231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S.438, 449 (1976)).

    Here, Plaintiff has identified three categories of potentially actionable statements: those

concerning Ryanair's labor relations, those concerning Ryanair's profitability, and those

concerning Ryanair's ability to meet its growth targets.  Each set of statements is discussed in

turn.

### a.   Statements Concerning Labor Relations

    The first category of potentially actionable statements concerns Ryanair's labor relations.

(*See* Dkt. No. 35 at 9.)  Some of these statements are quite general.  For example, according to

the complaint, in response to concerns that Ryanair was facing pilot shortages and the threat of

strikes, Defendants "falsely represented that Ryanair was attracting pilots and crew with

'industry leading' job security and pay, 'excellent working conditions,' 'excellent rosters,' and

'unrivalled career progression.'"  (Dkt. No. 35 at 9 (quoting Compl. ¶¶ 136–138, 157–159, 163,

169, 172, 174–175, 177, 179–180, 186, 188).)

    These kinds of statements are not actionable because they are quintessential "puffery" —

*i.e.*, statements that lack materiality because they are "too general to cause a reasonable investor

to rely upon them."  *ECA*, 553 F.3d at 206.  Statements touting, for instance, Ryanair's "industry

leading pay" or "excellent" treatment of its pilots (Compl. ¶ 172) lack materiality because they

"would [not] have been viewed by the reasonable investor as having significantly altered the

'total mix' of information made available.'"  *ECA*, 553 F.3d at 197 (quoting *Basic*, 485 U.S. at

232).  Those statements are mere boosterism, the kinds of statements that "almost every [airline]

makes."  *Id.* at 206; *see also Basic Inc.*, 485 U.S. at 234 (warning against "attribut[ing] to

investors a child-like simplicity" (quoting *Flamm v. Eberstadt*, 814 F.2d 1169, 1175 (7th Cir. 1987))).[6]

Plaintiff argues that these kinds of statements are actionable because they were provided alongside attempts to reassure the market about Ryanair's labor relations, a matter "particularly important to the company and investors." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017). But the importance of Ryanair's labor relations to its business model does not perforce establish the materiality of any statement bearing on labor relations. The relevant inquiry is whether the particular statement significantly altered the "total mix" of information. *ECA*, 553 F.3d at 197 (quoting *Basic Inc.*, 485 U.S. at 232). And, again, these statements did not.

Other statements listed in the complaint are too specific to qualify as puffery. For example, the complaint alleges that Defendants inaccurately attributed the September 2017 cancellations to a mistake in "the allocation of annual leave to pilots," rather than to pilot shortages resulting from unsustainable labor practices. (Compl. ¶ 157.) As evidence, Plaintiff cites "contemporaneous employee accounts, analyst and media reports, and Ryanair management admissions." (Dkt. No. 35 at 12.) None of this evidence, however, "demonstrate[s] with specificity why" "the statements . . . were false." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). For example, the complaint cites as evidence an October 2017 letter sent to O'Leary, in which a Ryanair pilot stated that the company's "approach" to its pilots "has failed the company,

---

[6] These allegations are independently defective because Plaintiff has failed to plead falsity. Read in context, these particular statements do not even qualify as objective characterizations of Ryanair's labor practices. Ryanair's statement reads, in full, that "it's no surprise [Ryanair] continue[s] to attract hundreds of pilot applicants from other airlines, who join Ryanair for [its] industry leading pay, excellent working conditions, unrivalled career progression and brand new aircraft." (Compl. ¶ 172.) In other words, the statement refers to the subjective motivations of pilots applying to Ryanair and not Ryanair's actual market position.

13

as evidenced by the shortage of pilots that has led to the cancellations crisis."  (Compl. ¶ 89.)

The complaint sets forth no facts, however, "indicat[ing] a high likelihood that [the pilot]

actually knew [the] facts underlying [her] allegations."  *Glaser*, 772 F. Supp. 2d at 590.  The

mere fact that the speaker was a Ryanair pilot does not alone furnish an explanation of "how [the

pilot] came to learn" the reason that corporate officers at Ryanair chose to cancel flights in

September 2017. *Long Miao v. Fanhua, Inc.*, No. 18-CV-8183, 2020 WL 996602, at *19

(S.D.N.Y. Mar. 2, 2020); *see also Novak*, 216 F.3d at 313–14 ("[P]ersonal sources must be . . .

described in the complaint with sufficient particularity to support the probability that a person in

the position occupied by the source would possess the information alleged.").  The letter, then,

does not qualify as sufficient evidence of falsity.

Other attempts to establish falsity are even further afield.  Plaintiff cites, for example, "a

few analysts [who] suggested that Defendants' claimed excuse was misleading."  (Dkt. No. 35 at

14.)  But those analyst reports "provide[] no basis on which a reader could possibly evaluate the

reliability of [their] factual claim."  *Lopez v. CTPartners Executive Search Inc.*, 173 F. Supp. 3d

12, 32 n.8 (S.D.N.Y. 2016).  (*See, e.g.*, Compl. ¶ 78 (quoting analyst report stating that, "[i]n our

view, the company's reasons for its actions . . . sound like 'football manager excuses'"); *id.*

(quoting an analyst's unadorned "understanding" that "the airline has been suffering from a pilot

shortage"); Compl. ¶ 81 (quoting analyst's unsupported "belie[f]" that "Ryanair is short of

pilots").)  Nor does the resignation of Chief Operating Officer Hickey — whose replacement was

tasked with "ensur[ing] that the pilot rostering failure . . . will never be repeated" (Dkt. No. 35 at

13) — provide any basis whatsoever for concluding that Ryanair was misrepresenting the cause

of the cancellations.

The only statements concerning labor relations that meet the requirements of falsity and materiality are those addressing the likelihood of unionization.  *See supra* note 4.  Plaintiff's other claims premised on statements concerning labor relations are dismissed.

### b.      Statements Concerning Profitability

Another category of potentially actionable statements comprises those concerning the effect of two events — the *Mons* decision and the choice to recognize unions — on Ryanair's bottom line.  For both events, Defendants minimized the effect these events would have on profitability.  These statements are not actionable because, again, Plaintiff fails to allege falsity.

As for the statements relating to the *Mons* decision, Defendants predicted that *Mons* would not require an increase in pay and that it would not "change Ryanair's cost base by one cent."  (Compl. ¶¶ 155, 166.)  Plaintiff argues that these predictions were false when made because Ryanair knew that *Mons* would both require Ryanair to "pay [more in] benefits [and] social taxes" and trigger an increase in Ryanair's "litigation costs."  (Dkt. No. 35 at 21.)  In support, however, Plaintiff alleges no facts specifically indicating that Defendants possessed evidence that their predictions were wrong or misleading.  (*See* Dkt. No. 35 at 21; Compl. ¶¶ 44– 47, 72–74, 156, 168(b).)  Absent such evidence, Plaintiff has failed to "demonstrate with specificity" that "the statements . . . were false" at the time they were made.  *Rombach*, 355 F.3d at 174.

As for the statements relating to unionization, Plaintiff argues that Defendants "focus[ed] on immediate increases in staff compensation, [which] painted a misleading picture of the true impact that union recognition would have on [Ryanair's] key cost base long term."  (Dkt. No. 35

at 22 n.15.)[7]  The issue, as Plaintiff sees it, is one of emphasis: although Defendants

acknowledged some risk, they impermissibly "downplayed . . . the impact [that unionization]

would have."  (Dkt. No. 35 at 22 n.16.)

The argument that Defendants "omitt[ed] . . . material aspects of pilot and crew

employment that [Defendants] knew would also change" because of unionization (Dkt. No. 35 at

22) fails because Plaintiff must plead with specificity that Defendants knew, at the time of the

omissions, that union recognition would have a material effect on Ryanair's cost base.  *See*

*Rombach*, 355 F.3d at 174.  Plaintiff does not do so with the requisite specificity.  For example,

Plaintiff argues that Ryanair knew unionization would lead to alterations in Ryanair's

cost-minimizing labor practices.  But as support, Plaintiff cites only pre-unionization complaints

and demands from Ryanair employees.  (*See, e.g.*, Compl. ¶ 85 (citing pilots who were

"demanding changes in their contract terms"); Compl. ¶ 89 (citing pilot complaint that Ryanair's

practices were "not in line with the normal practices of [other airlines]").)  This is flimsy

evidence that Ryanair understood it to be a "foregone conclusion" that unionization would lead

to "adverse consequences."  *Acito*, 47 F.3d at 53; *see also id.* ("[D]efendants' lack of

clairvoyance simply does not constitute securities fraud."); *cf. In re Express Scripts Holdings Co.*

*Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (summary order) ("[Plaintiff] essentially argues

that Defendants should have anticipated the outcome of the negotiations sooner . . . , but in the

circumstances here, where the discussions were ongoing, Defendants did not [commit a violation

by failing to] disclose more about the uncertain state of the negotiations.").

---

[7] Notably, Plaintiff does not contest the veracity of Defendants' specific predictions about increases in staff compensation.  (Dkt. No. 22 n. 15.)

The argument that Defendants "omitted the material fact that Ryanair's business model . . . hinged on . . . operational 'flexibility'" (a factor that would be affected by unionization) fails for the same reason.  Again, there must be evidence that Defendants knew unionization would have a material effect on operational flexibility.  And the only evidence cited by Plaintiff is that, "once employees had negotiating power through their unions, they demanded that . . . this 'flexibility' . . . be eliminated."  (Dkt. No. 35 at 23 (citing Compl. ¶¶ 85, 111, 124).)  That does not suffice.  *See Acito*, 47 F.3d at 53; *cf. In re Express Scripts*, 773 F. App'x at 14.

In sum, the claims premised on Defendants' statements concerning profitability are dismissed for failure to allege falsity.

### c.      Statements Concerning Growth Targets

 The final category of statements comprises those predicting Ryanair's ability to meet its growth target of 200 million passengers by March 2024.  (*See* Compl. ¶¶ 145, 150, 183, 188, 190, 193, 198, 200–201, 224.)  Plaintiff argues that Defendants failed to disclose that Ryanair would be unable to achieve this growth target *without* unionization — specifically, because the target relied on expanding operations in union-friendly regions like France and Scandinavia. (Dkt. No. 35 at 24–26.)  Once more, Plaintiff fails to plead the falsity of these statements because it cites no specific evidence, available to Defendants at the time of the omission, establishing that the growth targets indeed required unionization.  *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 71 (S.D.N.Y. 2015) ("[T]he plaintiff 'must identify particular . . . facts going to the basis of the [defendant's] opinion — facts about the inquiry the [defendant] did or did not conduct or the knowledge it did or did not have — whose omission makes the opinion statement at issue misleading to a reasonable person.'" (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pen. Fund*, 575 U.S. 175, 194 (2015))).  Instead,

Plaintiff cites as evidence (1) the opinion of "[f]inancial analysts" that the growth targets were unrealistic without unionization and (2) post-unionization statements by O'Leary that Ryanair had "restarted negotiations with airports in France and Scandinavia," which were previously unsuccessful because of Ryanair's "antipathy to union recognition."  (Compl. ¶¶ 63, 111; *see also* Compl. ¶ 99(j).)  The former evidence is uncompelling because the opinion of third-party analysts sheds little light on the information available to Defendants when they established their growth target.  *Cf. In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) ("[T]he fact that other [analysts] may have had views different from [the defendant] does not provide any basis for an inference that [the defendant] did not believe his own professed opinions . . . .").  And the post-unionization statements from O'Leary are even less useful.  At best, they establish Defendants' post-unionization understanding that expansion into union-friendly regions like France and Scandinavia would aid Ryanair in reaching its growth targets.  But they say nothing about the falsity of the growth target — and whether it assumed that unionization was necessary — at the time it was issued.

* * *

In sum, Plaintiff has failed to establish falsity, materiality, and scienter for all of the potentially actionable statements listed in the complaint, with the sole exception of Defendants' statements regarding the likelihood of unionization.  Accordingly, Plaintiff's section 10(b) and Rule 10b-5 claims are dismissed, with the exception of those premised on Defendants' statements regarding the likelihood of unionization.

### B.   Claim under Section 20(a)

Plaintiff also alleges control-person liability under section 20(a) of the Act.  To establish a prima facie case of control-person liability, a plaintiff must successfully allege a primary violation.  *See ATSI*, 493 F.3d at 108.  Plaintiff has failed to allege any primary violation, with

the exception of the statements regarding the likelihood of unionization.  Accordingly, Plaintiff's claims under section 20(a) are dismissed, except for those premised on Defendants' statements regarding the likelihood of unionization.

### C.    Leave to Amend

In the event of dismissal, the plaintiffs have requested leave to amend the complaint. (Dkt. No. 35 at 35.)  Under Federal Rule of Civil Procedure 15(a), leave to amend shall be freely granted "when justice so requires."  Typically, district courts "grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)."  *ATSI*, 493 F.3d at 108.  Accordingly, leave to amend is granted.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Plaintiff's motion to strike is DENIED as moot.

The Clerk of Court is directed to close the motions at Docket Numbers 30 and 37.

SO ORDERED.

Dated:  June 1, 2020
        New York, New York

_____
                    J. PAUL OETKEN
                United States District Judge