UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――
CITY OF BIRMINGHAM FIREMEN'S
AND POLICEMEN'S SUPPLEMENTAL
PENSION SYSTEM,
                              Plaintiff,

            -v-

RYANAIR HOLDINGS PLC, *et al.*,
                              Defendants.
―――――――――――――――――――――――――――――――

18-CV-10330 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

In this putative securities class action, Lead Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System sues Ryanair Holdings plc ("Ryanair") and Ryanair CEO Michael O'Leary under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder. This Court previously dismissed the first amended complaint in part for failure to state a claim. Lead Plaintiff moves to further amend the complaint. For the reasons that follow, Lead Plaintiff's motion is denied.

**I.    Background**

The Court assumes familiarity with the factual background and procedural history of this case. (*See* Dkt. No. 52 at 2-3.)

**II.   Legal Standard**

The parties dispute whether Rule 15 or Rule 16 of the Federal Rules of Civil Procedure governs the motion for leave to file a second amended complaint. (*See* Dkt. No. 89 ("Pl.'s Memo") at 7-9; Dkt. No. 97 ("Defs.' Opp'n") at 10-12; Dkt. No. 100 ("Pl.'s Reply") at 3-4.) Rule 15(a)(2) permits amendment "only with the opposing party's written consent or the court's leave" and directs that "[t]he court should freely give leave when justice so requires." The

1

operative case management order confirms that "[f]urther amended pleadings may not be filed, and additional parties may not be joined, except with leave of the Court." (Dkt. No. 78 ("CMP") ¶ 3.). Although Rule 15 "provides that leave to amend 'shall be freely given when justices so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)).

### III.  Discussion

Denial is appropriate because the motion for leave to amend imposes undue prejudice, evinces bad faith, and would be futile.

#### A.  Undue Prejudice

Granting leave to amend would impose undue prejudice. An amendment causes undue prejudice where it would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). Granting leave here would require Defendants to expend significant additional resources to conduct discovery and significantly delay the resolution of the disputes in this matter. First, granting leave would "negate [prior] work, waste [prior] efforts, and largely send the parties back to the discovery drawing board." *In re Int. Rate Swaps Antitrust Litig.*, No. 16-MC-2704, 2018 WL 2332069, at *22 (S.D.N.Y. May 23, 2018). On June 20, 2020, the Court dismissed the first amended complaint, except for those claims "premised on Defendants' statements regarding the likelihood of unionization." (Dkt. No. 52 at 19.) Lead Plaintiff moved for leave to file a second amended complaint on March 31, 2021. (*See* Dkt. No. 88.) In the meantime, "the parties have spent nearly a year in negotiations over

discovery, including to identify custodians, craft search terms, negotiate a protection order, and perform other pre-discovery work responsive to Plaintiffs' requests — all of which was focused on addressing" the remaining claim on the likelihood of unionization.  (Defs.' Opp'n at 16.) Given the breadth of Lead Plaintiff's proposed amendment, granting leave to amend "would require counsel to start negotiating anew the expanded universe of discovery issues"; "would require developing and testing new potential search terms to gauge the utility and burden of each"; and "would require counsel to revisit prior compromises based on the aggregate burdens for [Defendants] in light of the added burdens presented by the amended allegations and extended time period."  *In re Int. Rate Swaps Antitrust Litig.*, 2018 WL 2332069, at *22.

Second, granting leave to amend would "effectively overrule the Court's rulings . . . excluding . . . a host of . . . topics from the scope of permitted discovery."  *Id.*  Since Lead Plaintiff announced that it did not intend to amend the complaint, the parties have briefed three discovery disputes.  (*See* Dkts. No. 66-67; Dkt. No. 77; Dkt. No. 86.)  Most notably, on February 4, 2021, the Court resolved dozens of requests relating to the scope of discovery.  It set "a one-year period before the stated class period" — "that is, one year before May 30th, 2017" — as "the general period of time for search documents."  (Dkt. No. 77 ("Feb. 4, 2021 Conf. Tr.") at 23:21-24.)  It set December 15, 2017, as the "end of the default period," except that "post period statements that go to scienter . . . would still [need to] be produced."  (Feb. 4, 2021 Conf. Tr. at 24:5-8.)  It excluded "information on Ryanair's labor practices generally and government investigations regarding such practices."  (Feb. 4, 2021 Conf. Tr. at 24:10-15.)  It excluded "post-corrective disclosure information."  (Feb. 4, 2021 Conf. Tr. at 24:16-18.)  It generally excluded "information on employee grievances and threats of industrial action, loss of staff, and difficulties with staffing at Ryanair."  (Feb. 4, 2021 Conf. Tr. at 24:22-25:6.)  It excluded "Mr.

O'Leary's stock sales . . . stock and stock buybacks." (Feb. 4, 2021 Conf. Tr. at 25:25-26:1.) Were Lead Plaintiff granted leave to file the proposed second amended complaint, "[i]t would almost certainly open up new rounds of protracted litigation over discovery disputes." *In re Int. Rate Swaps Antitrust Litig.*, No. 16-MC-2704, 2018 WL 2332069, at *22. The "large additional expenditures of time and effort that would be required by the court and parties" favor denial. *In re "Agent Orange" Prod. Liab. Litig.*, 220 F.R.D. 22, 26 (E.D.N.Y. 2004).

### B. Bad Faith

In addition, Lead Plaintiff's motion for leave to amend evinces bad faith. "The possibility of bad faith is, in and of itself, reason to deny" a motion for leave to amend. *Rotter v. Leahy*, 93 F. Supp. 2d 487, 496 (S.D.N.Y. 2000). Bad faith exists where counsel "conveyed a misleading impression" that "claims were fixed." *In re Int. Rate Swaps Antitrust Litig.*, No. 16-MC-2704, 2018 WL 2332069, at *19. That is the case here. For almost a year, in the operative case management and scheduling orders, Lead Plaintiff has consistently stated that it did "not intend to amend the operative complaint pursuant to the Court's June 1, 2020 Order." (Dkt. No. 58 ("CMP") ¶ 3; Dkt. No. 74 ("Am. CMP") ¶ 3.) At the February 4, 2021 conference, the Court ruled on the understanding, which Lead Plaintiff did not contradict, that there was "one set of claims left" — "the claims related to the likelihood that Ryanair employees would unionize"; "[t]here was no amendment to the complaint"; and other claims were "not going to be revived." (Feb. 4, 2021 Conf. Tr. at 3:8-12, 17:23-25, 24:3-4.) Remaining "silent on the prospect of a motion for leave to amend" at that conference is "indicative of bad faith." *In re Gen. Elec. Co. Sec. Litig.*, No. 09-CV-1951, 2012 WL 2892376, at *5 (S.D.N.Y. July 12, 2012).

Bad faith also exists where the earlier decision not to plead additional allegations "was a tactical one." *State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990); *see Oneida Indian Nation of New York State v. Cnty. of Oneida, N.Y.*, 199 F.R.D. 61,

4

80 (N.D.N.Y. 2000) ("A finding that a party is seeking leave to amend solely to gain a tactical advantage . . . also supports a finding that such an amendment is made in bad faith.")  The evolution of this matter suggests that the amendment here is tactical.  Lead Plaintiff waited until after the Court set the scope of discovery to move for leave to file a second amended complaint, and the proposed second amended complaint would revive excluded issues.  That pattern — where a party "has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave" — evinces bad faith.  *Id.* at 418; *cf. In re Gen. Elec. Co. Sec. Litig.*, 2012 WL 2892376, at *5 (denying leave to amend where "Plaintiff made a tactical decision to . . . wait until after the Court's judgment to alter substantially its legal theory").  Accordingly, the Court exercises its discretion to deny leave to file a further amendment.

  **C.**  **Futility**

Lastly, to the extent that Lead Plaintiff seeks to revive previously dismissed claims, the proposed second amended complaint is futile.  A proposed amendment is futile when it "would not withstand a motion to dismiss."  *Thea v. Kleinhandler*, 807 F.3d 492, 496 (2d Cir. 2015).  The proposed second amended complaint asserts that Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and the SEC's Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  (*See* Dkt. No. 89-1 ("SAC") ¶¶ 299-303.)  It further asserts that Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons of Ryanair.  (*See* SAC ¶¶ 304-307.)  The proposed amendment attempts to revive claims relating to statements concerning Ryanair's labor relations in general; Ryanair's profitability; and Ryanair's ability to meet its growth targets.  (*See* Dkt. No. 52 at 12; Pl.'s Memo at 11-22.)

These proposed amendments still would not withstand a motion to dismiss.  To state a claim under section 10(b) or Rule 10b-5, a plaintiff must plead, among other things, (1) "a material misrepresentation or omission by the defendant" that (2) was made with the requisite "scienter."

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  Even assuming that Lead Plaintiff has now adequately pleaded falsity and materiality, as before, the proposed amendments still do not adequately allege scienter.  A plaintiff stating a claim under section 10(b) or Rule 10b-5 must raise a "strong inference" of scienter by alleging facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Lead Plaintiff still has not done so.

### 1.     Motive and Opportunity

The proposed second amended complaint still does not adequately allege that Defendants had a "motive and opportunity" to commit fraud.  *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).  To plead a motive to commit fraud, a plaintiff must allege "that the individual defendants received a 'concrete and personal benefit' from making their alleged misrepresentations" or actionable omissions.  *Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 57 (2d Cir. 2018) (summary order).  The only concrete and personal benefit identified in the proposed second amended complaint is a set of stock sales by Michael O'Leary.  The Court previously rejected his sales as a basis for scienter on the grounds that "O'Leary sold only twelve percent of his Ryanair stock holdings," and "[t]he fact that O'Leary retained the vast majority of his stock holdings substantially undermines Plaintiff's claim that O'Leary was motivated to commit fraud."  (Dkt. No. 52 at 6.)  Lead Plaintiff has not addressed this defect.  *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (concluding that stock sales were not "unusual" where insider sold "less than 11% of his holdings").  Instead, Lead Plaintiff offers an expert's analysis of the stock sales.  (*See, e.g.*, SAC ¶ 259) (describing expert's "opinion").  Such expert opinions are "inappropriate at the pleading stage" because "opinions cannot

6

substitute for facts under the [Private Securities Litigation Reform Act ("PSLRA")]. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).

### 2. Conscious Misbehavior or Recklessness

Nor does the proposed second amended complaint allege facts reflecting "strong circumstantial evidence of conscious misbehavior or recklessness." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d at 39. Such behavior must be "highly unreasonable" and "an extreme departure from the standards of ordinary care," *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001), *i.e.*, "a state of mind approximating actual intent," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). The proposed amendment does not meet this high bar.

Lead Plaintiff first attempts to show scienter by alleging that Ryanair CEO Michael O'Leary had "knowledge of facts or access to information contradicting [his] public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). But "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309. The second amended complaint does not adequately identify any statement made accessible to Defendant O'Leary. Instead, in roundabout fashion, the proposed amendment alleges that Chief Operations Officer ("COO") Michael Hickey received an unspecified "written warning from senior personnel within the Flight Operations department" of a "critical shortage of experience pilots that was likely to negatively impact flight operations"; that the Flight operations managers started discussing these problems in "a weekly Monday meeting"; and then "the problem" was "flagged for O'Leary." (SAC ¶¶ 72-73.) Such allegations do not raise a strong inference of scienter because they simply do not identify any statements conveyed to Defendant O'Leary or identify what information those statements contained. When the proposed second amendment complaint does get to Defendant O'Leary, it alleges that he "received detailed correspondence delivered via his secretary's email account notifying him that

7

Hickey, Clear, and others in the Flight Operations department had been consistently forewarned by senior Flight Operations managers . . . of a shortage of experience pilots and unsustainable experienced pilot attrition problems and that these known trends and risks would force the airline to cancel flights due to the shortage of experienced pilots." (SAC ¶ 229.) Putting aside the fact that this message was sent to his secretary, absent information about who sent this information, and what this message said, it is not possible to assess Defendant O'Leary's knowledge. *See Novak*, 216 F.3d at 313-14 ("[P]ersonal sources must be . . . described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.")

Likewise, the proposed amendment does not adequately identify any report made accessible to Defendant O'Leary. It does allege that COO Michael Hickey received "data-based reports from Ryanair's Netline system showing that up to 40 experience pilots were leaving per week." (SAC ¶ 72.) But there is no allegation that Defendant O'Leary received or had access to this report. Elsewhere, the proposed second amended complaint does allege that a Ryanair employee provided O'Leary with "reports" on "critical operational issues" such as "pilot numbers . . . and pilot production" (SAC ¶ 230), but it does not specify what these reports contained, and so it does not raise an inference about O'Leary's knowledge about the facts alleged to contradict his public statements — namely, the number of experienced pilots.

The rest of the proposed amendment rehashes arguments previously rejected by this Court or easily dispatched. The purported "admissions" by senior officials only admit that employee relations were Defendant O'Leary's "biggest focus at the moment," which does not facilitate an inference of any fraudulent intent. (*See* SAC ¶ 220.) Lead Plaintiff alleges that COO Michael Hickey resigned in part because he mishandled a pilot shortage, but Lead Plaintiff

8

has not alleged facts "non-speculatively linking the resignation[] . . . to the . . . alleged fraud" here, *i.e.*, *inter alia*, the *concealment* of the pilot shortage. *See Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 415 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). Lead Plaintiff invokes the "core operations" doctrine (*see* SAC ¶ 230), but that doctrine "does not independently establish scienter." *Lipow v. Netl UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (collecting cases). Lead Plaintiff emphasizes Defendant O'Leary's background as "an extremely focused, detailed, cost-conscious, and ruthless businessman" (SAC ¶ 225), but a "hands-on management style" is also "insufficient to establish scienter on its own." *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021).

As always, the inquiry is one that turns on the totality of the circumstances — *i.e*, one that asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322. Considering the proposed second amended complaint in its entirety, the Court concludes that Lead Plaintiff has once again failed to propose facts that collectively give rise to an inference of scienter "at least as compelling" as other, innocuous explanations for Defendants' statements and conduct. *Id.* at 324. Because Lead Plaintiff has not adequately pleaded scienter, the proposed amendment is futile.

### IV.   Conclusion

Lead Plaintiff's motion for leave to further amend the complaint (Dkt. No. 88) is DENIED.

The parties are directed to file a joint letter addressing the status of discovery and proposed next steps within 14 days after the date of this opinion and order.

SO ORDERED.

Dated: September 22, 2022
New York, New York

_____
J. PAUL OETKEN
United States District Judge